UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLENE LIBERTY, JOHN DAPONTE,
JOHN DAVIS, DUANE GOMES, ADAM HANRAHAN,
and CHARLES KENNER,
on behalf of themselves and all others
similarly situated; and
DISABILITY RIGHTS RHODE ISLAND,                    NO.: 19 CV 573

on behalf of its constituents,

                            Plaintiffs,

                                                   **CLASS ACTION**
              v.                                   **COMPLAINT FOR**
                                                   **DECLARATORY AND**
                                                   **INJUNCTIVE RELIEF**

RHODE ISLAND DEPARTMENT OF
CORRECTIONS;
PATRICIA COYNE-FAGUE,
in her official capacity as the Director of the
Rhode Island Department of Corrections;
MATTHEW KETTLE, in his official capacity as
Assistant Director of Institutions and Operations; and
BARRY WEINER, in his official capacity as
Assistant Director of Rehabilitation Services,

                            Defendants.


## I.     INTRODUCTION

1.        The Rhode Island Department of Corrections (RIDOC) and the individual

Defendants (the "Defendants") subject hundreds of people to prolonged solitary confinement in

tiny, frequently filthy cells where they are kept locked down for 22 to 24 hours a day for weeks,

months, and even years at a time.  While in solitary confinement, these men and women have

little human contact or access to exercise, fresh air and sunlight, or other environmental

stimulation.  The Defendants impose these overly harsh conditions on people who have been

sentenced to prison and on those who are detained pretrial.

1

2.	Defendants systematically subject persons with Serious and Persistent Mental Illness (SPMI) to these conditions of prolonged solitary confinement despite knowing the serious risk of harm these conditions pose.  These risks are well established by decades of research, federal court cases, and professional standards.  Indeed, RIDOC set up a Residential Treatment Unit (RTU) as an alternative to solitary confinement after public and legislative condemnation of its practice of placing individuals with SPMI in solitary confinement.  But the RTU is insufficient to ameliorate the negative impacts of solitary for people with SPMI and only has the capacity to enroll eight men at a time despite the scores of individuals with SPMI in solitary confinement on any given day in RIDOC.  Moreover, the Department never set up any RTU for women so there are no alternatives – however insufficient – to solitary confinement for women with SPMI.  As a result, Defendants continue to subject hundreds of people with SPMI to severe, debilitating isolation.

3.	Defendants, by statewide policy and practice of isolating people with SPMI in these inhumane conditions, subject individuals to serious psychological harm and increasingly acute symptoms.  Many individuals are already experiencing perceptible harm, including increased symptoms of anxiety, depression, social withdrawal, paranoia, agitation, and suicidal ideation.  Defendants deny or ignore individuals' administrative grievances and written requests to be removed from solitary confinement due to the harm they are experiencing in such conditions.  Defendants are deliberately indifferent to the serious risk of harm caused by these conditions.

4.	Plaintiff, Disability Rights Rhode Island (DRRI), on behalf of itself and in its representative capacity on behalf of its constituents who are people with SPMI, and the Individual Plaintiffs, on behalf of themselves and the Class they represent (collectively with

DRRI, "the Plaintiffs") bring this case to remedy violations of the Eighth and Fourteenth Amendments to the United States Constitution involving the use of solitary confinement on people with SPMI and the great harm and risk of harm it creates for them. These conditions of solitary confinement are not and cannot be ameliorated by the highly deficient mental health care Defendants provide to people with SPMI in the isolation units. Additionally, Plaintiffs seek to remedy Defendants' discrimination against people with SPMI in their use of solitary confinement and their failure to provide people with SPMI equal access to RIDOC's programs, services and activities, and failure to provide access to services in the most integrated setting, to which Plaintiffs are entitled under the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973. Plaintiffs seek declaratory and injunctive relief on behalf of prisoners with SPMI.

5.        Without the requested relief, these individuals will continue to suffer conditions of extreme isolation, placing them at risk of decompensation, self-harm, and additional injuries, and they will face continued discrimination and limitations on accessing the programs, services and activities they need to return successfully to the community.

## II.        JURISDICTION AND VENUE

6.        This action arises under the United States Constitution and 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343.

7.        This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1343, 2201 and 2202. This Court also has authority under the

ADA (42 U.S.C. § 12205), Section 504 of the Rehabilitation Act (29 U.S.C. § 794a(b)) and 42

U.S.C. § 1988 to award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because

Defendants reside in the District of Rhode Island; venue is also proper pursuant to 28 U.S.C. §

1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs'

claims occurred in the District of Rhode Island.

### III.    CLASS ACTION ALLEGATIONS

9.      Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), the Individual

Plaintiffs Charlene Liberty, John DaPonte, John Davis, Duane Gomes, Adam Hanrahan, and

Charles Kenner bring this action on behalf of themselves and a Class of all RIDOC prisoners and

detainees identified as SPMI by RIDOC, who are now, or will in the future be, subject to solitary

confinement.  "Solitary Confinement" is defined by RIDOC's definition of "restrictive housing"

as:

> Any type of detention that involves removal of an inmate from general
> population, voluntarily or involuntarily; placement in a locked room or cell,
> whether alone or with another inmate; and the inability to leave the room or cell
> for the vast majority of the day, typically 22 hours or more.

*See* Policy 12.27 DOC at § III.E.

### 1.      Fed. R. Civ. P. 23(a)(1):  Impracticability of Joinder

10.      The Class is so numerous that joinder of all members is impracticable.  There are

hundreds of prisoners and detainees identified by Defendants as SPMI who have been, are, or

will be in solitary confinement at the RIDOC facilities.  According to RIDOC, approximately 15

to 20% of its entire incarcerated population is identified as having SPMI on any given day.[1] Over the course of a year, RIDOC reported to DRRI that approximately 100 people with SPMI were held in its solitary confinement units.  The proposed Class also includes prisoners and detainees who will be subject to solitary confinement in the future.  Therefore, the Class is so numerous that joinder of all Class members is impracticable.

11.     The Class members are identifiable using methods of assessment and/or records maintained in the ordinary course of business by the RIDOC.

**2.     Fed. R. Civ. P. 23(a)(2):  Commonality**

12.     All statewide solitary confinement policies are centrally promulgated, disseminated, and enforced from RIDOC central headquarters by Defendants.  These policies apply equally to all Class members.  As such, there are questions of law and fact common to the entire Class, including but not limited to:

a)     Whether Defendants' policy and practice of not providing a housing environment free of debilitating solitary confinement and inhumane conditions to prisoners and detainees with SPMI poses a substantial risk of serious harm.

b)     Whether denying Class members' basic human needs by locking them in solitary confinement for typically 22 hours a day for weeks, months or years at a time violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishments Clause of the Eighth Amendment.

c)     Whether locking people with SPMI in solitary confinement because of their disabilities violates the ADA and Section 504 of the Rehabilitation Act.

---

[1] RIDOC website, Mental Health Services, http://www.doc.ri.gov/rehabilitative/health/behavioral_mental.php (last viewed October 18, 2019).

d)      Whether failure to make reasonable modifications to policies, procedures, and practices to meet the needs of people with SPMI, resulting in their placement in solitary confinement, violates the ADA and Section 504 of the Rehabilitation Act.

e)      Whether housing people with SPMI in solitary confinement violates the integration mandate of the ADA and Section 504 of the Rehabilitation Act.

13.      Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

### 3.      Fed. R. Civ. P. 23(a)(3):  Typicality

14.      The claims of the Individual Plaintiffs are typical of those of the Class, as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law, as the Class claims.

### 4.      Fed. R. Civ. P. 23(a)(4):  Adequacy of Representation

15.      Each of the named Plaintiffs will fairly and adequately represent the interests of the Class and will diligently serve as a Class representative.  Their interests are co-extensive with those of the Class, and they have retained counsel experienced in complex class action litigation and prisoners' rights litigation.  Putative Class Counsel possess the experience and resources necessary to fairly and adequately represent the Class.

### 5.      Fed. R. Civ. P. 23(b)

16.      This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the Class includes scores of people at any given time, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants.  Additionally, the prosecution of separate actions by individuals could result in adjudications with respect to

individual class members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

17.     This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Class are common to and apply generally to all members of the Class.  All statewide solitary confinement policies are centrally promulgated, disseminated, and enforced from RIDOC central headquarters by Defendants.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Class as a whole.

## IV.     PARTIES

**Plaintiffs**

18.     Plaintiff Charlene Liberty is a thirty-six year old woman diagnosed by RIDOC with SPMI and a history of depression, head injury, substance use disorder, learning disabilities, and childhood trauma.  She has substantial limitations in thinking, concentrating, learning, caring for herself, interacting with others, and controlling her behavior.  During 2019, Defendants held Ms. Liberty in solitary confinement in the disciplinary confinement unit where women are housed for both rule violations and psychiatric observation at the Women's Facility.  The conditions in solitary confinement drive Ms. Liberty to engage in serious self-injurious behaviors, including multiple suicide attempts.  Exacerbating her mental health problems, Defendants have also pepper-sprayed Ms. Liberty as a result of these self-injurious behaviors while in solitary.  In response to her symptomatic behaviors, Defendants ordered that she be placed in leg shackles and belly chains, as well as a restraint chair, and that pepper-spray be used to address self-harm behaviors.  She has been hospitalized after attempting suicide, and then

returned to the solitary confinement unit.  Defendants punished Ms. Liberty with solitary confinement for attempting suicide.

19.     Ms. Liberty has fully exhausted her complaint regarding conditions of confinement in solitary confinement under RIDOC Policy 13.10-4 (Prisoner Grievances).  She filed the grievance on or about June 1, 2019.  She did not receive a response, and so, per policy, she was entitled to appeal, and filed a Level II appeal.  She has exhausted administrative remedies.

20.     Plaintiff John DaPonte is a fifty-one-year-old man with a diagnosis of SPMI and epilepsy from RIDOC.  He has substantial limitations in thinking, concentrating, interacting with others and controlling his behavior.  Mr. DaPonte has a lengthy history of solitary confinement.  As a result of disciplinary sanctions, he was given a sentence of 365 days in solitary in August 2017, and then kept in solitary under the rubric of "administrative confinement."  While in solitary confinement, he experiences increased symptoms and greater difficulties managing his mental illness and is unable to access adequate mental health care, including individualized therapy, and unable to access the art classes he finds therapeutic.  He is confined at the Maximum Security Facility.

21.     Plaintiff DaPonte has fully exhausted administrative remedies regarding the impact of solitary confinement on his mental state and lack of mental health care in solitary confinement under then-current policy 18.11-2 (Prisoner Complaints Relative to Health Care Services).  He first attempted to secure relief from Health Care Services staff by sending a letter to a staff member regarding his complaints on March 22, 2019, and by submitting a mental health request on April 27, 2019.  When he received no relief, he wrote to the Medical Program Director on June 19, 2019.  In doing so, he exhausted administrative remedies under RIDOC

policy.  Plaintiff DaPonte also exhausted administrative remedies regarding a denial of access while in solitary confinement to the art classes that he finds so therapeutic and helpful for his mental health conditions.  He filed a complaint pursuant to RIDOC Policy 13.10-4 (Prisoner Grievances), and received a Level II appeal decision dated July 25, 2019 upholding the original denial.

