## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

CHARLENE LIBERTY, JOHN DAPONTE,
JOHN DAVIS, DUANE GOMES,
ADAM HANRAHAN, and CHARLES KENNER,
on behalf of themselves and all others
similarly situated; and
DISABILITY RIGHTS RHODE ISLAND,
on behalf of its constituents,

C.A. No. 19-cv-0573-JJM-PAS

*Plaintiffs,*

v.

RHODE ISLAND DEPARTMENT OF
CORRECTIONS;
PATRICIA COYNE-FAGUE,
in her official capacity as the Director of the
Rhode Island Department of Corrections;
MATTHEW KETTLE, in his official capacity as
Assistant Director of Institutions and Operations; and
BARRY WEINER, in his official capacity as
Assistant Director of Rehabilitation Services,

*Defendants.*

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO COMPEL

Pursuant to Fed. R. Civ. P. 37 and Local Rule 37, individual plaintiffs Charlene Liberty,

John DaPonte, John Davis, Duane Gomes, Adam Hanrahan, and Charles Kenner ("Individual

Plaintiffs") and Disability Rights Rhode Island ("DRRI") (collectively referred to as "Plaintiffs")

move to compel defendants Rhode Island Department of Corrections ("RIDOC"), Patricia Coyne-

Fague, Matthew Kettle, and Barry Weiner (collectively referred to as "Defendants") to produce any and all restrictive housing reports, prescription lists, meeting minutes, and use of force reports and videos in unredacted form. For the reasons set forth below, Defendants do not have a valid legal basis to unilaterally redact or withhold the information, which is relevant to Plaintiffs' claims, and they should be compelled to produce unredacted copies of such documents and materials.

## **BACKGROUND**

Plaintiffs filed this action on October 25, 2019, bringing claims against Defendants, in their official capacity, for the unlawful practice of keeping people with serious and persistent mental illness ("SPMI") in solitary confinement in violation of the Eighth and Fourteenth Amendments, Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act. Plaintiffs' claims involve not only Defendants' unlawful practice of placing individuals with SPMI in solitary confinement itself, but also the treatment of people with SPMI in solitary confinement, the psychological, emotional and physical harms solitary confinement causes them, and Defendants' failure to provide equal access to RIDOC's programs, services and activities to individuals with SPMI, and Defendants' failure to provide access to services for individuals with SPMI in the most integrated setting. *See generally* Doc. 1.

On February 21, 2020, and May 22, 2020, respectively, Plaintiffs served their first and second sets of requests for production of documents seeking documents related to the allegations in the Complaint. *See* Ex. A, Plaintiffs' First Request for Production of Documents ("First Requests"); Ex. B, Plaintiffs' Second Request for Production of Documents ("2nd Requests").[1]

---

[1] On August 24, 2021, Plaintiffs also propounded a Third Request for Production of Documents. Defendants served their response to Plaintiffs' Third Request for Production of Documents on December 3, 2021.

Relevant for purposes of this motion, Plaintiffs First and Second Requests sought the following documents:

(1) All documents contained in RIDOC's health care records, including documents pertaining to mental health, for each plaintiff named in this litigation. Ex. A, Request No. 2.

(2) All minutes from meetings attended by health care staff, and any other meetings at which the mental health care of RIDOC prisoners in restrictive housing, mental health care policies and procedures in restrictive housing, health care staffing in restrictive housing, or any issue related to mental health care in restrictive housing was discussed. *Id*. at No. 12.

(3) Documents sufficient to show the number of all RIDOC prisoners confined in restrictive housing units each month from January 1, 2015, to the response date. *Id*. at No. 57.[2]

(4) Documents sufficient to show the duration of confinement in restrictive housing, including, but not limited to, the mean, median, and maximum length of confinement in restrictive housing for RIDOC prisoners with SPMI. *Id*. at No. 70.

(5) Documents sufficient to show the number of prisoners with SPMI housed in restrictive housing for each month from January 1, 2017, through the response date. *Id*. at No. 74.

---

[2] Plaintiffs agreed in a July 2020 meet and confer to, at least preliminarily, limit the time frame for most document requests to 2018 through the present.

(6) Documents and materials, including, but not limited to, video describing or depicting the use of force, including, but not limited to, chemical agents and restraints on Plaintiffs from January 1, 2015, through the response date. *Id*. at No. 58.

(7) Documents and materials, including, but not limited to, video describing or depicting the use of force, including, but not limited to, chemical agents and restraints, in any restrictive housing unit or the residential treatment unit from January 1, 2015, through the response date. *Id*. at No. 59.

Defendants served their first response to Plaintiffs' discovery requests for documents on June 11, 2020, followed by supplemental responses to Plaintiffs' First and/or Second Requests on or about July 28, 2020, September 3, 2020, October 27, 2020, December 9, 2020, May 24, 2021, June 14, 2021, July 1, 2021, September 27, 2021, October 18, 2021, and November 23, 2021.[3]

As part of Defendants' rolling production of documents, and in response to Requests No. 2, 12, 57, 70, 58, and 59, Defendants produced redacted copies of restrictive housing reports, prescription lists, meeting minutes, and use of force reports. Defendants objected to the production of the redacted information on the grounds that the redacted information was not relevant to Plaintiffs' claims, production was overly burdensome, and because the information contained private and confidential information. Plaintiffs raised the issue of Defendants' unilateral redaction of information within these responsive documents by letter on August 10, 2021, and the parties conferred about the discovery dispute on August 31, 2021. On September 1, 2021, Defendants

---

[3] Notwithstanding the rolling production of documents by Defendants on the dates set forth herein, as of the date of this motion, Defendants have only produced approximately 2,525 documents (which includes duplicates) despite the multiple claims, defenses and issues raised in this class action and number of parties involved. Of the 2,525 documents produced to date, 1,671 of them are use of force reports produced since September 2021 that have been redacted to remove names of incarcerated people and staff.

provided a written response to Plaintiffs' August 10, 2021 discovery letter, in which Defendants again objected to the production of the redacted information on the grounds that the information is not relevant to Plaintiffs' claims, is confidential health and mental health treatment protected from disclosure under federal and state law, regulations and RIDOC policies, and that Plaintiffs' claims that the redacted information is necessary because of evidence of failure of RIDOC to designate individuals with SPMI is unfounded. Notably, Defendants cite to RI DOC Policy 18.59-6, governing the confidentiality of health information of incarcerated persons, and refer to the federal and state laws and regulations RI DOC Policy 18.59-6 references, but do not cite to any caselaw to demonstrate a valid legal basis for their unilateral redactions of the responsive documents.

The parties subsequently attended a discovery dispute conference on September 2, 2021. However, the parties were unable to reach an agreement as to the dispute concerning the redacted documents. The parties have reached a stalemate concerning the redacted documents. Accordingly, Plaintiffs bring this instant motion seeking an order compelling Defendants to produce unredacted versions of the restrictive housing reports, prescription lists, meeting minutes, and use of force reports.

