1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF RHODE ISLAND

3

4
     * * * * * * * * * * * * * * *    C.A. NO. 19-573-JJM
5                                *
     CHARLENE LIBERTY, on behalf   *
6    of themselves and all others  *
     similarly situated, ET AL     *
7                                *
         VS.                      *    DECEMBER 20, 2021
8                                *    2:30 P.M.
     RHODE ISLAND DEPARTMENT OF   *
9    CORRECTIONS, ET AL           *
                                  *
10   * * * * * * * * * * * * * * *    VIA VIDEOCONFERENCE

11

12          BEFORE THE HONORABLE PATRICIA A. SULLIVAN,

13                     MAGISTRATE JUDGE

14                (Discovery Dispute Conference)

15

     APPEARANCES:
16

     FOR THE PLAINTIFFS:    JAMES S. ROLLINS, ESQ.
17                          Nelson, Mullins, Riley &
                            Scarborough, LLP
18                          One Post Office Square, 30th Floor
                            Boston, MA   02109
19
     FOR THE DEFENDANTS:    BRENDA D. BAUM, ESQ.
20                          Attorney General's Office
                            150 South Main Street
21                          Providence, RI   02903

22

23

24

25

1    20 DECEMBER 2021 -- 2:30 P.M.

2    VIA VIDEOCONFERENCE

3         THE COURT:  All right.  Hello, everybody.  We

4    are -- this is a conference for purposes of addressing

5    a discovery dispute.  The parties have submitted

6    letters to me regarding the dispute.  I have read the

7    letters.

8         With the assistance of my law clerk, we've

9    actually taken a pretty deep dive into the law because

10   I was surprised by the scope of what the Plaintiffs

11   were looking for, and they purported to have cases

12   supporting what they wanted.  So we did a lot of work

13   to prepare for this dispute.

14        So let me begin by kind of telling you what I

15   think the law says, which is not what the Plaintiffs

16   represented to me, which is a little troubling.

17        For starters, the lead case that the Plaintiffs

18   presented, *Braggs v. Dunn*, 2020 West Law 5909086 from

19   the Middle District of Alabama, October 2020, was

20   vacated by the Court five days later.

21        Subsequently, a different order was entered

22   which is in the docket of that case at docket number

23   3098-1, suggesting that they're up to 3,000 docket

24   entries, and it appears to have a very different scope

25   from what the Plaintiffs are suggesting, which was

1    based on what was in the case.

2         The research that we did suggests that the

3    principle articulated in the case we got from the

4    Defendant, which is *U.S. v. Territory of the Virgin*

5    *Islands,* 280 F.R.D. 232 from 2012, which is -- deals

6    with a facility inspection in a correction facility and

7    which talks about kind of guiding principles based on

8    the rules, which is where I think our discussion needs

9    to go, seems more appropriate.

10         The circuit court case, which is not in the

11   context of prison inspections, struck me as laying out

12   highly advisable principles for the Court to look at,

13   including finding it to be an abuse of discretion in

14   that case for the District Court to have entered an

15   order that allowed an expert to roam through the plant

16   making such inquiries as he deemed appropriate.

17         So we did a little research of our own, and I

18   think instructive is a case from 2020 from Mississippi,

19   *Amos v. Taylor.*  It does deal with inspection at a

20   prison facility based on Eighth Amendment alleged

21   violations, and that case is 2020 West Law 618824.

22         And at page 5 the Court notes, regarding inmate

23   interviews, Courts have cautioned against allowing

24   informal interviews during prison inspection because

25   these unsworn, roving depositions offer small utility

1    to fact finding; and based on that, this Court said,

2    No, we're not doing that.

3        We also looked for guidance in our own circuit,

4    which is always important, and in the immediate

5    vicinity; and I think while we didn't find anything

6    specifically on point, there's no question that a right

7    to inspect arises from Rule 34, that that inspection

8    has to keep security, including in the time of COVID,

9    and health strongly in mind but that the concept of

10   hybrid, unsworn depositions or roving depositions is

11   not something that I found to be endorsed anywhere in

12   our circuit.