22.     Plaintiff John Davis is a forty-six year old man with a history of psychosis and a diagnosis of SPMI from RIDOC.  He has substantial limitations in thinking, concentrating, learning, interacting with others and controlling his behaviors.  Mr. Davis has been confined in the Medium, Maximum and High Security facilities at RIDOC.  He is currently in solitary confinement at the Maximum Security facility.  During his incarceration, Defendants have repeatedly placed Mr. Davis in solitary confinement where he experiences auditory and visual hallucinations, as well as suicidal ideation due to the conditions of confinement.

23.     Plaintiff Davis has fully exhausted administrative remedies regarding conditions of confinement in solitary confinement under policy 13.10-4 (Prisoner Grievances).  He filed his prisoner grievance regarding conditions of confinement in solitary while he was on administrative confinement status.  After his grievance was denied, he appealed the grievance, thereby exhausting administrative remedies.  The Level II appeal decision dated June 4, 2019 was returned as unprocessed on the basis that it was grieving an ungrievable classification determination.

24.     Plaintiff Duane Gomes is a twenty-four year old man diagnosed by RIDOC with SPMI and a history of learning disabilities and mental health hospitalization in the community. Mr. Gomes has substantial limitations in thinking, concentrating, learning, interacting with others and controlling his behavior.  When Mr. Gomes was held pre-trial at the Intake Service

Center, he was placed in solitary confinement as a result of incurring over 190 days of disciplinary sanctions.  After he was moved to the Maximum Security facility, he continued to be placed in solitary, having accumulated over two years of disciplinary sanctions for multiple behavioral issues related to his mental illness.  While in solitary, he decompensated as a result of the conditions of confinement and lack of access to programming, exercise and other out-of-cell activities.

25.     Plaintiff Gomes has fully exhausted administrative remedies regarding unconstitutional conditions of confinement in solitary confinement pursuant to RIDOC's grievance policy.  On February 5, 2019, he filed a grievance regarding his conditions of confinement in the segregation unit.  He did not receive a response to this grievance within the fifteen working days required per policy, so Mr. Gomes filed his Level II appeal to fully exhaust administrative remedies.

26.     Plaintiff Adam Hanrahan is a thirty-four-year-old man diagnosed by RIDOC with SPMI and a recent history of cancer.  Mr. Hanrahan has substantial limitations in thinking, concentrating, caring for himself, interacting with others and controlling his behavior.  He has a history of suicide attempts, auditory hallucinations, and paranoia.  While confined, he has engaged in self-injurious behavior for which he was placed in solitary.  Being placed in solitary confinement causes Mr. Hanrahan to experience hallucinations and depression.  He is currently confined within the Maximum Security Facility.

27.     Plaintiff Hanrahan has fully exhausted his complaint regarding the harm he experiences due to conditions of confinement in solitary confinement under policy 13.10-4 (Prisoner Grievances).  On June 23, 2019, he filed a grievance regarding his conditions of

confinement.  Mr. Hanrahan did not receive a response to that grievance, so he filed an appeal, thereby exhausting administrative remedies.

28.      Plaintiff Charles Kenner is a twenty-six-year-old man with a history of treatment for SPMI as a child and in RIDOC.  Defendants prescribe him anti-depressants and anti-psychotic medications.  As a result of his impairments, Mr. Kenner has substantial limitations in thinking, concentrating, interacting with others and controlling his behavior.  Since 2013, he has been subjected to significant amounts of time in solitary confinement in the Intake Service Center and High Security Center, including sanctions of over 365 days of disciplinary confinement for multiple infractions.  While in solitary confinement, Mr. Kenner experiences heightened mental health symptoms, including greater difficulties controlling his behavior and suicidal ideation.  He is currently in solitary confinement at the High Security Center.

29.      Plaintiff Kenner has fully exhausted administrative remedies regarding conditions of confinement in solitary confinement under Policy 13.10-4 (Prisoner Grievances).  He filed a grievance dated June 13, 2019.  Four days later he received a response indicating that the complaint related to discipline, is not a grievable issue.  Mr. Kenner appealed this response on or about June 19, 2019 thereby exhausting administrative remedies.

30.      Plaintiff Disability Rights Rhode Island (DRRI) is the not-for-profit Rhode Island corporation that is the designated Protection and Advocacy (P&A) agency for the State of Rhode Island.  P&A agencies are created pursuant to federal laws designed to protect individuals with mental health, developmental and other disabilities, including the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI) 42 U.S.C. § 10801 *et seq.*, the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15041 *et seq.*, and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e.  Pursuant to PAIMI, DRRI is authorized

to pursue administrative, legal, and other appropriate remedies to ensure that individuals with mental illness are protected from abuse and neglect, 42 U.S.C. §§ 10802, 10805, and "to ensure that the rights of individuals with mental illness are protected." 42 U.S.C. § 10801(b)(1). As a P&A, DRRI is tasked under law to protect and advocate for the rights of individuals with mental illness by ensuring the enforcement of the Constitution and federal and state statutes. 42 U.S.C. § 10801(b)(2)(A).

31.     Consistent with PAIMI, DRRI's governing structure allows its constituents to express their collective views and protect their collective interests. DRRI has a PAIMI Advisory Council that includes individuals with mental illness who have significant input into the goals and objectives of DRRI, as well as a Board of Directors that includes individuals with disabilities.

32.     The PAIMI Act requires that sixty percent (60%) of the PAIMI Advisory Council's members are persons "who have received or are receiving mental health services," or are the family members of such individuals. 42 U.S.C. § 10805(a)(6)(B). DRRI reviews its activities at each PAIMI Advisory Council meeting and discusses potential future activities with the PAIMI Advisory Council three times per year. As required by 42 U.S.C. § 10805(a)(7), the PAIMI Advisory Council reports annually on its activities and its assessment of DRRI's activities as part of DRRI's funding source reporting.

33.     DRRI's Board of Directors is "composed of members… who broadly represent or are knowledgeable about the needs of the clients served by the system[,]" and includes the chairperson of the PAIMI Advisory Council. 42 U.S.C. § 10805(c)(1)(B). The Board of Directors has responsibility for planning, designing, and ensuring the functioning of the system. 42 U.S.C. § 10805(c)(2).

34.      As the P&A for the State of Rhode Island, DRRI's actions are informed by its PAIMI Advisory Council and Board of Directors, which develop and approve annual priorities for DRRI's activities pursuant to 42 U.S.C. § 10805(a)(6)(a) and (c)(2)(B).  For several years, the Board and Council have supported and approved eliminating the use of solitary confinement for prisoners with mental illness as a priority activity for DRRI.  A member of the PAIMI Advisory Council is also a constituent who was incarcerated at RIDOC as a result of behavior related to mental illness and thereafter sent to the state forensic hospital.

35.      The PAIMI Act also mandates that DRRI put certain procedures in place to ensure that its constituents have insight into how DRRI is run and the ability to provide input and feedback, as well as the ability to raise any grievances or concerns.  *See* 42 U.S.C. § 10805(a)(8) ("[P&As shall] on an annual basis, provide the public with an opportunity to comment on the priorities established by, and the activities of, the system[.]"); 42 U.S.C. § 10805(a)(9) ("[P&As shall] establish a grievance procedure for clients or prospective clients of the system to assure that individuals with mental illness have full access to the services of the system and for individuals who have received or are receiving mental health services, family members of such individuals with mental illness, or representatives of such individuals or family members to assure that the eligible system is operating in compliance with the provisions of [PAIMI]").

36.      In compliance with these requirements of PAIMI, DRRI participates in a series of annual public forums held throughout Rhode Island for individuals with disabilities that are designed to solicit feedback from individuals with disabilities on the priorities of the organization.  DRRI also has a grievance procedure in place that complies with the federal PAIMI requirements and ensures that individuals receive necessary services.

37.      DRRI is pursuing this action to protect and advocate for the rights of people with mental illness in the custody of the Rhode Island Department of Corrections (RIDOC). Many of the people incarcerated by RIDOC have mental illness, as that term is defined in 42 U.S.C. § 10802(4), and are qualified individuals with a disability, as defined in 42 U.S.C. § 12131(2) and pursuant to 29 U.S.C § 794(a). As such, they are constituents of DRRI. RIDOC is a "facility" rendering care and treatment for the mentally ill as that term is defined in 42 U.S.C. § 10802(3). The interests DRRI seeks to vindicate by bringing this lawsuit – the protection of the rights of institutionalized individuals with mental illness – are germane to DRRI's central purpose.

38.      Prior to the commencement of this action, DRRI spent considerable time and resources monitoring the conditions of confinement and treatment of people with SPMI in RIDOC custody and in responding to communications from its constituents incarcerated in RIDOC facilities. In the course of its monitoring, RIDOC identified to DRRI individual prisoners and pre-trial detainees with SPMI held in solitary confinement. DRRI provided a report to RIDOC in April 2017 with its findings regarding the harmful conditions of confinement and unmet mental health needs of these identified constituents. Subsequent to that report, DRRI continued to investigate the ongoing needs and conditions of confinement of prisoners and detainees with SPMI. The individual Plaintiffs and other DRRI constituents identified below, Mr. A, Mr. B, Ms. C, Mr. D, Mr. E, Mr. F, Mr. G, Mr. H, Mr. I, Mr. J, and Mr. K, are individual RIDOC prisoners or detainees who have SPMI.

39.      On February 10, 2019, DRRI sent a letter describing the continuing risk of harm to its constituents with mental illness posed by Defendants' policies and practices related to solitary confinement, and requested a meeting with RIDOC leadership. DRRI met with Defendants Coyne-Fague and Kettle, as well as the former Clinical Director of Behavioral

14

Health Services, Caitlin Bouchard, the current Acting Clinical Director of Behavioral Health

Services, and legal counsel.  However, Defendants failed to agree to take any actions to eliminate

the use of solitary confinement on people with SPMI or ameliorate the harmful conditions of

confinement in solitary confinement units within RIDOC.

40.     In addition to its monitoring work, DRRI has spent considerable resources

investigating the conditions of confinement and the unmet needs of its constituents with SPMI in

RIDOC's facilities, and seeking RIDOC's elimination of these conditions and accommodation of

its constituents needs.  The prior and continuing use of DRRI resources for this purpose has

diminished the resources available to DRRI to advocate for the civil and human rights of other

individuals with mental illness and to undertake other permissible activities under PAIMI.

41.     DRRI brings this matter on behalf of individuals with SPMI, but the Court has the

authority to cure Defendants' violations of the Constitution and federal law without requiring the

individual participation of DRRI's constituents.  No individualized determination is required in

order to grant the systemic relief requested by DRRI in this matter.

42.     DRRI's constituents who are in Defendants' custody are rarely able to complete

the Department's confusing and convoluted administrative grievance process.  This is especially

the case for those suffering the most acute disabilities, those who are decompensating due to the

harsh, isolating conditions of solitary confinement, and those whose disability-related needs

Defendants fail to accommodate.  Not only are many of DRRI's constituents incapable of

managing the complexity of the Defendants' administrative grievance process, but many are also

thwarted from doing so due to fears of retaliation by staff, as well as lack of access to forms,

Defendants' failure to respond to grievances once filed, and punishment for filing grievances.