## **DOCUMENTS AT ISSUE**

Defendants produced four categories of improperly redacted documents: (1) restrictive housing reports; (2) prescription lists; (3) meeting minutes; and (4) use of force reports and materials. [4]

---

[4] At the time of the letter, the initial meet and confer, and the discovery conference, the documents relating to the use of force had not been produced and Defendants had not detailed their reasons for planning to redact the names of RIDOC employees from documents yet to be produced, so the issue of their redaction was not addressed.

a. Restrictive Housing Reports

There are various kinds of restrictive housing reports that, generally, provide information about the individuals, and the number of individuals who are housed in restrictive housing at various times. There are statistical restrictive housing reports which purportedly provide the total number of persons in restrictive housing as of the last day of the month, as well as information about the breakdown between administrative and disciplinary confinement, and the amount of time people have spent in restrictive housing. Other statistical restrictive housing reports provide similar information for each year. The statistical restrictive housing reports do not contain any information about individuals and have not been redacted.

There is another category of restrictive housing reports that lists each individual in restrictive housing at any point in a given month, their status, the day they arrived in restrictive housing, and, for people in disciplinary confinement, the offense for which they were placed in restrictive housing. These documents, referenced herein as "Restrictive Housing Reports", have been redacted and are one subject of this motion.

Defendants failed to produce all relevant information about the housing of individuals in restrictive housing by redacting Restrictive Housing Reports to (1) include only those individuals in restrictive housing who have been designated as SPMI; or (2) leaving the entries for people who have not yet been designated as SPMI in others but, redacting all other information related to those individuals other than their location in restrictive housing; or (3) redacting identifying information for some individuals in restrictive housing who have been designated as SPMI. *See, e.g.*, Ex. C, March 2019 Restrictive Housing Report; *see* Ex. D, Excerpt of April 2018 Restrictive Housing Report. Defendants produced the full Restrictive Housing Report for only two months, October

2018 and April 2019.  *See* Ex. E, October 2018 Restrictive Housing Report *and* Ex. F, April 2019

Restrictive Housing Report.

  b. <u>Prescription Lists</u>

   Defendants also improperly redacted the names and, in some cases, RIDOC numbers of all

individuals the Defendants have not designated as SPMI from monthly lists of prescriptions

("Prescription Lists").  *See e.g.*, Ex. G, Excerpts of January 2020 Prescription Lists.  Upon review

of the Prescription Lists, it is clear that many of the medications included in the Prescription Lists

for individuals whose identifying information is redacted, are psychiatric medications prescribed

by psychiatric providers that only someone with an SPMI would be prescribed, such as

antipsychotic medications and lithium carbonate, which is prescribed for bipolar disorder.  *See id.*

*and*  Ex. R , the Rhode Island Department of Health's Licensing Information.

  c. <u>Meeting Minutes</u>

   The meeting minutes ("Meeting Minutes") produced include meetings where health care

staff, including mental health care staff, are present and information related to the specific

circumstances of various individuals with mental health needs in RIDOC's custody are discussed.

It appears that Defendants redacted certain paragraphs contained in these Meeting Minutes because

they relate to persons who have not been designated as SPMI by RIDOC. *See e.g.*, Ex. H, July 2,

2020 Women's Facility Triage Meeting Minutes.

  d. <u>Use of Force Reports</u>

   The use of force reports and materials, including video of such incidents, ("UOF Reports")

include information about instances where RIDOC's personnel engaged in the use of force against

individuals in RIDOC custody.  This includes summaries and descriptions of the events leading

up to and through personnel's use of force in restrictive housing units, statements by corrections officers who were involved in or witnessed the incident, information concerning any other individuals who witnessed the incident, statements by the individual incarcerated persons involved, the stated reason for the use of force, including whether or not the individual was assaultive, disoriented, self-injurious, destructive, threatening, or suicidal, information about any injuries, and whether or not the incident was videotaped. Defendants redacted *all* identifying information of the individuals in RIDOC custody who are not named Plaintiffs – including people designated as SPMI – and RIDOC personnel.[5] Defendants also stated their intent to continue to withhold identifying information for non-Plaintiff, non-SPMI in UOF Reports and videos on privacy grounds. Defendants object to production of identifying information of personnel based on contractual and privacy rights.

## ARGUMENT

Parties are permitted to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Discovery under the Federal Rules of Civil Procedure "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437

---

[5] To be clear, Defendants produced written UOF Reports for Plaintiffs Kenner and Gomes and stated their intent to produce written UOF Reports for other named Plaintiffs. However, the UOF Reports produced for Kenner and Gomes redact witness names of other individuals in RIDOC custody and RIDOC personnel with the exception of certain signatures of personnel who reviewed the written reports. Defendants have not produced any video of UOF incidents or referenced in UOF reports, even for the incidents involving named Plaintiffs.

U.S. 340, 351 (1971); *see also Kennicott v. Sandia Corp.*, 327 F.R.D. 454, 469 (D.N.M. 2018) (analyzing the 2015 amendment and concluding that it did not change the scope of discovery but clarified it, and therefore *Oppenheimer* still applies); *see also Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018) (relevancy is to be "broadly and liberally interpreted") (citing *Bennett v. La Pere*, 112 F.R.D. 136, 138 (D.R.I. 1986) and *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). "Because discovery is designed to define and clarify the issues [in the case], it is not limited to only those specific issues raised in the pleadings. Rather, the question of relevancy should be construed 'liberally and with common sense' and discovery should be allowed unless the information sought has no conceivable bearing on the case." *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995) (quoting *Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D.Cal.1992) (citation omitted).[6]

District courts have discretion to manage discovery matters. *Controlled Kinematics, Inc. v. Novanta Corp.*, No. 17-CV-11029-ADB, 2019 WL 3082354, at \*3 (D. Mass. July 15, 2019)(*citing Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003)). "[C]ourts assess disputed discovery requests in light of the proportionality considerations articulated in Rule 26(b)(1), including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Id.* (citing Fed. R. Civ. P. 26(b)(1); *Sustainable Sourcing, LLC v. Brandstorm, Inc.*, No. 12-cv-30093-MAP, 2017 WL 217747, at \*2 (D. Mass.

---

[6] Plaintiffs were not required to plead specific facts concerning Defendants' failure to properly designate individuals with SPMI to obtain the redacted information. The purpose of discovery is to "define and clarify the issues [in the case], it is not limited to only those specific issues raised in the pleadings." *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995) (*quoting Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D.Cal.1992) (citation omitted)).

Jan. 18, 2017) ("concepts of relevance and proportionality dictate limits on the discovery to which Plaintiff is entitled")).

## I.  THE DOCUMENTS DEFENDANTS REDACTED ARE RELEVANT

Generally, relevant, non-privileged documents requested in discovery that are proportional to the needs of the case should be produced in the manner in which they are kept in the usual course of business. Fed. R. Civ. P. 26(b)(1), 34(b)(2)(E).