13       And as noted, the Fourth Circuit's finding that

14   to be an abuse of discretion struck me as appropriate,

15   *Amos'* language indicating that that Court appears to

16   have really done work of looking at what's out there

17   and found it to be completely inappropriate.

18       So with all of that, it seemed to me that it may

19   be that we need a restart on a meet and confer that's

20   based on what the law says; and that would require, it

21   seems to me, a discussion of a -- first of all,

22   something that's fair to both sides; something that

23   takes into account that, other than their own clients,

24   Plaintiffs are talking to people who have Fifth

25   Amendment rights, HIPAA rights and ex-parte, unsworn

1    interviews by people who, frankly, I don't even know

2    how their qualifications make them -- make it

3    appropriate for them to be doing that.  Certainly that

4    hasn't been provided.

5         I have really serious concerns about the Fifth

6    Amendment rights of these people who are going to be

7    randomly approached and asked to talk about, for

8    example, why are you in seg when it may very well be

9    that the conduct is -- exposes that person to criminal

10   prosecution.  That just -- I mean, totally aside from

11   the fairness to the Defendant, fairness to these people

12   is pretty serious.

13        So I just can't imagine that I will order that

14   the Defendant needs to allow these experts to roam

15   through the institution and randomly have ex-parte,

16   confidential, unsworn access to unlimited interviews of

17   prisoners and staff.  It just doesn't make any sense.

18        The Rule 34 inspection rule does not permit it.

19   If you want to talk to people who are not your client,

20   you do it under oath, and the deposition process is

21   created for that purpose.

22        All of that said, it may very well be that a

23   discussion amongst the parties could lead to an

24   agreement that there might -- it might be appropriate

25   for, for example, an expert who's qualified to be

1    making the inquiry, I don't know what those

2    qualifications would be, but a qualified expert could

3    have a cell-side interview with the other side having

4    the right to have the same analogue expert, if they

5    want, one lawyer from each side, a preapproved script

6    to be addressed to the individuals who are questioned

7    and, you know, perhaps three or four questions, a time

8    limit, and both sides' experts would have the

9    opportunity to listen and observe.

10          There might be some utility in something like

11   that; but I'm not an expert in this area, so I don't

12   know what experts in this area actually think is

13   useful.

14          What's described in the Plaintiffs' proposal

15   seems to me is an expert report that would go out the

16   window under *Daubert*, but -- and, in the meantime,

17   we've done unknown injury to the individuals whose

18   Fifth Amendment rights have been invaded.

19          So I'm also not thinking it's appropriate for

20   this roving expert wandering through the facility to be

21   randomly questioning employees of the Defendant

22   ex-parte.

23          The Plaintiffs have actually presented me with a

24   case where a Defendant did that and it was found to be

25   totally unethical.  The mirror image is just as

1    unethical.

2         So that said, I can see where the parties might

3    agree that the Defendant would have an employee who

4    would be in charge of the -- being the escort and

5    explaining to the group, which, as I say, should

6    include one lawyer for the Plaintiff, one lawyer for

7    the Defendant, one expert for the Plaintiff, if the

8    Defendants want, one expert for the Defendants, and

9    that that person would explain to people what they're

10   seeing; and in that environment for questions to be

11   asked of the escort seems to me is something that could

12   readily be managed and agreed upon and that it would

13   make it more efficient.

14        But I don't think that's been discussed.  I

15   think what's been discussed is what the Plaintiffs have

16   proposed, which is kind of off the reservation.  It

17   doesn't fit with the rules at all.

18        So that's a long preamble.  I don't usually do a

19   preamble like that with a deposition -- a discovery

20   dispute conference, but in this instance I was taken

21   aback.  Frankly, when you discover that the lead

22   opinion that's been presented to you was vacated five

23   days later, it's not inspiring.