Defendants have not provided DRRI access to grievance forms or allowed DRRI to file

grievances on behalf of its constituents in Defendants' custody, nor have Defendants allowed DRRI access to the Defendant's records of the grievances of its constituents despite repeated requests.

43.     DRRI has its offices located at 33 Broad Street, Suite 601, Providence, Rhode Island, 02903.

**Defendants**

44.     Defendant Rhode Island Department of Corrections (RIDOC) is a department of the State of Rhode Island established to provide for the supervision, custody, care, discipline, training, and treatment of persons committed to state correctional institutions or on probation or parole so that those persons may be prepared for release, aftercare, and supervision in the community.  RIDOC operates a unified correctional system, having custody of pre-trial detainees as well as sentenced persons.  Defendant RIDOC is a public entity within the meaning of Title II of the ADA.  RIDOC receives state and federal funds for the operation of its prison and pre-trial facilities and has received such funds at all times relevant to this Complaint.

45.     Defendant Patricia Coyne-Fague is the Director of RIDOC, and since her appointment on March 7, 2019, has acted within the scope of her employment.  As Director, she has the authority to establish correctional facilities and enforce standards and policies for the same; manage, direct, and supervise the operations of RIDOC; approve the administration by the assistant directors of RIDOC; establish, maintain, and administer programs for sentenced and detained prisoners, including, but not limited to, education, training, and employment of prisoners; and establish a classification system for the purpose of developing individualized programs for each sentenced prisoner that will address each prisoner's individual treatment and rehabilitative needs.  *See generally* R.I. GEN. LAWS § 42-56-10 (2019).  Defendant Coyne-

Fague authorizes or condones the unconstitutional and unlawful policies and practices described herein.  Therefore, Defendant Coyne-Fague directly and proximately has caused and continues to cause the constitutional and statutory violations set forth herein.  At all relevant times, Defendant Coyne-Fague has acted under color of state law and as an official representative of the RIDOC. She is sued in her official capacity.

46.     Defendant Matthew Kettle is the Assistant Director of Institutions and Operations, and at all relevant times has acted within the scope of his employment.  He is responsible for the general administration of RIDOC's correctional facilities, which includes the determination of appropriate levels of custody, classification and services for prisoners.  Defendant Kettle authorizes or condones the unconstitutional and unlawful policies and practices described herein. Therefore, Defendant Kettle directly and proximately has caused and continues to cause the constitutional and statutory violations set forth herein.  At all relevant times, Defendant Kettle has acted under color of state law and as an official representative of the RIDOC.  He is sued in his official capacity.

47.     Defendant Barry Weiner is the Assistant Director of Rehabilitative Services at RIDOC, and at all relevant times has acted within the scope of his employment.  Among other services, he oversees health, educational, vocational, and re-entry services for prisoners. Defendant Weiner authorizes or condones the unconstitutional and unlawful policies and practices described herein.  Therefore, Defendant Weiner directly and proximately caused and continues to cause the constitutional and statutory violations set forth herein.  At all relevant times, Defendant Weiner has acted under color of state law and as an official representative of the RIDOC.  He is sued in his official capacity.

17

## IV.    FACTS

**Defendants Subject Men and Women to a Uniform Policy of Solitary Confinement at Nearly All RIDOC Facilities**

48.     RIDOC operates six (6) detention and correctional facilities on the Pastore Government Center Complex in Cranston, Rhode Island, collectively called the Adult Correctional Institutions (ACI).  During Fiscal Year 2018, the ACI housed on average 2,748 prisoners in its six facilities: the Intake Service Center, the Women's Facility, and the High Security, Maximum, Medium, and Minimum Facilities.

49.     The Anthony P. Travisono Intake Service Center (ISC) is a maximum security facility serving as Rhode Island's state-wide jail for men.  Its average population was 842 men during Fiscal Year 2018.  In addition to the pre-trial population, ISC also houses newly sentenced prisoners awaiting classification to other facilities and sentenced prisoners in protective custody.

50.     The Gloria McDonald Awaiting Trial Medium Security Facility (the "Women's Facility") houses women detainees awaiting trial as well as three classification levels of sentenced women prisoners (medium, minimum and work release).  Women prisoners and detainees are housed together in the same solitary confinement housing unit at this facility along with women confined for "psychiatric observation."  The average population of this facility for Fiscal Year 2018 was 140 women.

51.     The High Security Center (HSC) is a self-contained super-maximum security facility that houses prisoners who allegedly "require close custody, control, and security."  The majority of men housed in this facility are in solitary confinement.  The average daily population during Fiscal Year 2018 at HSC was 88 men.

52.      The Maximum Security facility opened in 1878 and has six housing units, including a specifically designated segregation unit that houses prisoners in solitary confinement. Other housing areas of this facility are also used to house men in solitary confinement.  The population includes prisoners with longer sentences, as well as prisoners transferred for behavioral reasons.  The average population of this facility for Fiscal Year 2018 was 411 men.

53.      The John J. Moran Medium Security Facility houses prisoners classified as "medium security."  The average daily population was 1,024 men in Fiscal Year 2018, including men held in solitary confinement.

54.      The Minimum Security Facility houses prisoners who are on work-release, are employed within the institution, or are seeking employment, unless they are unable to work.  The average daily population at this facility was only 278 men in Fiscal Year 2018, although the operational capacity of the facility is 708 people.

55.      All of these facilities, except for Minimum Security, hold people in solitary confinement.  Over the course of a year, hundreds of men and women will be subjected to solitary confinement in these facilities.  And all of these facilities operate under the same common policies, practices, and procedures related to the use of solitary confinement in RIDOC.

56.      "Solitary confinement" has been variously defined.  According to the U.S. Department of Justice (DOJ), it encompasses "any type of detention that involves … [r]emoval from the general prisoner population… placement in a locked room or cell, whether alone or with another prisoner; and [i]nability to leave the room or cell for the vast majority of the day, typically 22 hours or more."[2]

---

[2] U.S. Dep't Justice, Rep. and Recommendations Concerning the Use of Restrictive Housing at 3 (Jan. 2016), available at https://www.justice.gov/archives/dag/file/815551/download.

57.     The RIDOC uses the term "restrictive housing" as a euphemism for solitary confinement in its policy language applicable to all facilities, but its description of such housing is very similar to the definition used by the DOJ.  RIDOC policy defines "restrictive housing" as:

> Any type of detention that involves removal of an inmate from general population, voluntarily or involuntarily; placement in a locked room or cell, whether alone or with another inmate; and the inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

RIDOC Policy and Procedure, 12.27 DOC, *Conditions of Confinement* § III.E (effective date 2/26/18), available at:

http://www.doc.ri.gov/documents/administration/policy/policies/12.27_Conditions%20of%20Confinement_02-26-2018_Y.pdf (hereinafter "Policy 12.27 DOC").  According to RIDOC policy and procedure there are several classification names for restrictive housing/solitary confinement used in the Department, including administrative confinement, administrative detention, and disciplinary confinement.  *See* Policy 12.27 DOC at § III.E(1)-(3).

**Defendants Lock People in Inhumane Conditions of Solitary Confinement for Months at a Time**

58.     Defendants have a statewide policy and practice of confining hundreds of prisoners and detainees in solitary confinement housing units in conditions of enforced idleness, social isolation, and sensory deprivation, and are deliberately indifferent to the resulting substantial risk of serious harm inflicted on these individuals.

59.     Over the last several decades, mental health and correctional experts have increasingly documented the harmful effects of solitary confinement.  Common side effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.  *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J.,

concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)).

60.     Defendants impose solitary confinement on men and women in their custody as discipline ("disciplinary confinement") and as a response to assessed risk or conduct (for example, "administrative confinement" and "administrative detention").  *See* Policy 12.27 DOC at § III.E(1)-(3).  Under statewide policy and procedure, Defendants significantly restrict the movement, human interaction, access to programming, and exercise of people on these and other statuses.  *See* Policy 12.27 DOC at § IV.B(2)(3), (6), (7), (8).  Regardless of the reason for placement, all prisoners and detainees in these statuses are subject to RIDOC's unified, statewide policy and practice of solitary confinement.  *See* Policy 12.27 DOC at § III.E(1)-(3).

61.     Solitary confinement in RIDOC is designed to minimize human contact and environmental stimulation.  Most prisoners and detainees in solitary confinement are held in cells with solid steel doors with a food port and a small visual surveillance window.  None of these cells has access to fresh air.  These cells are extremely small, typically no larger than a parking spot, with very limited furnishings, such as a bed, writing table and stool, and a combined toilet and sink.  People placed in solitary confinement must sleep, eat, urinate and defecate in their cells.

62.     In these conditions of abnormal sensory deprivation, some people find it difficult to tell time and become disoriented and confused, not knowing the date or whether it is day or night.  Because the cells are often illuminated 24 hours a day, many people find sleep difficult and this lack of sleep further contributes to disorientation and mental deterioration, especially for people with SPMI.

63.     By statewide policy and practice, Defendants typically only allow people in solitary confinement out of their cells for one hour a day, five days per week for "recreation," and possibly "education, rehabilitation or other programming."  During their time out of cells, people must also shower, although under RIDOC policy and practice, people in solitary are generally only allowed to shower three times a week for 10 to 15 minutes.  On weekends, people in solitary confinement are almost never allowed to leave their cells, so they typically spend days at a time locked down with no respite from the four walls of their tiny cell.

64.     "Recreation" for people in solitary confinement in RIDOC consists of time spent in the "rec pens," which are barren cages with no exercise equipment.  The cages are typically small and similar in appearance to a large dog kennel.  Some segregation units, such as those at the Intake Service Center, do not even have the limited outdoor exercise space afforded by "rec pens."  Defendants provide no outside exercise to men held in solitary confinement at the Intake Service Center.  As a result, the men held in this unit can spend weeks or months without being able to see the sky or feel sunshine on their face.  Due to the insufficient exercise areas provided by RIDOC, some prisoners and detainees in solitary confinement receive no outdoor exercise for months on end; all receive insufficient exercise and out-of-cell activity to preserve their physical and mental health.

65.     The impact on people of being locked down alone in tiny cells nearly all of the time is compounded by the harsh conditions and severe restrictions Defendants impose on all aspects of their lives.

66.     Under statewide policy and practice, Defendants shackle, cuff, and often strip search people in solitary confinement every time they leave their cells, even for routine recreation, medical appointments, and visits.  *See* Policy 12.27 DOC at § IV.B(6).  The strip

searches are humiliating and degrading and often make people with SPMI and/or histories of trauma refuse to leave their cells.

67.     Under statewide policy and practice, visitation and phone calls are severely restricted for people in solitary confinement, with no visitation allowed for prisoners and detainees in disciplinary confinement.  *See* Policy 12.27 DOC at § IV.B(7).  Contact visits are severely restricted and often not allowed at all.  As a result, people in solitary confinement can go weeks or months without touching another human being.