"In the context of pretrial discovery, 'relevance' is 'broadly and liberally interpreted.'" *Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018) (citing *Bennett v. La Pere*, 112 F.R.D. 136, 138 (D.R.I. 1986) and *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Id.* (citing *Hickman*, 329 U.S. at 507).

The information sought through this motion is unquestionably relevant as discussed below. The Restrictive Housing Reports, Prescription Lists, Meeting Minutes, and Use of Force Reports should be ordered produced without redactions.

### A.  Information About Named Plaintiffs Is Relevant

Defendants did not object to producing information about the named Plaintiffs on relevance or any other grounds.  Nonetheless, Defendants have redacted information about two of the named Plaintiffs, John DaPonte and Charles Kenner from two of the categories of documents: Restrictive Housing Reports and Prescription Lists.   This appears to be due to Defendants' position that the two men do not have an SPMI.   The information about these two named Plaintiffs' time in restrictive housing and mental health medications is relevant regardless of their designation.

Defendants did not inform Plaintiffs that they were redacting information about Plaintiffs DaPonte and Kenner. It was only through luck and careful analysis that Plaintiffs were able to determine this. Plaintiffs DaPonte and Kenner were both in restrictive housing in October 2018, one of the two months for which Defendants produced complete Restrictive Housing Reports. *See* Ex. E, October 2018 Restrictive Housing Report. The October 2018 Restrictive Housing Report reflects that, as of that month, DaPonte had been in restrictive housing since April 17, 2018 and that Kenner had been in restrictive housing since September 14, 2018. *Id*. However, the September 2018 report includes neither man, and DaPonte does not appear in the April-August 2018 reports either. *See, e.g.*, Ex. I, September 2018 Restrictive Housing Report. It cannot reasonably be disputed that information concerning when, for how long, and under what circumstances named Plaintiffs were housed in restrictive housing is relevant to Plaintiffs' claims. Tellingly, Defendants do not articulate a single basis for redacting this information but instead assert that because they have not designated either as having an SPMI, somehow the information is irrelevant.

Similarly, Defendants redacted Plaintiffs DaPonte and Kenner from the Prescription Lists. For example, the January 2020 prescription list does not include either man, but both were receiving medications in RIDOC custody that month. *Compare* Ex. G (Excerpts of January 2020 prescription listings that would contain DaPonte and Kenner, based on housing location and alphabetical order) *with* Ex. J, Excerpt of medical record of DaPonte showing medications prescribed in January 2020 (DOC-JDap-001668) *and* Ex. K, Excerpt of medical record of Kenner showing medications prescribed in January 2020 (DOC-CKen-001395). Information about the specific medications named Plaintiffs were on during the relevant time period is equally as critical

to Plaintiffs' claims as information related to their placement in restrictive housing as it goes to the central issues of this case. This is particularly true with regards to Kenner's claim that he is, in fact, a person with SPMI, despite Defendants' failure to designate him as such. There is no legal basis for Defendants to withhold such critical information.

### B. Information About People Who Defendants Have Designated as SPMI Is Relevant

In a small number of Restrictive Housing Reports, Defendants have redacted information about people in restrictive housing whom they have designated as SPMI. *See, e.g*., Ex. D, April 2018 RH. These reports show that an unidentified person with an SPMI was in restrictive housing, the person's race, the location, and whether the person in was in restrictive housing for disciplinary or administrative confinement. *Id*.

The information that was redacted from Restrictive Housing Reports about individuals designated by Defendants as SPMI is relevant. It will provide critical information concerning some of the most essential facts in this case: how long people Defendants know to have an SPMI spend in restrictive housing and the circumstances of their placement in restrictive housing. Understanding why people designated as SPMI are in restrictive housing and how long they remain there is directly relevant to Plaintiffs' claims that Defendants are violating the constitutional rights of people with SPMI by unlawfully subjecting them to solitary confinement. *See*, *e.g.*, *Indiana Protection & Advocacy Services Commission v. Commissioner*, 2012 WL 6738517 (S.D. Ind., Dec. 31, 2012) (holding that the Indiana Department of Correction's practice of placing prisoners with serious mental illness in segregation constituted cruel and unusual treatment in violation of the Eighth Amendment); *see also* National Commission on Correctional Health Care, *Position Statement on*

*Solitary Confinement (Isolation)* (Apr. 10, 2016), available at https://www.ncchc.org/solitary-confinement ("mentally ill individuals...should be excluded from solitary confinement of any duration"); American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (approved Dec. 2012; retained Dec. 2017 ), *available at* https://www.psychiatry.org > about-apa > policies ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); American Public Health Association, Solitary Confinement as a Public Health Issue, Policy No. 201310.

### C. Information About People Who Likely Have an SPMI but Are Not Designated as Such Is Relevant

In all the documents at issue in this motion, Defendants have redacted the names of persons who they have not designated as having an SPMI. However, there is substantial evidence that there are many people in RIDOC custody who would meet any definition of SPMI, including RIDOC's own, who have not been designated as SPMI by RIDOC. Information about these individuals is relevant.

#### 1. Defendants have failed to identify and designate many of the people in their custody with an SPMI.

The most telling evidence of Defendants' failure to identify and designate people with an SPMI is found within the Prescription Lists. The Prescription Lists show that there are many people prescribed certain antipsychotic medications and lithium carbonate whose names have been redacted, indicating that they are not designated as SPMI. Many of the people who have not been designated as SPMI have been prescribed medications that are generally prescribed by psychiatric providers only for psychiatric disorders that are always indicators of SPMIs, such as schizophrenia and bipolar disorder, while in RIDOC custody. *See* Ex. M, Declaration of Dr. Jeffrey Metzner *and*

Ex. P, Excerpts of Medline Plus Drug Information, including the section "Why is this medication prescribed?".

For example, the April 2019 Prescription List includes 132 people prescribed antipsychotic medications or lithium carbonate but who are not designated as having an SPMI. These 132 people on antipsychotic medications or lithium are likely only a portion of the people who have an SPMI but have not been so designated, as people with other serious mental illnesses, such as major depressive disorder, are not as readily identifiable from a list of prescriptions. Many of these medications are prescribed by Psychiatric Providers. *See* Ex. R. It is rare for a Psychiatric Provider to prescribe psychiatric medications for off-label purposes. Ex. M, Declaration of Dr. Jeffrey Metzner.

Further, individuals currently in RIDOC's custody who are not named Plaintiffs but are putative class members attest to the fact that they are routinely prescribed certain antipsychotic medications by RIDOC for various mental illnesses including, but not limited to, bipolar, anxiety, depression, schizophrenia, and borderline personality disorder. *See* Ex. L, Incarcerated Persons' Declarations.

Defendants are aware that there are many more people in their custody who have an SPMI than those they have designated as SPMI. The total number of people in RIDOC custody who were designated as SPMI as of June 1, 2021, was 165. But, in "Critical Expense Request Forms" RIDOC stated that it needed funding for certain expenses because "[a]pproximately 25% of the Inmates at the ACI are individuals with serious mental illness." *See* Ex. N (Critical Expense Request Form, dated Dec. 27, 2018). At the end of June 2021 (the last published report of RIDOC

population[7]), the population of RIDOC was approximately 2,110, which suggests that by Defendants' own representations, approximately 525 people in RIDOC custody have a serious mental illness.