24        So, with that, I wonder if what ought to happen

25   is that there should be a second discussion based on

1   what the law says, what the cases say, what the experts

2   within their area of expertise opine is consistent with

3   fact-gathering given their area of expertise and with

4   an emphasis on a couple of themes:  Fairness to both

5   sides, fairness to the individuals who are not part of

6   a class, there's no certification -- certified class

7   here, and who are not the clients of the attorneys who

8   would be questioning them.  There's no attorney/client

9   privilege.  Their Fifth Amendment rights are hanging

10  out there.

11          With all of those concerns in mind, you know, I

12  know that there's been a lot of discussion of HIPAA

13  concerns, and that goes without saying; but anyway,

14  that's my -- sort of my quick reaction to the

15  interviews.

16          For the Defendant to be doing the reverse

17  ex-parte interviews is just as inappropriate for the

18  Plaintiffs, but the Defendants -- it's the Plaintiffs

19  who said we want -- we want us to be able to do

20  everything and the Defendant to be able to do nothing.

21  The Defendants didn't come back with anything along

22  those lines.  So I think that's for further discussion.

23          Regarding documents, the request contemplated

24  that this roving team would have immediate ex-parte

25  rights to demand access to documents to -- obviously

1    they have the right to question staff about documents.

2    Give me the documents, show me the documents, give me

3    your computer, no, that is not what the rules

4    contemplate.

5        Might there be some real efficiencies in -- if

6    in the course of such -- the progress through the

7    facility appropriately with everyone, with a lawyer for

8    each side, an expert for each side, to discuss

9    production of a document that is identified, of course;

10   but the rules contemplate that.  The rules do not

11   contemplate what has been proposed by the Plaintiff.

12       So it seems to me it's more meet and confer,

13   which as -- and that it's really hard for me in this

14   context to sort of have a real discussion because it

15   sounds like the Defendants haven't been presented with

16   a proposal that was worthy of discussion and that maybe

17   you guys need to have that discussion first and you

18   might actually solve all this, but -- so let me -- I

19   know I keep saying I'm going to stop talking; but,

20   Mr. Rollins, Plaintiffs' perspective, does it make

21   sense for you guys to go back and meet and confer a

22   little more?

23       MR. ROLLINS:  Thank you, your Honor.  First, if

24   we have miscited anything to the Court, I want to

25   sincerely apologize for that.

1    THE COURT:  You didn't miscite it.  You cited

2    something that was --

3    MR. ROLLINS:  Your Honor, please, my apologies;

4    but, please, I -- you know, I consider that as

5    misciting something.  If we did not appropriately cite

6    something to the Court, I apologize, and we will

7    address that.  Thank you.

8    THE COURT:  West Law doesn't tell you that.  You

9    have to go into the docket, which we did because I was

10    so stunned by what I was reading.  So we did, and lo

11    and behold.

12    MR. ROLLINS:  So, your Honor, in response to

13    your direct question, thank you, I think it does make

14    sense for the parties to have a further discussion.

15    I can tell you -- and I understand what you have

16    just said, your Honor, and I would just note that we

17    are not in agreement on all the points that you have

18    just stated.  I'm happy to run through them if you

19    would like, but I also don't want to take the Court's

20    time unnecessarily on that.  The parties can discuss it

21    further.

22    But my suggestion to the Court and to the

23    parties as to our proposal on this is that we have a

24    meet and -- a further meet and confer on this.

25    Frankly, the scope of the meet and confer and what

1    we've discussed to date and, frankly, what we've agreed

2    on, your Honor, I think is a bit more extensive than

3    your understanding.

4         We didn't raise all of -- we didn't put all of

5    that in a letter to you because we wanted to highlight

6    what we didn't agree on rather than what we agreed on.

7    So we want the Court to understand that, that it's not

8    that we presented a proposal to the Defendants and that

9    there was, you know, absolutely no agreement on it.

10        Actually, there was a good bit of agreement, but

11   there are certain points here that we couldn't agree

12   on.  We both agreed they should be presented to the

13   Court, and I appreciate all of the background work that

14   your staff and you have done, your Honor.