68.     People in solitary confinement live in barren environments with very little personal property.  In fact, under RIDOC policy and practice, prisoners and detainees in solitary confinement rarely have access to televisions, radios, or music players to help them pass the time.  *See* Policy 12.27 DOC at § IV.B, Attachment 1.

69.     As a matter of statewide policy and practice, Defendants also deny people in solitary confinement the opportunity to practice their religion in a congregate setting, and access to clergy is extremely limited.

70.     People in RIDOC's solitary confinement units go months or even years with extremely limited and grossly abnormal human interaction.  Other than having a very rare opportunity for a brief medical or legal appointment, people in solitary are isolated from virtually all normal human contact.  Their only consistent interaction with another human being occurs when officers deliver food trays through a slot in their door, when medical/mental health staff conduct brief, cell-front status checks, when they are able to shout through steel doors at other prisoners in solitary, or when officers strip-search them or place them in restraints while being taken to or from showers, medical appointments or the "rec pens."

23

71.     Because people in solitary confinement are generally locked down in their cells, they cannot have normal human conversations with other people.  Their only avenues of communication are to yell through vents in their cells or to scream loudly enough for people to hear through the cell walls and door.  Even where individuals are confined in one cell together while in solitary confinement – often referred to as being "double-celled" – such confinement means that human interactions are grossly abnormal.[3]

72.     These solitary confinement units can be extremely loud.  For some individuals, and especially for some with SPMI, the isolation leads to decompensation in their mental status so that they repeatedly scream and rattle and kick at their doors.  This cacophony then echoes throughout the unit.  The chaos and noise of these units can be unbearable and damaging to prisoners' mental health.

73.     In addition, due to the harsh and debilitating conditions in solitary confinement, many people, and especially those with SPMI, throw or smear feces, urine, or food inside and outside their cells.  This creates unsanitary conditions in which people are forced to live, sleep and eat.  Because Defendants fail to maintain clean conditions of confinement on these units, they are often contaminated and infested with vermin.

74.     Despite the known impacts of solitary confinement on human beings, by statewide policy and practice, Defendants place no limits on the length of time a person can spend in solitary confinement.  The duration of solitary confinement can extend to one year or more.  At the end of 2018, the average length of time in administrative confinement was 208 days, and the average length of time in disciplinary confinement was 25 days.  Defendants

---

[3] The practice of "double-celling" people in solitary confinement, often due to over-crowding in solitary confinement units, is so common that both the DOJ and the RIDOC definitions of solitary confinement/restrictive housing include being placed in a cell alone or with another person. *See supra* ¶¶ 56-57.

subjected each of the Individual Plaintiffs, the putative Class, and the constituents of DRRI with SPMI to substantial periods in solitary confinement, including months and even years of isolation.

**Defendants Subject People with Serious and Persistent Mental Illness (SPMI) to the Inhumane Conditions and Known Dangers of Solitary Confinement**

75.     Contrary to the practice in many states mandated by law, court orders, and professional standards, Defendants' policy and practice allows for people with SPMI to be housed in solitary confinement, and Defendants knowingly hold prisoners and detainees designated as SPMI in solitary despite the serious known risks associated with this practice.

76.     RIDOC records indicate that at any given time 15 to 20 percent of prisoners and detainees at the ACI have an "SPMI" designation.[4]  During the Special Commission hearings, referenced in paragraphs 103 – 106, Caitlin Bouchard, RIDOC's Acting Clinical Director of Behavioral Health Services testified that up to 23 percent of the people held in solitary confinement by RIDOC over the course of a fifteen month period were designated SPMI.

77.     RIDOC recognizes the definition of SPMI to include those conditions affecting individuals eighteen years of age or older who have been diagnosed with a mental illness such as schizoaffective disorder, schizophrenia, other specified schizophrenia spectrum and other psychotic disorders, bipolar disorder(s), delusional disorder, major depressive disorder, panic disorder, agoraphobia, post-traumatic stress disorder, obsessive-compulsive disorder, and borderline personality disorder.  For purposes of this Complaint the term "SPMI" refers to the definition used by RIDOC.

---

[4] RIDOC uses Severe and Persistent Mental Illness (SPMI) as a designation for a subset of individuals with mental illness.  As discussed in paragraphs 77-78, RIDOC's definition of SPMI does not encompass the full meaning of SPMI or "serious mental illness" as generally recognized in the community at large.

78.     RIDOC's definition of SPMI overlaps with—but is more limited than—the commonly used definition of "serious mental illness" (SMI) that is generally utilized in the community, correctional institutions, mental health standards and court cases.[5]

79.     The Individual Plaintiffs are all SPMI as defined by RIDOC and have all suffered decompensation while subjected to solitary confinement.  Plaintiffs Adam Hanrahan and John Davis experience hallucinations while confined to solitary and Plaintiffs Charles Kenner, John Davis, and Charlene Liberty have all expressed suicidal ideation or attempted suicide while placed in solitary confinement.  Defendants continued to place Plaintiff Davis in solitary confinement, despite his longstanding chronic hallucinations, and prior experience of worsening hallucinations in solitary.  Moreover, the majority of Plaintiff DRRI's constituents in RIDOC custody are SPMI as defined by RIDOC.  Many of these constituents have suffered or will suffer serious harm in solitary confinement.  All of them are at substantial risk of such serious harm.

80.     Despite the well-known harms of solitary confinement, especially for those with mental illness, by statewide policy and practice Defendants punish prisoners and detainees with solitary confinement if they engage in desperate acts of self-harm and self-mutilation.  For

---

[5]A more widely accepted definition of SPMI or SMI would include the following: 1) Individuals with SMI who have been determined to be within the priority population of the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities and Hospitals ; or 2) Individuals psychiatrically hospitalized as an inpatient at the Eleanor Slater Hospital or Ward; or 3) Individuals diagnosed by a licensed clinician with any of the following mental illnesses:  a) Cognitive disorders (e.g., traumatic brain injuries, Cognitive Disorder Not Otherwise Specified); b) Schizophrenia (all subtypes); c) Schizoaffective Disorder (all subtypes); d) Paranoid Disorder (e.g., Delusional Disorders); e) Major Depressive Disorder (all subtypes); g) Other Psychotic Disorders (e.g., Schizophreniform, Psychotic Disorder Not Otherwise Specified); or 4) Individuals diagnosed by a licensed clinician with another mental disorder, not listed above, that has resulted in significant functional impairment, defined as:  a) the inability to attend to and effectively perform the usual or necessary activities of daily living; b) an extreme impairment of coping skills, rendering the patient exceptionally vulnerable to unintentional or intentional victimization and possible mismanagement; or c) behaviors that are bizarre and/or dangerous to self or others.

example, in May 2019, Plaintiff Charlene Liberty, a woman with a long history of mental illness who is recognized by RIDOC as SPMI, attempted suicide by hanging and self-mutilation.   Her condition was so severe that she was sent to an emergency room and then to a psychiatric and intensive care stay at Kent Hospital.  On May 16, 2019, after her return from the psychiatric hospital to RIDOC, she was immediately placed in the solitary confinement unit as punishment for her suicidal behavior.  Weeks later, on June 4, 2019, Plaintiff Liberty was still in solitary confinement.

81.      By statewide policy and practice, correctional staff retain the ultimate discretion to pursue disciplinary sanctions, including solitary confinement.  Although RIDOC policy requires mental health staff to review disciplinary reports daily and to consult with the facility warden to discuss whether the reported misconduct was the result of symptoms of mental illness or to what extent the sanction interferes with a prisoner's/detainee's treatment, their consultations are non-binding.  As a result, many prisoners receive disciplinary charges for behavior that is a symptom of their mental illness.  The more severe a prisoner's mental illness, the more likely they are to become trapped in solitary confinement due to symptomatic behavior, where the harsh conditions will exacerbate their mental illness still further.  As a result, prisoners and detainees with mental illness not only receive disciplinary charges for acts of self-harm and self-mutilation, but they are also punished with solitary confinement for non-threatening conduct that is similarly symptomatic of their illnesses, such as shouting, kicking the doors, smearing or throwing their feces.

82.      The case of DRRI constituent Ms. C illustrates Defendants' policy and practice. Ms. C is a forty-one year old woman with a long history of anxiety and obsessive-compulsive disorder (OCD).  When Ms. C arrived at the ACI as a detainee, she was taken off a medication

and then was not given the scheduled follow-up appointment with the psychiatrist.  Her

condition worsened as a result.  She was subsequently placed in the solitary confinement unit for

filing daily medical slips and washing her hands too frequently – behavior that is entirely

predictable for someone with anxiety disorder and OCD, especially someone who has been taken

off her medication.

83.     People in solitary confinement receive minimal contact with psychiatrists and

mental health clinicians.  They do not have access to the same mental health treatment and

programming available to prisoners and detainees in general population units.  The interactions

that people in solitary confinement have with mental health staff members often consist of only

short "cellfront" contacts in which the staff member shouts through the cell door.  In these

interactions, staff typically only ask the prisoner or detainee how they are feeling and whether

they want to harm themselves.  Many prisoners and detainees reported to DRRI that meetings

with mental health staff often occur within earshot of both officers and other prisoners and that

they do not feel comfortable discussing such private medical matters in an open setting.  The

cursory mental health treatment available to prisoners and detainees with SPMI in solitary

confinement in no way ameliorates the harmful conditions of isolation to which Defendants

subject them.

84.     Compounding this minimal mental health treatment in solitary confinement is

Defendants' pattern of using force as a first resort in reaction to what is often disability-related

behavior on the part of prisoners and detainees with SPMI in the solitary confinement units.

Force is used on people who are deemed, correctly or not, to have disrupted facility operations,

disobeyed facility rules, engaged in self-harm, or disrespected staff.  In many instances, the use

of force, and pepper-spray in particular, is completely unnecessary to control behavior or

28

maintain order in the facility.  Instead, it is often an over-reaction to disability-related behavior by staff who lack adequate training in the signs and symptoms of mental illness, de-escalation techniques, and the management of people with mental illness.

85.     In the case of Plaintiff Liberty, a correctional officer pepper-sprayed her on May 5, 2019, for engaging in the self-injurious behavior of running head first into the door and diving off the sink/toilet two times.  A medical staffer noted in her record that when he entered her cell he was overcome by pepper-spray and had to immediately exit to put on another mask.  When he returned to her cell he noted that she was foaming at the mouth, had cyanosis (bluish discoloration) of the neck and face, and was twitching as if experiencing a seizure.  He had her immediately removed from the cell and sent to the emergency room.  After another incident of self-injurious behavior on May 12, 2019, medical staff wrote in Ms. Liberty's file that a multi-disciplinary team had decided that upon her return from the hospital she would immediately be placed in belly and leg chains and be monitored by an officer armed with pepper-spray.  This was to be the "treatment plan" to prevent her from biting her tongue or other acts of self-harm.  On May 16, 2019, Plaintiff Liberty returned to the prison after receiving psychiatric and intensive care in the hospital.  Her records note that after she threatened to bang her head on the wall and bite her tongue, while both her hands and feet were shackled, officers again pepper-sprayed her.  She was returned to solitary confinement after these incidents.  Similarly, RIDOC officers pepper-sprayed Plaintiff DRRI's constituent Mr. G for symptomatic behavior when he threatened to jump off his cell sink and hurt himself while in solitary confinement.