Further, RIDOC currently states on its website: "In the past 5 years, RIDOC has seen an increase in the number of severe and persistently mentally ill (SPMI) inmates entering our facilities, with the number in the RIDOC being approximately 15-20% at any given time." Ex. Q, RIDOC website – Behavioral Health Services, Dec. 6, 2021. Therefore, based on Defendants' own published statements, there should be approximately 315-420 people in RIDOC custody with an SPMI, but, again, there are just 165 so designated.

Defendants may argue the large number of people on medications that suggest they have an SPMI is not evidence that those people have an SPMI because there may be some "off label" use for certain medications or lithium prescriptions. Such an argument would be without merit. Plaintiffs' counsel met with several individuals who fall into the category of being prescribed these medications but not identified as SPMI. Every one of these individuals stated that they were prescribed psychiatric medications to treat mental illness. *See* Ex. L. As attested to by Jeffrey Metzner, M.D., who specializes in the practice of psychiatry with a subspeciality in correctional psychiatry, the principal purpose psychiatrists and psychiatric nurse practitioners ("Psychiatric Providers") prescribe antipsychotic medications is to treat conditions of serious mental illness. *See* Ex. M, Declaration of Jeffrey Metzner, M.D., at ¶¶ 7, 10. Although there may be some alternate reason to prescribe antipsychotic medications, mental illness is the primary and principle purpose

---

[7] *See* RIDOC FY 2021 Annual Report at 13-14, *available at* http://www.doc.ri.gov/docs/FY21%20Annual%20Population%20Report.pdf

for such prescriptions by Psychiatric Providers. *Id.* at ¶¶ 10-11. Due to the large number of individual's in RIDOC custody being prescribed antipsychotic medications by Psychiatric Providers, it is highly unlikely that all or even the majority of these individuals are being prescribed for secondary or alternative purposes.[8] *See id.* at ¶ 11; *see also* Ex. R. Prescription Lists with individuals prescribed psychotropic medications is an effective way to identify the incarcerated persons with a serious mental illness, regardless of RIDOC's designation. *See* Ex. M at ¶ 12.

Even if some number of people are prescribed psychiatric medications for off-label purposes, the unredacted Prescription Lists are discoverable. As discussed above, most of the people prescribed psychiatric medications are prescribed those medications for psychiatric diagnoses. Many will fall within the definition of SPMI, despite Defendants' failure to designate them as SPMI, and they are, at the very least, witnesses with material information concerning the health care treatment of incarcerated persons, the process of how and why people are assessed for SPMI, and what the impacts of being designated – or not – as having an SPMI are with regards to placement and treatment in restrictive housing. *See Kallas v. Carnival Corp.*, 2007 WL 2819385 at *2 (S.D. Fla 2007)(ordering the defendant to disclose the names and contact information of non-parties and the production of unredacted illness logs and questionnaires because the information was relevant because they could be witnesses or have information related to the plaintiff's claims).

### 2. Information about people with SPMI but not so designated is relevant.

Information about people in RIDOC custody who likely meet the definition of SPMI but have not been so designated is relevant to the claims in this case. But these people have been

---

[8] The providers prescribing most of the psychiatric medications discussed here are Drs. Burgard, Matkovic, Myint-u, and Puttichanda. *See* Ex. G.

improperly redacted from Restrictive Housing Reports, Prescription Lists, Meeting Minutes and Use of Force Reports.

As discussed above, it appears that Defendants are missing about half, or even more, of the people with SPMI in their custody. That means that the information RIDOC is producing regarding people with SPMI is grossly incomplete. This redacted information concerns putative class members and potential witnesses with material evidence of Plaintiffs' claims regarding the treatment and conditions of solitary confinement.[9]

Moreover, Defendants' failure to designate all people with SPMI may, in turn, impact the treatment they receive in solitary confinement. For example, if mental health staff pay particular attention to the mental health of people designated as SPMI in restrictive housing, this would mean that the failure to designate someone as SPMI despite the person having an SPMI would mean that the individual would not get the benefit of that extra attention. Only the unredacted documents will provide an accurate understanding of the relevant facts in this matter to support the parties' claims or defenses. To permit Defendants to withhold such information conflicts with the purpose of discovery. *See McEvoy v. Hillsborough Country*, No. 90-cv-431-SM, 2011 WL 1813014, at *2 (D.N.H. 2011) ("The purpose of pretrial discovery is to make trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.") (quoting *Wamala v. City of Nashua*, No. 09-cv-304-JD, 2010 WL 3746008, at *1 (D.N.H. Sept. 20, 2010) (internal quotation marks omitted)); *Bennett v. La Pere*, 112 F.R.D. 136, 140 (D.R.I.

---

[9] Although the class definition in the Complaint includes only those designated as SPMI, the claims in this matter are not so limited. *See, e.g.,* Doc. 1 at ¶¶ 125-129, 131, 145-152, 160-162. Even if the class claims were limited to the treatment of only those people designated as SPMI, which they are not, there is no basis for limiting the claims of DRRI, which is not a member of the putative class.

1986) (the purpose of discovery is "to allow a wide search for facts which may aid a party in the attempt to ready the prosecution or defense of a claim.").

### D. Information About People in Restrictive Housing Is Relevant

Defendants have also redacted information about people who do not have a mental illness. Specifically, Defendants have redacted the restrictive housing reports to remove all information about anyone who is not designated as SPMI. As discussed above, these redactions remove information about people who have an SPMI but are not so designated. They also remove information about people who do not have an SPMI. This information is also relevant.

The case is about how people with an SPMI are treated in RIDOC – when they are placed into restrictive housing, what the conditions are in restrictive housing, and whether they are placed there and kept there effectively as punishment for their mental illness.

Information about restrictive housing in RIDOC generally is relevant to the Plaintiffs' claims and Defendants' defenses. One can only determine if people with SPMI are more likely to be placed in restrictive housing than those who do not have an SPMI, whether they stay for longer periods of time, and whether they are placed into restrictive housing for similar reasons if one has information about those with an SPMI and something to compare that to, namely information about those who do not have an SPMI. For example, if people with an SPMI spend, on average, 30 days in restrictive housing at a time, but people who do not have an SPMI spend, on average, 15 days at a time, this would certainly be relevant to Plaintiffs' claims that people with SPMI are being punished for their mental health conditions, whereas if people who do not have an SPMI were spending 60 days on average, that would suggest that some accommodation was being made. Information about people who do not have an SPMI is also relevant to Plaintiffs' claims because

it provides a comparison of the frequency, amount, length of time, and reason for placement in restrictive housing for persons with SPMI. Such a comparison is appropriate and likely crucial to establish whether or not Defendants are using improper practices resulting in discrimination against persons with SPMI being placed in restrictive housing. This information is not only centrally related to Plaintiffs' claims, particularly its claims for violations of the ADA, and Section 504 of the Rehabilitation Act, but it also directly related to Defendants' likely defense that SPMI individuals are placed in restrictive housing less often or for shorter periods of time.