15        So I think we should do that; but I'd like to

16   get an understanding, collective understanding, if we

17   do that and if we are not able to reach agreement, our

18   thought is we file a motion at that point instead of

19   coming back to the Court again; but I want -- we don't

20   want to do that if that's not what they --

21        THE COURT:  Right.  Right.  I mean, I know time

22   is ticking; and, yeah, I guess the date, as I recall,

23   is the end of January, which means --

24        MR. ROLLINS:  That's correct, your Honor, and

25   also -- yeah, I think the big thing overlying or

1    overlaying all of this since the COVID situation, we
2    are well aware --
3            THE COURT:  Which is --
4            MR. ROLLINS:  We understand that --
5            THE COURT:  Yeah, yeah, yeah.  Today we closed
6    our clerk's office.
7            MR. ROLLINS:  Yeah.
8            THE COURT:  So I'm acutely aware.
9            MR. ROLLINS:  So we're aware of that.  We
10   understand that those dates may have to be continued
11   for that reason.
12           THE COURT:  Right.
13           MR. ROLLINS:  While we don't want them continued
14   for other reasons, we understand they may need to be
15   continued for other reasons if we can't reach
16   resolution on this matter otherwise, with or without
17   the Court's assistance, and we understand that.
18           But having that in mind, and I know Ms. Baum or
19   Ms. Partington will want to address this, but having
20   that in mind, do you contemplate having us coming
21   back -- come back again?
22           THE COURT:  So let me suggest this because I'm
23   aware of that problem, and actually my law clerk and I
24   talked about how should we answer that question.
25   They're going to ask us that.  So we've already thought

1    about it.

2         I think it probably makes more sense if you've

3    true -- I mean, you've heard my guidance.  I sort of

4    ran through it, cited some cases and so forth; and if

5    based on that the parties have now had a meet and

6    confer that's really grounded in, you know, Rule 34 and

7    what it says and there is a disagreement, then it

8    probably, mindful of holidays and all the other things,

9    makes sense for you to go ahead with a motion.

10         The one thing that the -- the caveat is that I

11   would give the Defendant the opening to say, Hold on,

12   but you can file the motion and they can still do it

13   and say, Wait a minute, we can reach an agreement; but

14   I think we ought to treat this as enough and you need

15   to, you know, get to lift off with a motion if the

16   parties can't reach an agreement.  That's sort of my

17   quick sense, but I'm going to give the Defendants an

18   opportunity to address that.

19         MR. ROLLINS:  Okay.  Thank you, your Honor.  If

20   I could take just a moment more of the Court's time to

21   address some related either issues that your Honor

22   raised or questions that I have from things that your

23   Honor asked about.

24         First of all, I just want to focus on the

25   Court -- the Court on the fact that at the commencement

1    of this case, we collectively agreed with the Court's

2    guidance, with your guidance, your Honor, that we would

3    collapse the merits and the class discovery.  Okay.

4            Some of what we are clearly running into at this

5    point in terms of concerns raised by the Defendants but

6    also just mentioned by you, your Honor, are the fact

7    that there is not a certified class at this point in

8    time.

9            And obviously there's a solution to that.  We

10   can certify a class or we can request that the class be

11   certified.  We were hoping to, and I think the Court

12   was, frankly, I assume, I don't want to import or

13   suggest I know what the Court's thinking, but I think

14   that part of the Court's concerns and the reason for

15   collapsing the schedule in that fashion at the outset

16   were anticipated efficiencies in how to deal with the

17   case; but we wanted to certainly note that for the

18   Court because we're running, frankly, smack into that

19   at this point.

20           THE COURT:  Yeah.  I mean, no doubt.  And just

21   one other observation.  Your cases were in the context

22   not only of a class or a certified but also a

23   termination proceeding.  So they were cases where the

24   Court had already made the findings that this is a

25   class, the class has been injured, the injury is so

1    serious that we're entering a remedial order, and now

2    we're dealing with should the remedial order terminate.

3         It's very different.  So to the extent that you

4    come back to me with cases, let's stick with the

5    context we're in, not that context, which seems to me

6    is quite different.