86.     This excessive use of force on individuals with SPMI in solitary confinement is also exemplified in the experience of DRRI constituent Mr. F.  On January 3, 2019, Mr. F became agitated and distraught while in solitary confinement at the Intake Service Center and

was brought to the infirmary with a red ring around his neck that appeared to be a ligature mark. He was put on "Crisis Management Status."  On January 5, 2019, Mr. F was again brought to the infirmary in a state of mental health crisis.  While in the infirmary, he was pepper-sprayed for "resisting" being cuffed after being stripped naked in anticipation of being placed in psychiatric observation.  Records note that corrections officers sprayed him to "enforce compliance."  The following day, medical records note that Mr. F had significantly deteriorated with odd behaviors, disorganized thought process, nonsensical speech, and uncontrollable crying.  After this traumatic incident, Defendants disciplined him for his symptomatic behavior by sentencing him to 20 more days in solitary confinement.

87.     In 2018, in response to public outcry over the poor treatment of people with SPMI in solitary confinement, RIDOC developed a Residential Treatment Unit (RTU) for a limited number of sentenced male prisoners with SPMI.  This unit was supposed to be an alternative to solitary confinement.  But it generally enrolls no more than eight individuals at a time, including both people who would have been subject to solitary confinement and other prisoners not assigned to solitary confinement who need a higher level of clinical care as determined by RIDOC.  As a result, even the few RTU beds are not all used as an alternative to solitary confinement for people with SPMI.

88.     The bed capacity of the RTU is insufficient to house the number of individuals with SPMI who are currently in solitary confinement in RIDOC.  DRRI interviewed and reviewed the records of individuals who meet the criteria to be housed in the RTU rather than solitary confinement.  For example, after DRRI constituent Mr. D tried to commit suicide in January of 2019 after eight months in solitary confinement, he repeatedly requested to be removed from isolation because of the pain it causes him, and tried to get placed in the RTU.  As

of May 2019, he was still on a waiting list for RTU placement and he has not subsequently been admitted.

89.     While the RTU is entirely insufficient for the needs of male prisoners who have SPMI, women prisoners do not have access to an RTU at all.  There is no alternative to solitary confinement for women with SPMI in the RIDOC.  Instead, they languish in solitary confinement subject to the well-known, heightened risks of harm to people with SPMI.

90.     Pre-trial detainees with SPMI who are housed at the Intake Services Center also generally do not have access to the RTU or any alternative to solitary confinement.

91.     Additionally, conditions in the RTU can be damaging even to the few prisoners with access.  By policy, the aspirational goal of the RTU is to provide each prisoner with 10 hours of out-of-cell structured time and 10 hours of out-of-cell unstructured time per week.  However, this level of treatment is not actually required under RIDOC policy.  In practice, this level of treatment and out-of-cell time is frequently not achieved.

92.     In particular, sanctioning for disciplinary reasons occurs at the RTU, and includes placement in an "accountability cell," with isolation and a loss of privileges, such as employment, TV and radio, and loss of rehabilitative programming.  In DRRI's review of medical records and interviews of prisoners and detainees, it discovered a pattern of expelling patients from the RTU program for predictable, symptomatic behavior.  For example, DRRI constituent Mr. B, who experiences paranoia and delusions, was terminated from the RTU after a letter was found in his cell detailing an inappropriate relationship he believed he had with an RTU counselor.  Thereafter, he was placed in lockdown for twenty-three hours a day.  DRRI constituent Mr. H was also terminated from the RTU for "being negative" and allegedly encouraging others to be negative, although records often document his positive participation

and impact on other participants.  Likewise, Plaintiff Duane Gomes was terminated from the RTU for allegedly being disruptive and non-compliant with his treatment plan, despite his SPMI designation and long history of psychiatric hospitalization in the community and various diagnoses of depression, anxiety, ADHD, mood disorder, and reading disorder.  Simply being disruptive or noncompliant are predictable problems for individuals with SPMI and should not be grounds for termination – even though a review of Plaintiff Gomes' records shows Defendants' justification for termination to be inconsistent with the vast majority of group progress notes made by clinicians.  After terminating him from the RTU, Defendants put Plaintiff Gomes back in solitary confinement for several months.

93.     As discussed in paragraph 87-92 above, prisoners who have been determined appropriate for the RTU have been terminated from the RTU despite their need for mental health treatment.  Others, like DRRI constituent Mr. G, have had their admission to the RTU delayed because the facility warden required that Mr. G remain in solitary for approximately 30 days before entering the RTU.

94.     From its opening in February 2018 until December 14, 2018, only 23 male prisoners were housed in the RTU.  During that same period of time, RIDOC housed over 100 people it identifies as SPMI in solitary confinement.

**Defendants are Deliberately Indifferent to the Harm Inflicted on Individuals with SPMI Housed in Solitary Confinement**

95.     The devastating effects of solitary confinement are well-known to Defendants. An abundant psychiatric literature beginning in the Nineteenth Century[6] has documented the

---

[6] Over a century ago, the Supreme Court noted that:

> [Prisoners subject to solitary confinement] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still,

adverse mental health effects of isolation and Rhode Island prisoners are no exception. These devastating impacts of solitary confinement place all individuals at risk of harm. The most widely documented consequences of solitary confinement are its psychological effects. These include anxiety, ranging from persistent low-level stress to full-blown panic attacks; depression, ranging from flat/low mood to major depression; increased anger, ranging from irritability to outbursts of violence; cognitive disturbances, ranging from decreases in concentration to total disorientation; perceptual distortions, ranging from hypersensitivity to hallucinations affecting all five senses; paranoia and psychosis, ranging from obsessive thoughts to full blown psychosis; and increased risk of suicide and self-harm.[7] These effects frequently manifest within hours or days of placement in solitary confinement, worsening with time and causing permanent damage

---

committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168 (1890).

[7] For example, *see*: Bruce Arrigo & J. Bullock, *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change*, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, Criminal Justice and Behavior, 33, 760-781 (2006); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, Washington University Journal of Law & Policy, 22, 325-383 (2006); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 124-156 (2003); Craig Haney, *Restricting the Use of Solitary Confinement*, Annual Review of Criminology, 1, 285-310 (2018); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, New York Review of Law & Social Change, 23, 477-570 (1997); and Peter Smith, *The Effects of Solitary Confinement on Prison Prisoners: A Brief History and Review of the Literature*, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

to individuals, especially those held in solitary confinement settings for months or years.[8]  These

effects are caused by the three main factors inherent in solitary confinement – social isolation,

enforced idleness and inactivity, and oppressive security and surveillance procedures (and the

weapons, hardware, and other paraphernalia that go along with them).

96.        There is a well-known risk of self-harm, self-mutilation and suicide for

individuals in solitary confinement.  A 2007 study investigating attempted suicide in six state

prison facilities in Oregon identified solitary confinement as one of the main risk factors in

suicidal thoughts and suicide attempts.[9]  Another study recently found that prisoners in solitary

confinement in New York City jails were 6.9 times more likely to harm themselves than those in

the general population.[10]  Even more tragically, approximately fifty percent of all prisoner

suicides occur among prisoners in solitary confinement, even though prisoners in solitary usually

---

[8] *See* Nadia Ramlagan, *Solitary Confinement Fundamentally Alters the Brain, Scientists Say*, AAAS.org (Feb. 15, 2014), http://www.aaas.org/print/4706, (describing emerging neuroscience findings that solitary confinement is likely to permanently alter the brain); Joseph Stromberg, *The Science of Solitary Confinement*, Smithsonian (Feb. 19, 2014), http://www.smithsonianmag.com/science-nature/science-solitary-confinement-180949793/?no-ist (same); *see also* Shruti Ravindran, *Twilight in the Box*, Aeon, http://aeon.co/magazine/living-together/what-solitary-confinement-does-to-the-brain/ (summarizing research on animals  in isolation and conditions of sensory deprivation); David Brooks, *The Archipelago of Pain*, N.Y. Times, Mar. 7, 2014, http://www.nytimes.com/2014/03/07/opinion/brooks-the-archipelago-of-pain.html?hpw&rref=opinion (describing and condemning the  psychological torment of long-term solitary confinement and referencing studies of animals in comparable conditions); and Paul Gendreau, N.L. Freedman, G.J.S. Wilde & G.D. Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency  During Solitary Confinement*, 79 J. OF ABNORMAL PSYCHOL. 54, 57-58 (1972) (finding lower levels of brain function, including a decline in EEG activity after only seven days  in solitary confinement).
[9] Ildiko Suto, Doctoral Dissertation, *Prisoners Who Attempted Suicide in Prison: A Qualitative Study* at 43, Pac. Univ. (July 27, 2007), goo.gl/1ZGqpo; Am. Psychiatric Ass'n, *Psychiatric Services in Correctional Facilities* at 14 (3d ed. 2016).
[10] Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Prisoners*, 104 AM. J. PUB. HEALTH 442, 442- 447 (Mar. 2014), goo.gl/dma34K.

constitute only a small percentage of the total prisoner population.[11]  One court noted that solitary confinement in Indiana resulted in a disproportionately higher percentage of suicides compared with prisoners in the general population.[12]

97.     Solitary confinement is even more predictably damaging for people with SPMI. For these prisoners and detainees, their illness may be exacerbated by exposure to solitary confinement, resulting in mental decompensation and increased risk of permanent harm or even death.[13]  The extreme deprivations imposed by solitary confinement exacerbate symptoms of mental illness or provoke a recurrence, and can cause severe impairment in one's ability to function.[14]  A 2016 U.S. Department of Justice (DOJ) report, aimed at offering recommendations for safely reducing the use of "restrictive housing" (a euphemism for solitary confinement), includes guiding principles for American correctional facilities.  These Guidelines state that "inmates with serious mental illness (SMI) should not be placed in restrictive housing."[15]  Similarly, Human Rights Watch recommends that prisoners with mental disabilities should not be housed in solitary confinement.[16]

98.     Recognizing the dangers associated with solitary confinement for individuals with SPMI, numerous correctional and medical organizations have issued statements opposing its use on these individuals.  The American Correctional Association, which promulgates standards for

---

[11] Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement* at 11 (2011), goo.gl/ERzw3z.
[12] *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, No. 1:08-CV-01317-TWP-MJD, 2012 WL 6738517, at *16 (S.D. Ind. Dec. 31, 2012).
[13] *See, e.g.*, Jeffrey Metzner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY L. 104 (2010).
[14] Human Rights Watch, *Callous and Cruel: Use of Force against Prisoners with Mental Disabilities in US Jails and Prisons* at 32-36 (May 2015), goo.gl/3n2j9S.
[15] U.S. Dep't Justice, Rep. and Recommendations Concerning the Use of Restrictive Housing at 99 (Jan. 2016), goo.gl/ky0xEg.
[16] Human Rights Watch, *Callous and Cruel*, *supra* note 14.

and provides voluntary accreditation to correctional facilities, recommends that "[a]n individual diagnosed with a serious mental illness will not be placed in Extended Restrictive Housing, unless the multidisciplinary service team determines there is an immediate and present danger to others or the safety of the institution."[17]  The National Commission on Correctional Health Care (NCCHC), which promulgates national health care standards for correctional facilities, states that "mentally ill individuals … should be excluded from solitary confinement of any duration."[18]  In 2012, the American Psychiatric Association (APA) issued a formal policy statement against solitary confinement, noting that "[p]rolonged segregation of adult prisoners with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such prisoners."[19] And the American Medical Association recently called for the elimination of solitary confinement for individuals with mental illness and the implementation of alternatives to solitary confinement in all correctional facilities.[20]

99.     Indeed, the harms of solitary confinement for human beings generally have been recognized in many different forums.  For example, the American Bar Association (ABA) urges that "[s]egregated housing should be for the briefest term and under the least restrictive

---

[17]  Am. Corr. Ass'n Restrict Housing Standard 4-RH-0031 (Jan. 2018), http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/Restrictive_Housing_Committee/ACA_Member/Standards_and_Accreditation/Restrictive_Housing_Committee/Restrictive_Housing_Committee.aspx?hkey=458418a3-8c6c-48bb-93e2-b1fcbca482a2.