Finally, Plaintiffs review of the only two unredacted Restrictive Housing Reports produced reflecting every person that was in Administrative or Disciplinary Confinement during the months of October 2018 and April 2019, and the date they entered restrictive housing, demonstrate that the data in the statistical restrictive housing reports is not reliable and understates the actual number of people in restrictive housing on certain dates. For example, the statistical restrictive housing report for March 2019 states that there were 99 people in restrictive housing on March 31, 2019. Ex. O, Restrictive Housing at RIDOC March, 2019. But the April 2019 Restrictive Housing Report, which shows the dates that people who were in restrictive housing during April 2019 entered restrictive housing identifies 144 people who entered restrictive housing on or before March 31, 2019. Ex. F, April 2019 Restrictive Housing Report. In other words, not only is the redacted information relevant to understand the conditions of solitary confinement, but it is necessary to assess the accuracy and credibility of other information produced.

### E. The Meeting Minutes Are Relevant

Defendants have redacted blocks of text from Meeting Minutes, apparently because they refer to someone not designated as SPMI. The blocks of redacted text contained within the Meeting Minutes is specific to a person and their situation. Thus, it is impossible to know the specific relevance of each redacted paragraph or whether the person likely has an SPMI regardless of the designation. However, review of the paragraphs that are not redacted indicate that the discussions in these meetings are highly relevant to the claims in the case. For example, in the Meeting Minutes from one meeting, it is noted that one particular person is on CMS (Crisis Management Status), that she should be kept in isolation, and that the warden has said that she can be placed on ARS (Administrative Restrictive Status) if necessary. *See* Ex. H, July 2, 2020 Women's Facility Triage Meeting minutes. It appears that they are discussing keeping someone in the restrictive housing unit because she is having a serious mental health crisis.

In other Meeting Minutes, another person is discussed as being on psychological observation and being kept in quarantine in the Restrictive Housing Unit ("RHU") and it is noted that she is paranoid. Because there are many people in RIDOC custody who likely have an SPMI but are not so designated, it is likely that some of the redacted paragraphs discuss people who have an SPMI. These discussions, like the ones that relate to persons who are designated as SPMI, may clarify whether and how mental health staff and custodial staff consider the effect of isolation on people with an SPMI, and make decisions about continued segregation placement in such circumstances.

### F. The Use of Force Reports Are Relevant

Defendants have redacted all identifying information and blocks of information – sometimes entire pages – within the UOF Reports. It is impossible to determine the specific relevance of the redacted information. However, the information that remains in the UOF Reports pertain to the events leading up to, the occurrence of the use of force on individuals in restrictive housing in RIDOC, and some of the effects of the use of force (e.g., medical issues following the use of force). Absent knowing the identity of the individuals involved, Plaintiffs are unable to identify whether or not the person involved is someone designated as having an SPMI, or on the list of people who are prescribed medications suggesting they have an SPMI. This information is highly relevant because it provides details necessary to understand the facts, circumstances, and witnesses to instances when incarcerated individuals—including Plaintiffs—were subjected to force at the hands of RIDOC personnel. The UOF Reports would show who was subjected to the use of force, when, how many times, the circumstances under which the use of force was applied, and, in some cases, the connection between the use of force and the consideration of whether a person has an SPMI. For example, in May 2019, Plaintiff Charlene Liberty engaged repeatedly in self-harming activities and was subjected to the use of force. It was during this period that Plaintiff Liberty was assessed for and determined to be SPMI. The information in the use of force reports pertains directly to Plaintiffs' claims that Defendants subject individuals with SPMI to inhumane treatment and Defendants' unlawful pattern of using force as a first resort in reaction to what is often disability-related behavior. *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1080 (E.D. Cal. 2014) (holding that the evidence including, but not limited to, defendants continued use of force "against mentally ill inmates at a rate greatly disproportionate to their presence in the overall inmate population", demonstrates that

defendants have not sufficiently remedied Eighth Amendment violations in use of force, disciplinary measures, and segregated housing of seriously mentally ill inmates).

Further, the identity of individuals on whom force is used, including whether or not they are designated as SPMI, is relevant. This information will demonstrate Defendants' practice of the use of force on individuals with SPMI and how that practice compares with the use of force on non-SPMI individuals. For example, it will show whether or not individuals with SPMI are more likely to be subjected to force compared with those who do not have SPMI. It will also show whether the uses of force on people with an SPMI are for different reasons, such as self-harm, than for people who do not have an SPMI. Understanding and comparing the events leading up to incidents where RIDOC personnel used force and the effects of that force on individuals with SPMI compared with those without SPMI is directly related to Plaintiffs' claims of discrimination and inhumane treatment of individuals with SPMI in violation of the law.

Additionally, disclosure of the names of RIDOC personnel contained within the UOF Reports is clearly relevant to Plaintiffs claims because they are material witnesses to the information central to this case, as discussed above. Absent a valid legal basis to withhold such information—which Defendants do not have, as explained below—this information clearly falls within the broad scope of discovery.

Lastly, the information contained within the UOF Reports is also relevant to Defendants likely defense that Defendants do not have an unlawful practice or custom of using force against persons with SPMI. Without the identity of the individuals involved in these incidents—both individual's in RIDOC custody and RIDOC personnel—Plaintiffs are unable to assess the credibility of such naked assertions including, but not limited to speaking with material witnesses involved.

## II. DEFENDANTS' UNILATERAL REDACTION OF INFORMATION CONTAINED WITHIN RESPONSIVE DOCUMENTS IS IMPROPER

As discussed above, relevant, non-privileged documents requested in discovery that are proportional to the needs of the case should be produced in the manner in which they are kept in the usual course of business. Fed. R. Civ. P. 26(b)(1), 34(b)(2)(E); *Bonnell v. Carnival Corp.*, No. 13-22265-CIV, 2014 WL 10979823, at *3 (S.D. Fla. Jan. 31, 2014). Courts have noted in disputes over redactions that "Fed. R. Civ. P. 34 concerns the discovery of 'documents'; it does not concern the discovery of individual pictures, graphics, paragraphs, sentences, or words within those documents." *Bartholomew v. Avalon Cap. Grp., Inc.*, 278 F.R.D. 441, 451–52 (D. Minn. 2011); *Bonnell,* 2014 WL 10979823, at *2–4; *Graff v. Haverhill N. Coke Co.*, No. 1:09-CV-670, 2011 WL 13078603, at *7–8 (S.D. Ohio Aug. 8, 2011); *ArcelorMittal Cleveland Inc. v. Jewell Coke Co., L.P.*, 2010 WL 5230862, at *3 (N.D. Ohio Dec. 16, 2010); *see also Orion Power Midwest, L.P. v. American Coal Sales Co.*, 2008 WL 4462301, at *1–2 (W.D. Pa. Sept. 30, 2008) (finding that there is no express or implied support in the Federal Rules of Civil Procedure by "which a party would scrub responsive documents of nonresponsive information.").