7         No doubt we've got a chicken and an egg problem.

8    It comes up in lots and lots of cases.  You are -- you

9    have a group of clients and a putative class, and the

10   things change somewhat in terms of the obligations of

11   the parties vis-a-vis the putative class versus the

12   certified class.  Those are different places.

13        A lot of the problems that I've got don't go

14   away after you're certified.  You know, when a group of

15   civil attorneys who don't even know where the Fifth

16   Amendment is located in the Constitution run into a

17   prison and start willy-nilly asking people questions

18   and their rights are not protected and you're dealing

19   with people who have that on their menu of really

20   serious concerns, I don't know that the person being in

21   a putative class or -- I'm not sure how that plays.  I

22   haven't seen attention to it, and it certainly ought to

23   be attended to.

24        Well, I'm not going to allow roving questioning.

25   If there's to be questioning of people who are in

1    segregation, it should be done in the way that I was

2    describing, including that the individuals should get a

3    -- from a neutral an advisory of their rights not to

4    participate and of risks they might face if they do.

5    Somebody should tell them.

6         I mean, just based on my work, I see many

7    situations where people are genuinely exposed to

8    criminal prosecution based on conduct that gets them

9    into disciplinary confinement.  So that's not a

10   hypothetical risk.  It's a very real risk, and it ought

11   to be taken into consideration.

12        I don't know what the solution is, but I'm sure

13   there is some sort of a solution; but I don't think a

14   magic wand of class cert is going to solve all these

15   problems.  That's my point.

16        MR. ROLLINS:  We understand, your Honor, the

17   issues about the -- the concerns that you have noted

18   and, you know, how class cert would play into those.

19        I do want to say I'm assuming all my -- I,

20   frankly, assume that everybody on this call on both

21   sides is well aware of where the Fifth Amendment law

22   is, your Honor, and the consequences to parties.

23        THE COURT:  Yeah.  Sorry.  That was rude of me.

24        MR. ROLLINS:  I didn't want that --

25        (Overlapping speech)

1          MR. ROLLINS:  I didn't want that comment to pass
2      without comment.
3          THE COURT:  Yeah.  I've had, not in this case,
4      but other cases where I have civil attorneys dealing
5      with prison issues and are really clueless about the
6      most important rights of all for the individuals who
7      they are purporting to be acting on behalf of, and
8      that's really important.
9          MR. ROLLINS:  And we do have some practical
10     solutions which we can propose in this case.  We don't
11     need to get into them right now, but we can; and they
12     are ones that, frankly, all the defense -- all the
13     Plaintiffs' counsel in this case have used in past
14     cases where we have engaged in these kinds of
15     inspections, not in roving depositions, but in discrete
16     questions to staff.
17         Again, I understand you don't agree with that,
18     your Honor, but let me note one other thing in terms of
19     who the parties are in this case.
20         Disability Rights Rhode Island is a Plaintiff
21     under every single count of this Complaint.  They have
22     their own statutory obligations and duties, and we will
23     brief that to the Court if need be.  I'm sure it will
24     get briefed to the Court a number of times in a number
25     of contexts.

1      Frankly, in some of these cases around the

2  country, virtually identical cases, the protection

3  advocacy agency, which is what DRRI is, is sometimes

4  the only Plaintiff.  We just, for a host of reasons,

5  have brought it slightly differently in Rhode Island.

6      This is also a common approach that's taken in a

7  number of other cases of this kind around the country,

8  but DRRI is its own Plaintiff.  I realize some of the

9  issues you've raised, your Honor, wouldn't necessarily

10  be addressed even with DRRI as a Plaintiff; but I did

11  want to (indiscernible).  It doesn't all rise and fall

12  on the status of an uncertified class or the status of

13  at least six named individual prisoner Plaintiffs.

14      Your Honor, I will let Brenda speak here.

15      THE COURT:  Eventually.

16      MR. ROLLINS:  Let me ask, because I'm -- I'm a

17  bit concerned about the question you raised in terms of

18  appropriate qualifications and not knowing what the

19  appropriate qualifications of these experts might be.

20  I recognize that you have not been presented with these

21  experts on the record without going into off-the-record

22  matters.