[18]  Nat'l Comm. On Corr. Health Care, *Position Statement on Solitary Confinement* (Apr. 2016), https://www.ncchc.org/solitary-confinement.

[19]  APA, *Position Statement on Segregation of Prisoners with Mental Illness* (2012; 2017), https://www.psychiatry.org/home/policy-finder.

[20]  Am. Medical Assoc., *Reducing the Use of Restrictive Housing in Prisoners with Mental Illness*, Res. 412.2018 at 641, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-reference-committee-reports.pdf.

conditions practicable. . . ."[21]   Similarly, the bipartisan Commission on Safety and Abuse in America's Prisons overseen by the Vera Institute of Justice recommended that correctional facilities "[e]nd conditions of isolation," calling solitary confinement "expensive and soul-destroying. . . ."[22]  Members of the Commission include a former Chief Judge of the U.S. Court of Appeals for the Third Circuit, a former Attorney General of the United States, a former Director of the Southern Center for Human Rights, a former prisoner, and a former federal prison warden.[23]

100.     Similarly, many states and correctional systems prohibit the placement of people with mental illness in solitary confinement, or limit its use to only when absolutely necessary – and only as a last resort – for a strictly limited timeframe that is augmented with significant amounts of out-of-cell time and increased access to mental health care.

101.     There is also an international consensus that the type of prolonged solitary confinement practiced by Defendants violates international human rights norms and civilized standards of humanity and human dignity.  International human rights organizations and bodies, including the United Nations, have condemned prolonged solitary confinement and especially solitary confinement of vulnerable populations like people with mental illness.[24]  The United

---

[21] ABA Standards for Criminal Justice, *Treatment of Prisoners* Standard 23-2.6(a), (3d ed. 2011),
https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners/ (last viewed October 22, 2019).
[22] John J. Gibbons & Nicholas deBelleville Katzenbach, *Confronting Confinement: A Report of The Commission on Safety & Abuse in America's Prisons*, 22 WASH. UNIV. J. LAW & POLICY 385, 467, 470 (June 2006), https://goo.gl/YdoFCp.
[23] *Id.* at 395-97; *see also* John E. Dannenberg, *Confronting Confinement, A Report On Safety and Abuse In America's Prisons* (Feb. 15, 2007), Prison Legal News, goo.gl/OfiEJb.
[24] In 2015, the U.N. General Assembly adopted the U.N. Standard Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules."  The Rules specifically prohibit solitary confinement that is "indefinite" or "[p]rolonged," and emphasize that solitary confinement should be used only as a last resort and for the shortest possible amount of time, and

Nations Special Rapporteur on Torture has condemned such solitary confinement practices as cruel, inhuman and degrading treatment that can amount to torture.[25]

102.     Defendants are and have been aware of the impact of solitary confinement on prisoners with SPMI and the substantial risk of harm associated with its use.  This type of harm is well-documented in the clinical literature, standards for correctional health care and correctional practice, and court decisions.

103.     In response to these known risks, a Special Commission to Study and Assess the Use of Solitary Confinement at the Rhode Island ACI ("Special Commission") was convened in 2016 by the Rhode Island General Assembly.  Members of that commission included the former Director of RIDOC as well as the former Clinical Director of Behavioral Health Services, the former Assistant Director of Institutions/Operations, and the contracted Director of Psychiatric Services for RIDOC.  During ten public hearings, which concluded in May 2017, the Special Commission members heard testimony from experts, advocates, former prisoners and the public regarding the significantly adverse psychological impact of solitary confinement on prisoners generally and on prisoners with pre-existing mental illness in particular.

104.     RIDOC clinical staff testified during the Special Commission hearings regarding

---

should be subject to independent review by a competent authority.  Solitary confinement is defined by the Nelson Mandela Rules as "confinement of prisoners for 22 hours or more a day without meaningful human contact[,]" and "prolonged solitary confinement" is defined as "solitary confinement for a time period in excess of 15 consecutive days."  The Rules also prohibit the use of solitary confinement when it would exacerbate a prisoner's pre-existing mental or physical disabilities.  U.N. Office on Drugs & Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners* ("Mandela Rules") R. 43-45 at 16-17, available at https://www.un.org/en/events/mandeladay/mandela_rules.shtml (last viewed Sept 18, 2019).

[25] Juan Mendez, *Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, *Interim Rep. of the Special   Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 77, U.N. Doc. A/66/268 (Aug. 5,  2011), http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf.

RIDOC's limited clinical staffing and capacity to meet the mental health needs of prisoners with mental illness.  At a commission hearing on January 26, 2017, Louis Cerbo, a psychologist and the former Director of Behavioral Health, testified that in 2016, RIDOC had only eleven clinical social workers to provide care for 3000 prisoners.  This is despite the fact that, in his words, RIDOC is the "largest psychiatric hospital in Rhode Island."

105.    On June 29, 2017, the Special Commission issued its final report with recommendations including a general recommendation to exclude prisoners with SPMI and/or developmental disabilities from solitary confinement.

106.    Since the Special Commission concluded, RIDOC reported to DRRI that over 160 men and women with SPMI have been subject to solitary confinement in its facilities.  In April 2017, DRRI provided an investigative report to RIDOC regarding its review of the conditions of confinement and mental health services to prisoners with serious mental illness.  The report was based on prisoner interviews, a review of prisoner records, and a review of clinical literature and standards.  DRRI's report urged RIDOC to: exclude prisoners with SPMI from solitary confinement of any duration; ensure that mental health staff were not involved in determining whether prisoners and detainees should be placed in solitary confinement; direct additional resources to providing organized acute and ongoing mental health services for prisoners and detainees; increase its qualified mental health provider capacity; provide specialized residential treatment services; standardize treatment planning; and establish policies that ensure privacy in clinical encounters.

107.    Numerous individual prisoners and detainees in the custody of RIDOC have also repeatedly requested, through internal grievance request forms, to be removed from solitary confinement because of the harm caused by the inhumane conditions to which Defendants are

subjecting them.  The Defendants have responded to some individuals' grievances by stating that "classification decisions" are not subject to the grievance process.

108.     In her March 5, 2019 testimony before the Rhode Island General Assembly's House Finance Committee regarding RIDOC's proposal to rebuild the High Security Center, Defendant Coyne-Fague acknowledged that "[a]s corrections has evolved, we've realized keeping people in cells 23 hours a day is not the way to go."  Despite these clear admissions and the knowledge of the Defendants, hundreds of people in RIDOC, including many with SPMI, are still forced to live in the harmful, harsh and dehumanizing conditions of solitary confinement.

**<u>Defendants Discriminate Against People with Disabilities in Their Use of Solitary Confinement.</u>**

109.     Defendants discriminate against people with SPMI by housing them in solitary confinement; by failing to accommodate their particular vulnerability to the conditions of solitary confinement; by denying them access to programs and services because they are housed in solitary confinement based on behaviors and failures to comply related to their disabilities; and by using force to respond to behaviors and failures to comply associated with psychiatric disabilities.

110.     The stressful conditions of solitary confinement are more traumatic and damaging for people with disabilities.  Yet Defendants have not modified their policies and practices to eliminate or reduce the use of solitary for people with SPMI.  Nor have Defendants acted to ameliorate the conditions of solitary confinement.  They have not ensured access to programs, services, and activities for people with SPMI in solitary.  They have not limited the duration of solitary for people with SPMI.

111.     Defendants have a statewide policy and practice of locking people with SPMI in solitary confinement for nonconforming and erratic behaviors related to their disabilities, such as acts of self-mutilation and other self-harm.

112.     The harsh conditions in solitary confinement and lack of mental health care or accommodations exacerbate underlying mental illness and other disability-related behaviors and escalate symptomatic behaviors.  In response, Defendants continue to punish individuals with these disabilities, which in turn leads to more time in solitary confinement for individuals with disabilities.

113.     Defendants routinely subject prisoners and detainees with SPMI to discipline for symptomatic behaviors.  For example, Plaintiff DRRI's constituent Mr. A is a twenty-three year old man with a history of psychiatric institutionalization in the community.  RIDOC recognizes that he has SPMI with a current diagnosis of ADD, Anxiety, PTSD, Bipolar 2 and mild intellectual disability.  During a nine-month period he was repeatedly sentenced to periods of solitary confinement adding up to more than 590 days.  He has a long history of disciplinary infractions for disability-related behavior such as kicking his door; refusing to stand for count; threatening to throw feces and urine; flooding his cell; and swearing at officers.  Many of these purported infractions take place once he is placed in solitary confinement where his behavior worsens.  Similarly, Plaintiff DRRI's constituent Mr. B is a twenty-five year old man with a history of psychiatric institutionalization in the community and participation as a child in mental health programs for children with psychiatric disorders and abuse-related trauma.  RIDOC recognizes him as SPMI with varying diagnoses including severe depression, anxiety, PTSD and symptoms of paranoia and delusions.  Mr. B has spent much of his incarceration in solitary confinement, including nearly ten straight months from September 2017 to July 2018.  He has an

extensive history of disciplinary infractions for disability-related behavior such as refusing to stand for count; refusing to give an officer his food tray; kicking his door and yelling obscenities at officers; and submitting letters to staff in which he states his belief that he is involved in a sexual relationship with them.  Many of these purported infractions occurred while he was already in solitary confinement, adding months and months to his time in isolation.  DRRI found similar patterns of extended stays in solitary confinement by people with SPMI in all RIDOC facilities using solitary confinement.

114.     Under Defendants' statewide policy and practice, the initial duration of disciplinary solitary confinement depends upon the nature of the stated infraction, which is often intertwined with the individual's disability.  But the period of isolation is often extended by the addition of consecutive time for multiple or subsequent offenses purportedly committed while in isolation.  Thus, Defendants punish many people with SPMI by subjecting them to solitary confinement for long periods of time for disability-related behavior, and then continue to punish them as they decompensate in isolation.  As a result, many people with SPMI are spending months and months in solitary confinement.