A party should not unilaterally redact information it believes to be irrelevant. *See, e.g.*, *Bartholomew*, 278 F.R.D. at 451–52 ("Redaction is an inappropriate tool for excluding alleged irrelevant information from documents that are otherwise responsive to a discovery request. It is a rare document that contains only relevant information. And irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information."); *Sexual Minorities of Uganda v. Lively*, No. 3:12-30051-MAP, 2015 WL

4750931, at *4 (D. Mass. Aug. 10, 2015) ("Redaction of documents that are responsive and contain some relevant information should be limited to redactions of privileged information when, as in this case, there is a protective order restricting the use and dissemination of other sensitive information."); *HR Technology, Inc. v. Imura Int'l U.S.A., Inc.*, 2011 WL 836734, *3 (D. Kan. Mar. 4, 2011) ("a party may not redact non-responsive portions from a document that is otherwise responsive." ); *Hasbro, Inc. v. Mikohn Gaming Corp.*, No. CV 05-106 ML, 2006 WL 8456748, at *1 (D.R.I. Mar. 30, 2006) ("The substantial redactions are based solely on relevancy grounds. However, courts have generally not been receptive to the practice of unilateral document redactions on the basis of relevancy objections."); *United States v. Davis*, No. 85 Civ. 6090, 1988 WL 96843 (S.D.N.Y. Sept. 13, 1988) (unilateral redaction of documents on relevance grounds "unfairly" deprived requesting party of its discovery rights).

Notably, there is no provision governing discovery in the Federal Rules of Civil Procedure that provides a party the right to withhold discoverable but purportedly irrelevant portions of relevant documents. *See* Fed. R. Civ. P. 26, 34; *see also Bartholomew*, 278 F.R.D. at 451–52 (analyzing distinction between Rule 5.2 and Rule 34, and deciding that Rule 34 does not permit redaction on relevance grounds); *Evon v. Law Offices of Sidney Mickell*, 2010 WL 455476, at *4 n.1 (E.D. Cal. Feb. 3, 2010) ("Redaction is, after all, an alteration of potential evidence. The Federal Rules sanction only very limited unilateral redaction, *see* Fed. R. Civ. P. 5.2. Outside of these limited circumstances, a party should not take it upon him, her or itself to decide unilaterally what context is necessary for the non-redacted part disclosed, and what might be useless to the case."); *ArcelorMittal Cleveland Inc.*, 2010 WL 5230862, at *3 (finding that Rule 34 does not permit redactions based on relevance grounds).

The Federal Rules of Civil Procedure weigh heavily *against* redactions of the nature at issue here. *See Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, No. 12CV00787FLWLHG, 2017 WL 3624262, at *2–4 (D.N.J. Apr. 26, 2017), *report and recommendation adopted*, No. CV 12787 (FLW)(LHG), 2017 WL 3668391 (D.N.J. Aug. 23, 2017) (Rule 34(a) "permits a party to request that its adversary 'produce and permit the requesting party ... to inspect [any responsive documents] in the responding party's possession custody or control[.]' In turn, 'the responding party may state that it will produce copies of documents...instead of permitting inspection.'") (citing *Bonnell*, 2014 WL 10979823, at *3 (finding "that Rule 34 requires documents to be produced in a form or forms in which they are ordinarily maintained") and Fed. R. Civ. P. 34(b)(2)(B))(emphasis in the original). The court continued: "The language of the rule plainly intimates that the copy of the document produced would be identical to the document to be inspected. If portions of a document produced did not contain the same content as the document had it been inspected, then it would not be a true copy, and would defeat the purpose of an inspection." *Id.*

The Restrictive Housing Reports, Prescription Lists, and Meeting Minutes are responsive to Plaintiffs' discovery requests, which is why the Defendants produced them. Thus, even to the extent some of the information Defendants redacted is irrelevant—which it is not, as set forth in detail above—Defendants unilateral redaction of purportedly irrelevant information contained within responsive documents on the grounds of irrelevancy is improper. Additionally, it denies the full context resulting in incomplete information and raises suspicions, particularly here, where there is evidence of conflicting information and failure of Defendants to properly designate individuals with SPMI. *See In re State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*,

2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009) (stating that "[unilateral] redactions are generally

unwise. They breed suspicions, and they may deprive the reader of context.").

### III. DISCLOSURE OF PRIVATE OR CONFIDENTIAL INFORMATION IS PERMISSIBLE SUBJECT TO ADEQUATE PROTECTIONS

Defendants object to the production of unredacted versions of the Restrictive Housing

Reports, Prescription Lists, Meeting Minutes, and UOF Reports on the grounds that the

information is confidential and protected from disclosure. However, absent a valid legal basis for

privilege, which does not exist here, courts routinely order the disclosure of relevant confidential

and sensitive information provided that such information is sufficiently protected.[10] *See Sexual

Minorities of Uganda*, 2015 WL 4750931, at *4; *see also Diaz-Garcia v. Surillo-Ruiz*, 45 F. Supp.

3d 163, 168-69 (D.P.R. 2014) (finding that the protective order was sufficient to safeguard privacy

concerns relating to the production of employee personnel files, and order production without

redaction); *Wallace v. Pharma Medica Rsch., Inc.*, No. 4:18CV01859 PLC, 2021 WL 22593, at *6

(E.D. Mo. Jan. 4, 2021) (finding that the protective order provided sufficient protection for medical

"records and reports relating to other study participants testing positive for hepatitis C" and ordering

that the documents be re-produced without redaction).

---

[10] Assertions of privilege in pretrial discovery disputes in federal courts are governed by Fed. R. Evid. 501. *See N.O. v. Callahan*, 110 F.R.D. 637, 640 (D. Mass. 1986) (*citing American Civil Liberties Union of Mississippi, Inc. v. Finch*, 638 F.2d 1336, 1342 (5th Cir.1981); *In re Hampers*, 651 F.2d 19, 22 (1st. Cir.1981); 4 J. Moore, J. Lucas, and G. Gromeer, Jr., Federal Practice, ¶ 26.60[7] 223–4 (1984)). "In federal question cases, federal common law controls the existence and application of evidentiary privileged." *In re Administrative Subpoena Blue Cross Blue Shield*, 400 F. Supp. 2d 386, 389 (D. Mass. 2005) (*citing* Fed. R. Evid. 501 (stating that privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience")); *see also Gargiulo v. Baystate Health, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011), *objections overruled*, 279 F.R.D. 62 (D. Mass. 2012) (*citing Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 227 (D. Mass. 1997)); *U.S. v. Sinha*, 2014 WL 1265157, at *2-3. (S.D. Miss. 2014)(federal courts apply federal common law to make determinations regarding the existence and scope of privilege, not state law)(*citing Coughlin v. Lee*, F.2d 1152, 1159 (5th Cir. 1991)). Defendants do not articulate any grounds for the application of a federal common law privilege to the documents at issue in this motion thus, Defendants have no basis to withhold the redacted information on privilege grounds.