23      THE COURT:  Yes.  So --

24      MR. ROLLINS:  So I want to acknowledge you are

25  well aware of who these people are.

1        THE COURT:  Yes, I am.

2        MR. ROLLINS:  Okay.

3        THE COURT:  Yeah.  So here was my -- what I

4   realized.  When I thought about that and I -- and the

5   Defendants may not have this concern at all; and, I

6   mean, you're right, obviously the Defendants know a

7   lot -- have a lot deeper perspective than I do.

8        So I know who we're talking about.  I didn't go

9   back to see if I actually have CVs for those two

10  individuals.  I'm not sure I've ever seen CVs, but

11  possibly I have in the context of mediation, but I

12  don't -- I consider that to be a wall.

13       So if by any chance they're there, I didn't go

14  look for them and I don't have them in my mind.  So if

15  I do know their credentials, I don't know them as I am

16  standing before you right now.

17       My concern was that when we get -- when you get

18  to the *Daubert* stage of a case, part of what is going

19  to be at issue is whether the expert is relying on

20  information that is the type of information that within

21  that person's area of expertise is appropriate to rely

22  on.

23       For example, a psychologist might perform a

24  clinical interview doing a mental status examination.

25  A nonpsychologist might say, They're just asking

1    questions, what's the big deal about that?  But the

2    psychologist would say, Based on my training, this is

3    the method that is used customarily within my area of

4    expertise, and here's what it is, and here's how it

5    works, and here's why it's scientifically accepted, and

6    now I'm going to go on to my opinion.

7         So that foundational kind of area of expertise

8    appropriate is in some -- I'm just raising it.  It may

9    be a nonissue here.  The Defendants may be perfectly

10   content with what's going on, but before something

11   is -- what strikes me as so really off the wall as what

12   was proposed is authorized by the Court, it's outside

13   the four corners of the rules, I do look ahead to the

14   *Daubert* phase of the case and think, wait, the expert

15   relied on unsworn, random conversations procured

16   ex-parte and that's the foundation for the opinion?

17   Wait a minute.

18        MR. ROLLINS:  Your Honor, there is -- we're well

19   aware of the case law extent in that space, and there

20   certainly is case law squarely behind what you're

21   saying, not everything you just said, but in terms of

22   what is the expert relying upon; and we're well aware

23   of the fact that if there's statements that are sought

24   to be relied upon or information conveyed in an

25   informal context from individuals, that that, you know,

1    likely needs to be supported by sworn testimony as

2    well, whether it's deposition or otherwise.

3          So we're well aware of that and happy to talk

4    about the qualifications of these individuals.  I would

5    just note that they are two of the most eminent people

6    in their respective field, one being in prison

7    administration and the other being the prison mental

8    health, in the country.

9          And we would obviously need to address that if

10   it's challenged before the Court, and we would be happy

11   to do so; but I just wanted to get an understanding,

12   and thank you, your Honor.

13         THE COURT:  Yeah.  That's -- I have no idea if

14   that's a real issue, but something is kind of out there

15   as what's been proposed.  It was one of the things that

16   I thought how -- I mean, it's frankly the -- it's part

17   of what the case that I cited to you, *Amos v. Taylor*,

18   takes into consideration, that that is that these --

19   you know, the Court says unsworn roving depositions

20   offer small utility to fact finding.  So that --

21         MR. ROLLINS:  Your Honor, I don't want to --

22         THE COURT:  So here I say, wow, why would we

23   order that?

24         MR. ROLLINS:  Yeah.  Your Honor, I don't want us

25   to collectively get sidetracked on that right now and

1    waste people's time; but I do want to say just so we

2    have a practical understanding of what we're talking

3    about, to the extent you don't already have it, and

4    maybe you do, so maybe this is redundant and

5    unnecessary, but if you can indulge me for about 60

6    seconds.

7         In terms of staff questions, just so you know

8    what we're talking about, it's, you know, kind of a

9    tour through a particular pod, and this is only one

10   example, and the expert says, Okay, where do your

11   security people tend to be, you know, when they're

12   checking on people, you know, especially if they're

13   severely mentally ill folks, you know, how do you do

14   the self-harm checks.