115.     Plaintiff DRRI found repeated instances of Defendants' practice of punishing people for their disabilities.  For example, Plaintiff Hanrahan was sentenced to disciplinary confinement on September 4, 2017 for mutilating himself by self-inflicted deep cuts to his leg, although clinicians determined he was experiencing psychosis and depression at the time. DRRI's constituent Mr. J has had multiple disciplinary sentences to solitary for self-mutilation involving swallowing foreign objects and inserting items in his rectum.  On September 7, 2018, after swallowing a pen and inserting a shower head in his rectum, he was determined to be suicidal and placed on "Crisis Management Status."  He was then given disciplinary time in

solitary confinement as a result of his self-harming behavior and placed back into solitary confinement.

116.     Similarly, on July 3, 2018, DRRI constituent Mr. K, who has a long history of schizophrenia, self-mutilation, and placement in solitary confinement, was returned from a local hospital to a psychiatric observation isolation cell following medical treatment for self-mutilation.  While there, he re-injured himself by inserting the handle of an eating utensil into his penis.  He was disciplined for mutilating himself, but ultimately placed in the Residential Treatment Unit and then terminated from the program due to behaviors, such as requesting a phone call, that staff alleged were disruptive but also acknowledged were related to his mental illness.

117.     On April 4, 2019, DRRI constituent Mr. G was sentenced to solitary confinement after being pepper-sprayed in response to verbally abusive behavior and threats to dive off his cell sink, during the process of being placed in "Crisis Management Status" for psychiatric observation.  Likewise, on August 9, 2019, DRRI constituent Mr. D was given a disciplinary sentence for kicking his cell door in an attempt to get staff to provide his daily medication that had not been delivered.

118.     On September 29, 2018, DRRI constituent Mr. E, a thirty-one-year old man with a long history of being repeatedly placed in solitary confinement for SPMI behavior, played with his toilet water and splashed the water at two corrections officers while he was housed in a psychiatric observation cell at the Intake Services Center.  The officers threatened to pepper-spray him if he did not stop splashing water, so he stopped.  Nonetheless, they removed him from the cell and wrote a disciplinary charge against him; he was subsequently prosecuted with felony charges for "throwing bodily fluids."

119.     As discussed in paragraphs 84-86, above, Defendants also have a practice of responding to disability-related behaviors and failures to comply with use of force.  Defendants use such force without regard to the traumatic impact of such measures, and without first attempting crisis intervention, de-escalation, clinical intervention, and other reasonable accommodations.

120.     Defendants' policy and practice of locking people with SPMI in solitary confinement based on their disabilities inappropriately deprives them of access to programs, services, and activities that are only available in less restrictive settings.  For example, DRRI constituent Mr. D, who has repeatedly deteriorated and struggled with thoughts of self-harm while in solitary confinement, asked RIDOC officials if they would give him access to programs and activities to help keep him busy and ameliorate the impacts of solitary confinement on his mental health.  These requests were repeatedly ignored, and he has yet to be admitted to the RTU.

121.     Likewise, Plaintiff Duane Gomes spent months in solitary confinement due largely to symptomatic behavior.  During these months he was not allowed to enroll in programs like the GED.  He finally enrolled when released to the general population.  Plaintiff Kenner also lost access to GED and anger management classes when he was placed in solitary confinement. Similarly, DRRI's constituent Mr. I wanted to enroll in GED classes and speak with his counselors while in solitary, but his requests were ignored.  Only after filing a grievance in March of 2019 after months in solitary was he finally admitted to the RTU in April 2019. Plaintiff DaPonte sought access to art classes that he finds therapeutic and helpful in alleviating the increased mental health symptoms he experiences in solitary.  Because he was in solitary, he was denied access to the Class.

122.     The experience of being denied necessary programming and services as a result of being placed in solitary confinement due to their disabilities is a common experience for the Individual Plaintiffs and Plaintiff DRRI's constituents held in Defendants' custody.

123.     Defendants' policies and practices regarding the use of solitary confinement and force against people with SPMI are a direct violation of the ADA and Section 504 of the Rehabilitation Act.

## V. CLAIMS FOR RELIEF

### COUNT 1:  Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments, 42 U.S.C. § 1983
### (By Plaintiff DRRI and Plaintiffs Liberty, DaPonte, Davis, Gomes, Hanrahan, and Kenner, on Behalf of Themselves and All Others Similarly Situated v. Defendants Coyne-Fague, Kettle, and Weiner)

124.     By the policies and practices described herein, the individual Defendants have deprived and continue to deprive Plaintiffs of the minimal civilized measure of life's necessities and have violated their basic human dignity and their right to be free from cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment.

125.     Defendants' policies and practices systematically violate the Eighth Amendment rights of prisoners with SPMI.  Such policies, practices and procedures include, without limitation:

a)     maintenance of conditions of confinement in solitary confinement housing units that exacerbate the mental illness of prisoners with SPMI and deprive them of basic human needs, including, but not limited to, near-constant isolation with little, if any, human contact; lack of access to adequate physical exercise, fresh air, and sunlight; extreme environmental and sensory deprivation; and a lack of any meaningful activity;

b)      confinement of people with SPMI in solitary confinement for conduct directly attributable to their mental illness; and

c)      failure to make available, maintain, and utilize adequate therapeutic alternatives to solitary confinement for people with SPMI in solitary.

126.      By their policies and practices, the individual Defendants impose periods of solitary confinement upon individuals with SPMI that lead to the deterioration of their mental health and a substantial risk of serious harm and injury in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

127.      The individual Defendants are aware of the consequences of these conditions of confinement for individuals with SPMI in their custody, control and care, as a result of legislative hearings and reports, clinical literature, professional organization positions and standards, communications and reports by advocates, prisoner grievances and complaints, and by multiple other means, but they have failed to take reasonable corrective action.

128.      By imposing solitary confinement while aware of the harmful effects that it will have on people with SPMI, the individual Defendants act with deliberate indifference to the substantial risk of serious harm to these individuals.

129.      The policies and practices described herein have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the ongoing deprivation of rights secured by the United States Constitution for the Individual Plaintiffs, the putative Class, and Plaintiff DRRI's constituents.

**COUNT TWO: Cruel and Unusual Punishment in Violation of the Fourteenth Amendment, 42 U.S.C. § 1983**
**(By Plaintiff DRRI v. Defendants Coyne-Fague, Kettle, and Weiner)**

130.     By the policies and practices described herein, the individual Defendants have deprived and continue to deprive Plaintiffs of the minimal civilized measure of life's necessities, and have violated their basic human dignity and their right to be free from cruel and unusual conditions, and subject them to punishment in violation of the Fourteenth Amendment to the United States Constitution.

131.     By their policies and practices the individual Defendants subject pre-trial detainees with SPMI to a substantial risk of serious harm and injury from the use of solitary confinement; failure to provide adequate therapeutic alternatives to solitary confinement; and confinement of detainees with SPMI to solitary confinement due to conduct directly attributable to their mental illness, in violation of the Fourteenth Amendment to the U.S. Constitution.

132.     Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

133.     The policies and practices described herein have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the ongoing deprivation of rights secured by the United States Constitution for the Individual Plaintiff, the putative Class, and Plaintiff DRRI's constituents.

**COUNT THREE:  Disability Discrimination in Violation of the**
**Americans with Disabilities Act**
**(By Plaintiff DRRI and Plaintiffs Liberty, DaPonte, Davis, Gomes, Hanrahan, and Kenner,**
**on Behalf of Themselves and All Others Similarly Situated v. Defendants Rhode Island**
**Department of Corrections, Coyne-Fague, Kettle, and Weiner)**

134.	On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Title II of the ADA provides, in relevant part, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

135.	The Individual Plaintiffs, the Class, and Plaintiff DRRI's constituents are qualified individuals with disabilities as defined in the ADA.  They have mental and other impairments that substantially limit one or more major life activities, including but not limited to thinking, concentrating, learning, interacting with others and controlling their behavior.  And, as prisoners and detainees in the RIDOC, Plaintiffs meet the essential eligibility requirements for receipt of services or the participation in programs or activities provided by RIDOC.  42 U.S.C. §§ 12102(2), and 12131(2).

136.	Defendant RIDOC is a public entity subject to Title II of the ADA.  42 U.S.C. § 12131(1)(B); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 201-11 (1998).

137.	Title II of the ADA prohibits disability-based discrimination by any public entity. 42 U.S.C. §§ 12131-12132.

138.	Defendants are legally responsible for ADA violations committed by RIDOC staff and contractors who provide programs, services or activities, including but not limited to mental health services, to prisoners and detainees in RIDOC.  *See* 28 C.F.R. § 35.130(b)(1).

139.     RIDOC programs, services and activities are covered by the ADA.  The

programs, services, and activities that RIDOC provides to prisoners and detainees in its custody

include, but are not limited to, sleeping, eating, showering, toileting, communicating with those

outside the prison by mail and telephone, exercising, entertainment, safety and security, the

prison's administrative, disciplinary, and classification proceedings, medical and mental health

services, the library, educational, vocational, substance abuse, and anger management classes,

and discharge services.

140.     Congress directed the United States Department of Justice (DOJ) to promulgate

regulations implementing the ADA's prohibition against discrimination.  42 U.S.C. § 12134.

Pursuant to this mandate, the DOJ issued regulations defining the forms of discrimination

prohibited by Title II of the ADA.  28 C.F.R. § 35.101 *et seq*.  These regulations include

regulations specific to adult detention and correctional facilities.  28 C.F.R. § 35.152.

141.     Under the ADA, a public entity like RIDOC may not "[d]eny a qualified

individual with a disability the opportunity to participate in or benefit from [the public entity's]

aid, benefit, or service."  28 C.F.R. § 35.130(b)(1)(i).  The opportunity to participate in or benefit

must be "equal to that afforded others."  28 C.F.R. § 35.130(b)(1)(ii).  Defendants here are

violating the ADA by failing to ensure that qualified individuals with disabilities in their custody

have access to, are permitted to participate in, and are not denied the benefits of, Defendants'

programs, services, and activities.  Instead, qualified individuals with disabilities are placed into

unnecessary solitary confinement and thereby excluded from programs, services, and activities.

142.     Under the ADA, a public entity like RIDOC may not "utilize criteria or methods

of administration … [t]hat have the effect of subjecting qualified individuals with disabilities to

discrimination on the basis of disability[.]"  28 C.F.R. § 35.130(b)(3)(i); *see also id.* at (b)(8).

Defendants here are violating the ADA by employing methods of administration that cause qualified individuals with disabilities to spend extensive periods of time in unnecessary solitary confinement and to be excluded from programs, services, and activities. These methods of administration include: the use of solitary confinement to respond to disability-related behaviors; the extension of solitary confinement sentences for such behaviors while in solitary (and decompensating); and the maintenance of brutal and inhumane conditions in solitary confinement.

143.    Under the ADA, a public entity like RIDOC must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the natures of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Defendants violate the ADA by failing to make such reasonable modifications. These failures include: using a person's disability-related behaviors or failures to comply as a basis for housing the person in solitary confinement or for extending their time in solitary; the failure to divert individuals with disabilities into alternative appropriate placements other than solitary confinement; and the failure to make environmental and programmatic changes to ameliorate the brutal and inhumane conditions of solitary.