There are certainly statutes and regulations that limit the disclosure of private or confidential information. However, the statutes and regulations that are at play here do not prohibit disclosure; rather they require adequate protections of such information, protections that are already in place in this case. For example, the Health Insurance Portability and Accountability Act (HIPAA) of 1996 and its implemental regulations permit "disclosure of patient records in legal proceedings is permitted if ordered by the court." *See McEvoy v. Hillsborough County*, No. 09-cv-431-SM 2011 WL 1813014, at *6 (D.N.H. 2011) (*quoting Cora-Reyes v. P.R. Aqueduct & Sewer Auth.*, No. 08-1239 (CVR) 2019 WL 2670872, at *5 (D.P.R. 2010)). As explained by one court, the argument that HIPAA and its implementing regulations do not permit disclosure "is not a persuasive basis for refusing production because, at a minimum, the parties are free to enter into confidentiality agreements preventing disclosure outside the litigation context." *Cooks v. Town of Southampton*, No. 13-3460, 2015 WL 1476672, *10 (E.D.N.Y. March 31, 2015) (internal quotations and citations omitted).

Nor does Rhode Island state law provide a basis for withholding the requested documents from production when there are adequate protections in place. The Rhode Island Supreme Court has rejected such arguments in the past. *See, e.g.*, *In re Grand Jury Subpoena*, 748 A.2d 821, 824 (R.I. 2000) (discussing how the Rhode Island Supreme Court invalidated statutory attempts to create a complete ban on the production of confidential health records but declaring § 5-37.3-6.1 sufficient because it provides "a permissible balance between a party's interest in maintaining the confidentiality of his or her personal health care records and the court's need to access relevant information." (*quoting In re Doe*, 717 A.2d at 1133)); *see also Pastore v. Samson*, 900 A.2d 1067,

1085 (same);[11] *see also Bush v. Stewart*, No. C.A. NO. 88-0225, 1991 WL 789841, at *1 (R.I. Super. July 26, 1991)(ordering the defendant to provide discovery, including medical records and testimony of his observations of a psychiatric patient); *see also Butler Hospital, v. Nathaniel Hansmann, et al*., 2014 WL 12628520, at *2-3 (M.D. Fla July 28, 2014) (using a balancing test in finding that R.I. Gen. Laws §5-37.3-6.1 required disclosure of psychiatric records and explaining that common law privilege is inapplicable.)

Further, in circumstances where, as here, important federal interests are at stake, courts generally order the disclosure of sensitive information, even information covered by state law privileges. *See e.g., Garrity v. Thompson*, 81 F.R.D. 633, 636 (D.N.H. 1979) (granting plaintiffs, who were seeking class certification, access to the medical records of residents of a state school for persons with developmental disabilities, despite federal Medicaid and state privacy statutes); *N.O. v. Callahan*, 110 F.R.D. at 646-647 (permitting access to redacted medical records of class members in state mental health hospitals, despite state law protections for those records). Numerous courts have ordered the disclosure of confidential information of non-parties or certified class members under the protection of a protective order, despite applicable state statutes. *See Kallas v. Carnival Corp*., 2007 WL 2819385 at *2 (S.D. Fla 2007) (ordering the defendant to disclose the names and contact information of non-plaintiffs who contracted an illness and the production of unredacted illness logs and questionnaires because such information was relevant, the persons may be witnesses, and the plaintiff agreed to the entry of a HIPAA-compliant protective order); *G.D. v.*

---

[11] R.I. Gen. Laws § 5-37.3-6.1 requires notice to the person whose records are sought and the opportunity to object to the disclosure of such information. If the person objects to disclosure, the court is then required to conduct a balancing test to determine what should be produced. As an alternative, Plaintiffs' sought to obtain the identifying information of a sample of non-parties in order to notify and obtain a release or waiver if agreeable to the individual, but Defendants refused.

*Riley*, 2007 WL 2206559, at *3-4 (S.D. Ohio, 2007) (granting the Protection and Advocacy organization on behalf of plaintiffs access to HIPAA-protected information of potential class members, subject to a protective order); *Vanvalkenburg v. Or. Dep't of Corrections*, 2015 WL 421426 at *3 (D. Or. 2015) (allowing plaintiff to discover protected information about other inmates' accommodation requests in an action for violating federal and state anti-discrimination laws due to a protective order, noting that specific documents may be subject to privilege); *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 72-73 (S.D. NY 2010)(granting disclosure of personnel information of non-plaintiff employees, subject to a broad protective order limiting the disclosure of personally identifiable information of non-plaintiffs in an employment discrimination action); *Diaz-Garcia v. Surillo-Ruiz*, 45 F.Supp.3d 163, 168-69 (D.P.R. 2014) (ordering production of personnel files for 17 employees to plaintiffs asserting employment discrimination on the basis of political affiliation, subject to entry of a protective order to address privacy concerns). This is particularly true where, as here, Defendants are the only parties with access to this information. *See Soto v. City of Concord*, 162 F.R.D. 603, 615–16 (N.D. Cal. 1995) (distinguishing the balance of competing interests of confidentiality and plaintiff's need for discovery where the only way to "obtain information of comparable qualify" is from defendants from a case in which plaintiffs had access to the same information sought from defendants' personnel files) (*citing Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990)).

The Restrictive Housing Reports, Prescription Lists, Meeting Minutes, and UOF Reports vary in the level of privacy interests, but none implicate any federal common law privilege or privacy concerns that are not appropriately remedied by the existence of the Protective Order. *See generally*, Doc. 30. The Restrictive Housing Reports include the dates each person has been in

restrictive housing during the current stint in restrictive housing, the security level, the restrictive housing status (administrative or disciplinary), and information about the infraction, though not the factual basis of the infraction. None of this information is particularly sensitive. Any privacy concerns are adequately protected by the Protective Order.

On the other hand, Plaintiffs recognize that the Prescription Lists include information about the medications people in RIDOC custody are prescribed, the Meeting Minutes contain a variety of information about housing locations and mental health status of certain individuals in RIDOC custody, and although the UOF Reports contain mostly information concerning the subject incident, some also include reference to certain health information. Therefore, privacy concerns are implicated but, the information should be produced because it is sufficiently protected by the Protective Order.[12]

The Protective Order protects all "Confidential Information", defined as "any information that constitutes or contains private, personal information, including but not limited to protected health information as defined by the Health Insurance Portability and Accountability Act, 45 C.F.R. § 160.103, information protected pursuant to Fed. R. Civ. P. 5.2 and LR Gen 102, as well as information that implicates concerns for security, classification and limited correctional administration and is not already in the public domain or publicly available." *See* Doc. 30, Protective Order, § 2. Further, the Protective Order expressly states that use of Confidential Information "shall be held in confidence by each person to whom it is disclosed, shall be used only for purposes of this action, shall not be used for any business or an improper purpose, and shall

---

[12] To the extent Defendants believe the Protective Order does not provide adequate protection for these documents, Plaintiffs are willing to discuss ways to strengthen the Protective Order.