15        That may stray beyond, your Honor, what you

16   contemplate having -- contemplate as appropriate; but

17   those are certainly the kinds of things that, you know,

18   all of us on the Defendants -- excuse me, on the

19   Plaintiffs' side have done in the past, yes, by

20   agreement with the other side.

21        In addition, in terms of looking at documents,

22   we're, you know, simply talking about, for example, a

23   logbook for that facility, the current logbook, you

24   know, allowing an interaction about that.

25        I understand, your Honor, you don't agree with

1    that; and I understand you have cited law to us that

2    you believe is the leading case law on the issues.  We

3    believe our request is within the scope of extant case

4    law.  I understand you don't agree; but, you know, we

5    are -- from that perspective, I just wanted you to

6    understand that we believe what we have requested is

7    within the limits of what is allowed under the rules.

8    I understand you don't agree.  We will have further

9    discussion with the Defendants about that.

10         THE COURT:  Yeah.  And the key is, if the

11   Defendants agree because what's being proposed is fair,

12   then of course you can do it.

13         MR. ROLLINS:  Yeah.

14         THE COURT:  I mean, but -- I mean, I read your

15   paper.  I didn't have to read theirs to go -- have my

16   hair stand up straight in terms of unfairness.  So if

17   it can be calibrated so that it's fair, then the kind

18   of things you're now talking about sound very efficient

19   and appropriate.

20         MR. ROLLINS:  And that's, your Honor, one of the

21   reasons for pursuing them in this context.

22         THE COURT:  Yeah.  You've got to be fair about

23   it, though.  That's the key.

24         MR. ROLLINS:  Well -- and, your Honor, I

25   understand that you don't perceive what we've requested

1     as fair.  We don't agree, but we will have further
2     conversation with the Defendants.  If that doesn't
3     resolve all the issues, we hope we can perhaps resolve
4     some of the issues, we can then brief what we are not
5     in agreement on to you and cite additional appropriate
6     case law and have you address it.
7           With that, I should let Brenda speak.  So thank
8     you, your Honor, and thank you, Brenda, for listening
9     to me for so long.
10          THE COURT:  All right.  Ms. Baum.
11          MS. BAUM:  Thank you, your Honor.  I don't have
12    a lot to add.  I'm -- you know, we are certainly open
13    to having more communications and conversations with
14    Plaintiffs about what the scope of the inspection would
15    be.
16          I think I'd be overly optimistic if I said we
17    could resolve all the issues; but to the extent we can
18    narrow things so we're bringing before the Court, if
19    anything, something very narrow and tailored, I think
20    we will certainly all try to do so.
21          THE COURT:  Yeah.  I mean, the key, it seems to
22    me, is that if the Plaintiffs come to the table with
23    something that's meant to be fair and to be a true
24    exercise of fact finding to come up with a fair and
25    neutral, usable thing in the most efficient way

1   possible, then just because there's a technical rule

2   that says they can't do that under the rules, it seems

3   to me that's something that the Defendants ought to

4   engage with them on.

5          MS. BAUM:  Understood, your Honor, and we've

6   tried to view this inspection process from the get-go

7   as being fair; but yet, you know, in the interest of

8   being fair, it's certainly not my intent to be a patsy

9   about what the tour is.

10          So understanding what the Court is saying and

11  the lens through which the Court wants both sides to

12  look through the issue on, we're happy to do so.

13          THE COURT:  Yeah.  I mean, it's a key

14  fact-finding moment; and the more efficiently it yields

15  facts, the better.  And that's why the whole ex-parte,

16  you're not allowed to talk but we are, that doesn't --

17  that doesn't cut it for fairness; but there may very

18  well be some ways that some questions asked in sort of

19  carefully limited circumstances can be the most

20  efficient way to get the neutral facts.