144.    Under the ADA, a public entity like RIDOC must "ensure that prisoners or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152; *accord* 28 C.F.R. § 35.1309(d); *see also Olmstead v. L.C.*, 527 U.S. 581, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability.") As part of the ADA's integration mandate, RIDOC "[s]hall not place [prisoners] or detainees with disabilities in facilities that do not offer the same programs as the

facilities where they would otherwise be housed." 28 C.F.R. § 35.152(b)(2).  Defendants violate

the ADA by unnecessarily housing qualified individuals with disabilities in solitary confinement

for extensive periods of time.

145.     As a result of Defendants' unlawful actions and inactions, prisoners and detainees

with SPMI with disability-related behaviors and failures to comply are at a greater risk of being

housed in solitary confinement, which in turn inflicts additional harm on their mental health.

This constitutes discrimination against people with SPMI.

146.     Defendants' policy and practice of allowing prisoners and detainees with SPMI to

be disciplined and punished for conduct that is a direct result of their disabilities constitutes

discrimination on the basis of their disability.

147.     By placing prisoners and detainees with SPMI in solitary confinement, the

Defendants have denied prisoners and detainees with SPMI the benefits of RIDOC's services,

programs and activities, including education, medical and mental health care, recreation,

exercise, visitation, religious services, vocational services, work assignments and clinical

therapies.

148.     By placing prisoners and detainees with SPMI in disciplinary or administrative

confinement or other solitary confinement settings, and/or offering them treatment in

unnecessarily segregated settings, RIDOC fails to house prisoners and detainees with disabilities

in the most integrated setting appropriate to their needs.

149.     Defendants' mechanism of assessing prisoners' and detainees' mental health or

other disability-related needs and designating them for placement in solitary confinement

perpetuates the overuse of solitary confinement and prevents prisoners and detainees with SPMI

from accessing a wide variety of services, programs and benefits enjoyed by prisoners and

detainees without disabilities, such as regular human interaction, sunlight, exercise, recreation, educational, vocational, and rehabilitative programming.  Defendants place these prisoners and detainees in solitary confinement as a routine management technique to respond to disability-related behaviors and failures to comply, treating the effects of serious mental illness as a disciplinary or classification matter rather than as a mental health matter.

150.     By failing to divert people with SPMI from solitary confinement and failing to provide adequate treatment-based housing for disabled prisoners and detainees who require that level of care, Defendants fail to make reasonable modifications that are necessary to avoid disability discrimination.  Such modifications would not result in a fundamental alteration in the nature of a service, program, or activity; in undue financial and administrative burdens; or in a direct threat to the health or safety of others.  The physical conditions of solitary confinement in RIDOC are inappropriate for people with SPMI.  The combination of long-term sensory deprivation, idleness, and isolation make it very difficult to sustain mental stability for individuals with such disabilities.  Solitary confinement is inappropriate for prisoners and detainees with SPMI because it undermines their mental health and well-being – making it far less likely that they will ever be able to comply with prison rules and other requirements.

151.     By incarcerating people with SPMI in solitary confinement, Defendants require them to live and receive services at a facility that is not an integrated setting appropriate to their needs.  Defendants also house prisoners and detainees with SPMI in conditions of significant isolation known to exacerbate their disabilities where they have few opportunities to interact with individuals without disabilities.  Defendants respond to disability-related behaviors and failures to comply with placement into the extreme and unjustifiably isolating conditions in their solitary confinement units rather than in integrated settings.  This segregation is triggered by

prisoners' and detainees' disabilities and resulting conduct and is a form of unlawful

discrimination under the ADA.

152.     Defendants knowingly and consistently discriminate against prisoners and

detainees with SPMI in the manner noted herein.

**COUNT FOUR:  Violation of Section 504 of the Rehabilitation Act**
**(By Plaintiff DRRI and Plaintiffs Liberty, DaPonte, Davis, Gomes, Hanrahan, and Kenner,**
**on Behalf of Themselves and All Others Similarly Situated v. Defendants Rhode Island**
**Department of Corrections, Coyne-Fague, Kettle, and Weiner)**

153.     By their policies and practices described herein, Defendants have violated the

rights of the Individual Plaintiffs, the Class, and DRRI's constituents secured by Section 504 of

the Rehabilitation Act and its implementing regulations.

154.     Section 504 provides that "[n]o otherwise qualified individual with a disability in

the United States . . . shall, solely by reason of her or his disability, be excluded from participation

in, be denied benefits of, or be subjected to discrimination under any program or activity

receiving federal financial assistance." 29 U.S.C. § 794(a).

155.     The Individual Plaintiffs, the Class, and Plaintiff DRRI's constituents are

otherwise qualified individuals with disabilities as defined in Section 504 of the Rehabilitation

Act.  They have mental and other impairments that substantially limit one or more major life

activities, including but not limited to thinking, concentrating, interacting with others, learning,

and controlling their behavior.  As prisoners and detainees in the RIDOC, the Individual

Plaintiffs, the Class and DRRI's constituents meet the essential eligibility requirements for

receipt of services or the participation in programs or activities provided by the Defendant

RIDOC.  29 U.S.C. §§ 705(9)(b), 794.

156.     Defendant RIDOC is an agency of state government, which administers a

program or activity that receives federal financial assistance.

157.     Under the Rehabilitation Act, Defendants must provide "the most integrated setting appropriate to the person's needs."  45 C.F.R. § 84.4(b)(2).  They may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service," 45 C.F.R. § 84.4(b)(1)(iv), "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others,"  45 C.F.R. § 84.4(b)(1)(iv), or "utilize criteria or methods of administration . . . that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 45 C.F.R. § 84.4(b)(4).

158.     Defendants have failed to meet their obligations under the Rehabilitation Act.  By incarcerating prisoners and detainees with SPMI in solitary confinement, Defendants require them to live and receive services at a facility that is not remotely an integrated setting appropriate for their needs.  Defendants also house prisoners and detainees with SPMI in conditions of significant isolation known to exacerbate their disabilities where they have few opportunities to interact with individuals without disabilities.  Defendants respond to disability-related behaviors and failures to comply with violence and placement into the extreme and unjustifiably isolating conditions in their solitary confinement units rather than in integrated, treatment-based housing assignments and services.  This segregation is triggered by prisoners' and detainees' disabilities and resulting conduct and is a form of unlawful discrimination under the Rehabilitation Act.

159.     In addition, Defendants use the placement of prisoners and detainees with SPMI into solitary confinement as a routine management technique to respond to disability-related behaviors and failures to comply, rather than using alternatives such as adequate mental health treatment, planning, programming, effective communication, and crisis intervention and de-escalation.  Defendants treat the effects of disabilities as a disciplinary rather than disability-

related or rehabilitation matter.  Defendants' placement of prisoners and detainees with SPMI in solitary confinement prevents them from accessing a wide variety of services, programs and benefits enjoyed by prisoners and detainees without disabilities, such as basic medical care and mental health care, education, vocational, and rehabilitative programming.  In addition to denying prisoners and detainees with disabilities the opportunity to participate in and/or enjoy the benefits of these services, Defendants violate the Rehabilitation Act's prohibition on methods of administration that "have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap."  45 C.F.R. § 84.4(b)(4).

160.     Defendants discriminate against prisoners and detainees with SPMI by failing to provide reasonable accommodation for their disabilities.

161.     Defendants discriminate against prisoners and detainees with SPMI solely on the basis of their disabilities in violation of Section 504 of the Rehabilitation Act.

162.     By placing prisoners and detainees with SPMI in solitary confinement, Defendants have denied them the benefits of RIDOC's services, programs and activities, including education, recreation, exercise, visitation, religious services, vocational services and clinical therapies, and therefore discriminate against them in violation of Section 504 of the Rehabilitation Act.

## PRAYER FOR RELIEF

Prisoners and detainees with SPMI have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants, as alleged herein, unless they are granted the relief requested.  The Plaintiffs have no adequate remedy at law to protect them from this harm.  The need for relief is critical because the rights at

issue are paramount under the United States Constitution and the laws of the United States, and relief is necessary to prevent continued and further injury.

WHEREFORE, the Plaintiffs request that this Court grant the following relief:

A.    Declare the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2), including any necessary subclasses;

B.    Appoint the undersigned Class counsel pursuant to Federal Rule of Civil Procedure 23(g);

C.    Adjudge and declare that the acts, omissions, policies, and practices of the Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described in this Complaint are in violation of the rights of the Individual Plaintiffs and the Class they represent and the constituents of Plaintiff DRRI under the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

D.    Preliminarily and permanently enjoin all Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting the Individual Plaintiffs and the Class they represent and constituents of DRRI to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth in this Complaint;

E.    Grant permanent injunctive relief requiring Defendants, their predecessors, successors, present or former agents, representatives, those acting in privity and in concert with them, or on their behalf, under color of State law or otherwise, to take all necessary actions to:

i.      Ensure that policies, practices and procedures that preclude the placement of prisoners and detainees with SPMI in solitary confinement are promulgated and implemented;

ii.     Alleviate the conditions of confinement of all prisoners and detainees with SPMI so that they are no longer are incarcerated under conditions of isolation, sensory deprivation and lack of social and physical human contact;

iii.    Ensure that all prisoners and detainees with SPMI are housed in the most integrated setting, with access to the programs, services and activities available to prisoners and detainees in RIDOC's general prison/detainee population;

iv.     Create sufficient bed space in residential treatment units (RTUs) to accommodate all men and women with SPMI who would otherwise be placed in solitary confinement;

v.      Appoint an independent expert or experts to assess the conditions of confinement and housing of prisoners and detainees with SPMI by Defendants; make recommendations for the improvement of those conditions of confinement and housing, and oversee such improvements; and assist in the design and implementation of alternatives to solitary confinement for individuals with SPMI;

vi.     Apply the above-described policies, programs, and procedures to Rhode Island's current population of prisoners and detainees with SPMI and all future such prisoners and detainees; and

vii.     Comply with all other relief to which the Plaintiffs are entitled.

F.     Retain jurisdiction of this case until all Defendants have fully complied

with the orders of this Court, and there is a reasonable assurance that Defendants will continue to

comply in the future absent continuing jurisdiction;

G.     Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and

litigation expenses pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988, 12205, 12133, and other

applicable law.

H.     Grant such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITED, this 25th day of October, 2019.

By its attorneys,

 s/Anne M. Mulready
Anne M. Mulready (RI Bar No. 4738)
Brian Adae (RI Bar No. 2536)
DISABILITY RIGHTS RHODE ISLAND
33 Broad St., Suite 601
Providence, RI 02903
Telephone: (401) 831-3150
Facsimile: (401) 274-5568
Email:  amulready@drri.org
        badae@drri.org


Amy Fettig (D.C. Bar No. 484883)
   *Pro Hac Vice Admission Pending*
Lauren Kuhlik (DC Bar No. 888324779)
   *Pro Hac Vice Admission Pending*
ACLU NATIONAL PRISON PROJECT
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone: (202) 548-6608
Facsimile: (202) 393-4931
Email: afettig@aclu.org
        lkuhlik@aclu.org