not be disclosed to any person who is not authorized to receive such information as provided herein." *Id.*, § 5. Thus, the Protective Order is sufficient to protect the privacy interests of each individual. *See Pastore*, 900 A.2d at 1086 ("The Confidentiality of Health Care Information Act is not a shield behind which a medical provider may hide to avoid liability for medical negligence or for any other purpose"); *In re Grand Jury Investigation*, 441 A.2d at 531-32 (holding that the Confidentiality of Health Care Information Act cannot be used to prevent medical records of a patient's treatment during a criminal investigation); *Gaumond v. Trinity Repertory Co.*, 909 A.2d 512, 517 (R.I. 2006) ("A party may not hide behind confidentiality to avoid disclosure of unfavorable evidence.") (citing *State v. Guido*, 698 A.2d 729, 734 (R.I 1997) (holding that a statute providing for confidentiality of medical records may not be used to shield relevant and material evidence from legal process); *In re Doe*, 717 A.2d 1129, 1135 (R.I. 1998) (state prosecutor may not assert grand jury secrecy to avoid compliance with procedural protections for privileged medical records). This includes personnel records that are relevant to the claims asserted in the case. *See e.g.*, *Fowler-Washington v. City of New York*, No. 19-CV-6590(KAM)(JO), 2020 WL 5893817, at *4 (E.D.N.Y. Oct. 5, 2020) (ordering the production of personnel records regarding police officers' employment history including, disciplinary matters, complaints, accusations of excessive force, and other wrongdoing because they were relevant to plaintiff's civil rights allegations, under the protection of a protective order); *Theidon v. Harvard Univ.*, 314 F.R.D. 333, 334-336 (D. Mass. 2016) (holding that defendants could not redact the names or identifying information of internal and external letter writers who evaluated the plaintiff's candidacy for tenure, the names of individuals plaintiff was compared to, or the names of the individuals on the committee that considered her tenure case despite the confidentiality of the information because

plaintiff's need for the information relevant to plaintiff's discrimination claims outweighed the any harm of disclosure). Notably, Plaintiffs are not seeking identifying personal information beyond the names of correctional officers involved or witness to the misconduct in Plaintiffs' underlying claims, which are undeniably relevant in this case. *See Fowler-Washington*, 2020 WL 5893817, at *4 (holding that personnel records be produced but permitting the redaction of "personal identifying information only if it falls into one of the following categories: social security numbers, dates of birth, home addresses, and the names of family members"); *See also Cody v. New York State Div. of State Police*, No. 07-cv-3735, 2008 WL 3252081, at *4 (E.D.N.Y. July 31, 2008) (ordering production of the requested personnel files but permitting the redaction of "any information of a personal nature, such as social security numbers, personal telephone numbers, and home addresses" unnecessary to litigate). Notably, Defendants do not cite to any caselaw asserting that a protective order in this context is insufficient.

Moreover, the privacy concerns implicated here are far less intrusive than documents routinely produced subject to a protective order in putative class actions challenging aspects health care in prison systems. *See, e.g.*, *Wragg v. Ortiz*, 462 F. Supp. 3d 476, 490 (D.N.J. 2020) (discussing the medical records that had been produced in discovery); *Dockery v. Fischer*, 253 F. Supp. 3d 832, 844 (S.D. Miss. 2015) (same); *Braggs v. Dunn*, 317 F.R.D. 634, 649 (M.D. Ala. 2016) (same); *Coleman v. Wilson*, 912 F. Supp. 1282, 1303 (E.D. Cal. 1995) (same); *see also Wallace*, 2021 WL 22593, at *6 (ordering production of medical records of participants in medical trials who tested positive for hepatitis C).

## IV. DEFENDANTS' OBJECTIONS ON THE GROUNDS THAT PRODUCTION OF THE REDACTED INFORMATION IS OVERLY BURDENSOME IS MERITLESS

Finally, Defendants' objection to the production of the redacted information on the grounds that production of unredacted versions of the Restrictive Housing Reports, Prescription Lists, and Meeting Minutes is overly burdensome is meritless. Defendants should already have in their possession unredacted versions of the documents already produced. Therefore, simply producing those unredacted copies should not be overly burdensome. In fact, to produce those copies should take less work than the production of the redacted copies.[13]

Further, Defendants will not be required to review any *additional* documents as a result of Plaintiffs' request but will be required simply to produce the same documents they have already *without* having the task of making unilateral redactions.

## CONCLUSION

As described herein, the redacted information is essential to Plaintiffs' claims, Defendants are the only ones with access to it, Defendants failed to articulate a valid legal basis for withholding such information, and the cost or burden of producing such information is minimal, particularly compared to the importance of the issues at stake here. For all the reasons set forth above, the Court should grant Plaintiffs' Motion to Compel and order Defendants to provide

---

[13] To the extent that Defendants argue that it would be burdensome to produce the documents a second time, this argument is also without merit. When Plaintiffs first raised this issue with Defendants in February 2021, very few documents at issue here had been produced. Defendants decided to continue redacting and, thereby, took on the risk that they would have to re-produce the improperly redacted documents. They should not be permitted to evade their discovery obligations based on their decision to redact information from relevant, responsive documents.

Plaintiffs with unredacted versions of the Restrictive Housing Reports, Prescription Lists, Meeting Minutes, and UOF Reports.

Respectfully submitted,

By their attorneys,

*/s/ Maria V. Morris*
Maria V. Morris (D.C. Bar No. 1697904)
*Admitted Pro Hac Vice*
Tammie Gregg (MN Bar No. 262420)
*Admitted Pro Hac Vice*
ACLU NATIONAL PRISON PROJECT
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone: (202) 548-6618
Facsimile: (202) 393-4931
Email: mmorris@aclu.org
        tgregg@aclu.org

*/s/ Anne M. Mulready*
Anne M. Mulready (RI Bar No. 4738)
Brian Adae (RI Bar No. 2536)
DISABILITY RIGHTS RHODE ISLAND
33 Broad St., Suite 601
Providence, RI 02903
Telephone: (401) 831-3150
Facsimile: (401) 274-5568
Email: amulready@drri.org
badae@drri.org

*/s/ Patrick T. Uiterwyk*
Patrick T. Uiterwyk (RI Bar No. 7461)
James S. Rollins (MA Bar No. 569422)
*Admitted Pro Hac Vice*
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, MA 02111
Telephone: (617) 417-4700
Facsimile: (617) 217-4751

Email:
Patrick.uiterwyk@nelsonmullins.com
James.rollins@nelsonmullins.com

Dated: December 8, 2021                         **ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 8, 2021, the foregoing Plaintiffs' was sent by mail and electronically to counsel of record at the following addresses:

Brenda Baum
Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, RI 02903
Email: bbaum@riag.ri.gov

Rebecca Partington
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
Email: rebecca@desistolaw.com

Marc DeSisto
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
Email: marc@desistolaw.com

By: <u>*/s/ James Rollins*</u>