21          That, it seems to me, is the -- makes sense, but

22  that's something that I think you do by -- mostly by

23  agreement; and otherwise it's -- you know, the rule's

24  straight down the middle, and so far I've cited back to

25  you the cases that I think are instructive.

1          We may not have found the right ones.  I don't

2    know.  We didn't do a ton of research but enough to

3    come away with the impressions that I've shared with

4    the parties.

5          Ms. Baum, do you disagree with my judgment and

6    Mr. Rollins' judgment that if further meet and confer

7    does not yield an agreement, that the Plaintiffs will

8    just go right ahead with the motion, that we're done

9    with this, the meet and confer?

10          MS. BAUM:  I would agree, your Honor.  I would

11    just appreciate, and I'm sure that Jim and his team

12    would do this, you know, an acknowledgment that they

13    don't think -- at whatever point they don't think

14    further discussions on the topic would be fruitful and

15    that it's their intention to file a motion.

16          You know, I'd hate to leave off a meet and

17    confer and we think one thing and they think another

18    and then --

19          THE COURT:  And then the motion arises.

20          MS. BAUM:  -- a motion pops up because that

21    never brings good feelings; and I'm sure Jim would be

22    agreeable to that, so I don't think that's going to be

23    an issue.

24          THE COURT:  Yeah.  I don't think so either.

25          MR. ROLLINS:  Your Honor and Brenda, we would

1    certainly let you know we're going to go ahead and file

2    a motion.  One thing that's probably simply better for

3    everybody on the line, and sorry, your Honor, to do

4    this, it would be good to have some agreement as to

5    sort of a deadline to deal with the next meet and

6    confer phase because, your Honor, the parties

7    collectively have been doing a lot of work and we've

8    got a lot of things up in the air right now that we're

9    collectively working on; but I think this is one of the

10   most critical pieces because it will cause, you know,

11   other things to fall into place.

12        So I know we're at the holidays, believe me, but

13   I don't know if there's a date that -- we can be

14   flexible.  I don't know if there's a date that works

15   for the Defendants that they can say, yeah, we'll do it

16   by.

17        THE COURT:  I'm not going to set a deadline for

18   that.  You guys talk amongst yourselves.

19        MR. ROLLINS:  Okay.

20        THE COURT:  And obviously time is of the

21   essence.

22        MR. ROLLINS:  Thank you.  We can do that, your

23   Honor.  I just was trying to take the opportunity to --

24        THE COURT:  Seize the moment.

25        MR. ROLLINS:  -- cut a corner.  I've got

1    everybody on the line.

2            THE COURT:  Yeah, yeah, yeah, yeah, yeah.  I

3    have a feeling we'd spend 20 minutes with everyone

4    looking at their calendars and then come up with

5    nothing because everybody has to do more work.

6            All right.  I think we've -- we have not solved

7    this problem, but at least we've advanced the ball.

8    And I hope I don't see a motion.  I hope you guys can

9    work this out.  It ought to be worked out, and we'll --

10   but if there's a motion, we'll deal with it.

11           MR. ROLLINS:  Your Honor, just before we hop

12   off, so that we can get a -- either a tape or

13   transcript or whatever exists for today's proceeding,

14   which one of your staff people deals with getting

15   transcripts?

16           THE COURT:  Martha, do you know?

17           THE CLERK:  Yes, your Honor.  You just file the

18   transcript request on the docket, and it will be

19   assigned to a court reporter.

20           MR. ROLLINS:  Okay.  Thank you very much.

21           THE CLERK:  And you can find the transcript

22   request on our website.

23           MR. ROLLINS:  Okay.  Perfect.  Thank you.

24           THE COURT:  All right.  Bye, all.

25           (Adjourned)

1          **C E R T I F I C A T I O N**

2

3          I, Karen M. Wischnowsky, RPR-RMR-CRR, do

4     hereby certify that the foregoing pages is a correct

5     transcript from the official digital sound recording of

6     the proceedings in the above-entitled matter.

7

8

9                    /s/ Karen M. Wischnowsky

10

11

12                    January 11, 2022

13                    Date

14

15

16

17

18

19

20

21

22

23

24

25