## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

CHARLENE LIBERTY, JOHN DAPONTE,
JOHN DAVIS, DUANE GOMES,
ADAM HANRAHAN, and CHARLES KENNER,
on behalf of themselves and all others
similarly situated; and
DISABILITY RIGHTS RHODE ISLAND,
on behalf of its constituents,

<em>Plaintiffs,</em>

C.A. No. 19-cv-0573-JJM-PAS

v.

RHODE ISLAND DEPARTMENT OF
CORRECTIONS;
PATRICIA COYNE-FAGUE,
in her official capacity as the Director of the Rhode
Island Department of Corrections;
MATTHEW KETTLE, in his official capacity as
Assistant Director of Institutions and Operations; and
BARRY WEINER, in his official capacity as
Assistant Director of Rehabilitation Services,

<em>Defendants.</em>

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS'  MOTION TO COMPEL INSPECTION

Pursuant to Federal Rules of Civil Procedure 26 and 34(a)(2), individual plaintiffs

Charlene Liberty, John Daponte, John Davis, Duane Gomes, Adam Hanrahan, and Charles

Kerner ("Individual Plaintiffs") and Disability Rights Rhode Island ("DRRI") (collectively,

"Plaintiffs") request that Defendants be ordered to allow Plaintiffs' experts and counsel to

inspect and photograph certain Rhode Island Department of Corrections ("RIDOC") detention

and correctional facilities and operations, confer with staff and incarcerated persons, and review documents on mutually agreed upon dates.[1]

## I.      INTRODUCTION

In the ordinary course of discovery, Plaintiffs have requested access to certain RIDOC facilities ("RIDOC Facilities" or "Facilities")[2] to allow Plaintiffs' experts to tour the Facilities, take photographs (mindful of security concerns and individual privacy concerns), conduct confidential interviews with Plaintiffs' putative class members and such other incarcerated persons who agree to speak with them ("Plaintiffs' Inspection Request").  Plaintiffs also seek to conduct limited informal questioning of staff members in the presence of Defendants' counsel and to view a limited number of onsite documents, including electronic medical records.  The purpose of these requests is to obtain a better sense of the adequacy of health care provided to people with SPMI and a better understanding of conditions in and operations and logistics of the RIDOC Facilities.  All of these requests fall squarely within both the permissible scope of Federal Rules of Civil Procedure 26 and 34(a)(2) and the standard practice of experts in cases of this nature.  Defendants object to these requests and seek to allow Plaintiffs only what amounts to a walk-through of limited sections of the Facilities without leave to speak with anyone –

---

[1] Should the COVID-19 pandemic flare up again causing there to be an increased risk as as the expert inspections approach, Plaintiffs will work with Defendants to find the earliest appropriate date after a waning of the risk.

[2] As set forth in Plaintiffs' Inspection Request, Plaintiffs seek to inspect the Anthony P. Travisono Intake Service Center (ISC), Gloria McDonald Awaiting Trial Medium Security Facility, High Security Center (HSC), Maximum Security facility, and John J. Moran Medium Security Facility. Plaintiffs also requested access to the Minimum Security Facility.  However, based on Defendants' representations that there is no isolation in the Minimum Security Facility, Plaintiffs have informed Defendants that they do not seek access to that prison.

Individual Plaintiffs, putative class members, other incarcerated people, or staff – and no ability to inspect limited relevant documents on site.

## II.    BACKGROUND

Plaintiffs seek to have two experts, Dr. Jeffrey Metzner and Mr. Martin Horn, conduct inspections of the RIDOC Facilities.  Dr. Metzner is a psychiatrist who will be inspecting the RIDOC Facilities to gather information to form opinions about the mental health care provided to people with serious and persistent mental illness ("SPMI") housed in solitary confinement in the RIDOC Facilities, and about the risk of harm to such individuals.  Ex. 1, Declaration of Dr. Jeffrey Metzner ("Metzner Decl.") at ¶¶ 1, 6-8.  Mr. Horn is an experienced correctional administrator who will be inspecting the prisons to gather information to form opinions about the manner in which solitary confinement is administered in RIDOC Facilities.  Ex. 2, Declaration of Martin Horn ("Horn Decl.") at ¶¶ 2-5, 9-12.

Continued from the earlier agreed upon September 2021 dates,[3] expert tours in this case were rescheduled for the week of January 31, 2021.  On December 9, 2021, the parties met and conferred over the terms of the expert inspections; however, Defendants sought to severely limit Plaintiffs' experts' access to RIDOC Facilities, incarcerated people, relevant staff, and documents related to matters at issue in this case.  Specifically, the parties disagree as to whether and under what limitations experts can (1) talk with incarcerated people and staff, (2) review

---

[3] As noted in the parties' joint report to this Court submitted October 1, 2021, Plaintiffs conferred with the Defendants regarding expert tours, initially seeking a date in June 2021, but multiple scheduling difficulties postponed that tour until September 28, 29, and 30, 2021.  Ultimately, after further scheduling difficulties persisted, Plaintiff filed a Request for Entry onto Defendants' Premises for Inspection and Testing on September 16, 2021.  Defendants served their Objection to the Plaintiffs Request for Entry onto Defendants' Premises on September 22, 2021, and objected to the tour.  *See* Ex. 21.

records during the inspection, and (3) see areas of the RIDOC Facilities that are not used for people in restrictive housing.

The parties participated in a discovery conference with the Court on December 20, 2021, seeking assistance in resolving the discovery dispute.  Pursuant to the Court's guidance, the parties met and conferred on January 10, 2022, in a further attempt to narrow disagreements and reach agreement on the terms and scope of the inspection.  Prior to the meet and confer, the parties exchanged revised proposals regarding the parameters of the expert inspections.  The parties were unable to resolve the disputes.

Due to the rise in COVID-19 cases and the unresolved disputes over the then-upcoming expert inspections, the parties agreed to reschedule the expert inspections.  Plaintiffs have proposed that the inspections take place on May 16-18, or June 1-3 2022, and await Defendants' response.

Accordingly, Plaintiffs respectfully seek leave of this Court to conduct the requested inspections, consistent with Rule 34 and as outlined below.

### III.    ARGUMENT

Rule 34(a)(2) of the Federal Rules of Civil Procedure permits "one party to serve on another a request to permit entry onto the designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object *or operation* on it." Fed. R. Civ. P. 34(a)(2) (emphasis added).  A party "has a right to inspect and record the areas of [a prison] that may be relevant to [its] claims." *DuPonte v. Coyne-Fague*, 384 F. Supp. 3d 225, 227 (D.R.I. 2019). The scope of discovery under Rule 34, including inspections under Rule 34(a)(2), is "liberally, rather than narrowly, construed."  *Puerto Rico Port Auth. v. P/V Norwegians*, Nos.

21-1056 (RAM) and 21-1069 (RAM), 2021 WL 5570330, at *2 (D.P.R. Aug. 19, 2021) (citing Wright & Miller *et al.*, *Fed. Prac. & Proc.* § 2202 (3d ed. 2020)); *see also Coleman v. Schwarzenegger*, Nos. CIV S–90–0520 LKK JFM P, C01–1351 THE, 2007 WL 3231706, at *2 (E.D. Cal. Oct. 30, 2007) (quotations omitted)[4] ("Rule 34, like other rules relating to discovery, is to be liberally construed.").

The scope of inspection permitted under Rule 34(a)(2) is governed by the scope of Rule 26.  Fed. R. Civ. P. 34(a); *see also Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 171 F.R.D. 246, 248 (D. Minn. 1997) (in a patent infringement case, ordering an inspection of a competitor's plant, including photographs and sampling of the materials used in the production process); *Louisiana Crawfish Producers Ass'n-W. v. Mallard Basin, Inc.*, No. CV 6:10-1085, 2015 WL 8074260, at *5 (W.D. La. Dec. 4, 2015) (ordering inspection pursuant to broad relevance standard of Rule 26).

With respect to inspections, a Rule 34 request must set forth the property to be inspected and "specify a reasonable time, place, and manner of making the inspection and performing the related acts."  Fed. R. Civ. P. 34(b).

All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii). Fed. R. Civ. P. 26(b).  Fed. R. Civ. P. 26(b)(1) authorizes discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense…."  Fed. R. Civ. P. 26(b).  "A party moving to compel discovery bears the initial burden of proving the relevance of the requested information."  *In re Milo's Kitchen Dog Treats Consol. Cases*, 307 F.R.D. 177, 179 (W.D. Pa. 2015)), *supplemented*, 2015 WL 2341220 (W.D. Pa. May 14, 2015). This is not an onerous burden.  *Diaz-Padilla v. Bristol Myers Squibb Holding Liab. Co.*, No. 04-1003 (PG/GAG), 2005

---

[4] Citations and quotations omitted unless otherwise noted.

WL 783076, at *2 (D.P.R. Apr. 4, 2005); *Aronstein v. Massachusetts Mut. Life Ins. Co.*, No. CV 15-12864-MGM, 2017 WL 2818993, at *2 (D. Mass. June 29, 2017); *see also In re Urethane Antitrust Litig.,* 261 F.R.D. 570, 573 (D. Kan. 2009) ("A request for discovery should be allowed unless *it is clear* that the information sought can have *no possible* bearing on the claim or defense of a party.") (emphasis in the original); *Eirhart v. Libbey-Owens-Ford Co.*, 93 F.R.D. 370, 371 (N.D. Ill. 1981) (noting that demonstrating relevance under Rules 26 and 34 is a "very low hurdle" and ordering an inspection).

"Relevance" under Rule 26 is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 882 F.2d 682, 687 (2d Cir.1989) ("The broad scope of discovery delimited by the Federal Rules of Civil Procedure is designed to achieve disclosure of all the evidence relevant to the merits of a controversy."); *Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018) (citing *Bennett v. La Pere*, 112 F.R.D. 136, 138 (D.R.I. 1986) and *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)) ("In the context of pretrial discovery, relevance is broadly and liberally interpreted.")) ; *Rivera-Cartagena v. Walmart Puerto Rico*, 269 F.R.D. 169, 171 (D.P.R. 2010) (noting the "broad scope of relevance" under Rule 26).[5]  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead

---

[5] The 2015 amendments to Fed. R. Civ. P. 26 did not change the relevance standards.  *See Especias Montero, Inc., v. Best Seasonings Group, Inc. D/B/A Sofrito Montero*, No. 20-1740 (GLS), 2021 WL 3609663, at *1 (D.P.R. Aug. 13, 2021) (applying *Oppenheimer* after the 2015 amendment); *Martin v. Evans*, No. 16-CV-11362-PBS, 2018 WL 10247394, at *1 (D. Mass. Feb. 6, 2018) (same); *In re Porsche Auto. Holding SE*, No. CV 19-MC-91129-LTS, 2019 WL 5806913, at *5 (D. Mass. Nov. 6, 2019), *adopted sub nom. In re Porsche Automobil Holding SE*, No. CV 19-MC-91129-LTS, 2020 WL 813710 (D. Mass. Feb. 19, 2020), *aff'd*, 985 F.3d 115 (1st Cir. 2021) (same, specifically rejecting in 2020 WL 813710 the argument that the relevance standards under *Oppenheimer* were no longer applicable).

to the discovery of admissible evidence. *U.S. v. Territory of the Virgin Islands*, 280

F.R.D. at 235.   "A party does not have to prove a prima facie case to justify a request which

appears reasonably calculated to lead to the discovery of admissible evidence." *In re Urethane*

*Antitrust Litig.,* 261 F.R.D. at 573.  In the discovery stage of litigation, "a request for discovery

should be considered relevant if there is *any* possibility that the information sought may be

relevant to the subject matter of the action." *Schuurman v. Town of N. Reading*, 139 F.R.D. 276,

277 (D. Mass. 1991) (emphasis in the original).

　　　"Once the possibility of relevance is shown, the burden shifts to the party opposing

disclosure to show that the discovery is improper." *Aronstein* , 2017 WL 2818993, at *2 (citing

*Diaz-Padilla*, 2005 WL 783076, at *2 and *Condit v. Dunne*, 225 F.R.D. 100, 106 (S.D.N.Y.

2004)) ("The party resisting discovery 'bears the burden of establishing that compliance with the

request is unduly burdensome.'"); *see also Controlled Kinematics, Inc. v. Novanta Corp*., No.

17-CV-11029-ADB, 2019 WL 3082354, at *2 (D. Mass. July 15, 2019) (same).  *Viscito v. Nat'l*

*Planning Corp.*, No. CV 3:18-30132-MGM, 2019 WL 5318228 at *1 (D. Mass Oct. 21, 2019)

("when a party resists the production of evidence, it 'bears the burden of establishing lack of

relevancy or undue burden.'"); *BPP Retail Props., LLC v. N. Am. Roofing Servs., Inc.*, 300

F.R.D. 59, 61 (D.P.R. 2014) (the party resisting discovery has the burden of showing specifically

how the documents requested are not relevant or how the request at issue is overly broad,

burdensome, or oppressive).  At that point, the burden on the party resisting discovery is to show

that discovery "is of such marginal relevance that the potential harm occasioned by discovery

would outweigh the ordinary presumption in favor of broad discovery." *In re Urethane Antitrust*

*Litig.,* 261 F.R.D. at 573; *see also Brown v. Wetzel*, No. CV 20-512, 2021 WL 2896827, at *1

(W.D. Pa. July 9, 2021), reconsideration denied, 2021 WL 3130572 (W.D. Pa. July 23, 2021) (same, relying on *In re Urethane Antitrust Litig.*).

Although Defendants recognize that Plaintiffs are entitled to an inspection, the restrictions on which they insist – limited onsite access, no speaking with putative class members or other incarcerated people, no speaking with  relevant RIDOC staff  in the presence of Defense counsel – severely hinders Plaintiffs' ability to conduct discovery into the matters described in the Complaint as authorized under Rules 26 and 34.  *See Hickman*, 329 U.S. at 501 (noting that courts adopt a liberal approach to discovery with aim of ensuring that "civil trials in the federal courts [are] no longer ... carried on in the dark."); *Thibeault v. Square D Co*., 960 F.2d 239, 244 (1st Cir. 1992) (noting the "federal courts' desire to 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.'"); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 20 (D.P.R. 2009) (citing *Macaulay v. Anas*, 321 F.3d 45, 50, 52 (1st Cir. 2003)) ("The goal of Rule 26(a) is to promote full disclosure of the facts and prevent 'trial by ambush.'").

### A.   Plaintiffs' Inspection Request Should Be Granted Because It Falls Squarely Within the Scope of Rules 26 and 34, and Is Consistent with Standard Practice for Inspections in Similar Cases

Plaintiffs seek to conduct expert inspections under Rule 34(a)(2) to assist with developing mutual knowledge of the relevant facts in this case.  *See Hickman*, 329 U.S. at 507-508.  The expert inspections sought by Plaintiffs would include confidential interviews of people incarcerated in RIDOC Facilities, interviews of staff in the presence of RIDOC counsel, tours of all relevant areas as determined by the experts, and on-site review of documents.  *See* Ex. 3 (Plaintiffs' Inspection Request).  These activities are within the scope of Rules 26 and 34, and

are routinely conducted by experts in cases of this nature, often agreed to by the parties, but

otherwise ordered by courts.

**1. The Scope of the Inspection Request Is Tailored to Discover Relevant Information**

Plaintiffs seek to discover relevant information through inspection by two experts, Dr.

Jeffrey Metzner, a psychiatrist, and Martin Horn, a correctional administrator.  *See generally*

Exs. 1, 2. Plaintiffs have brought claims challenging Defendants' practice of keeping people with

serious and persistent mental illness ("SPMI") in solitary confinement in violation of the Eighth

and Fourteenth Amendments, Americans with Disabilities Act ("ADA"), and Section 504 of the

Rehabilitation Act of 1973 ("Rehabilitation Act").  *See* Doc. 1 (Complaint) at ¶¶ 48-162.

Plaintiffs' claims involve not only Defendants' unlawful practice of placing individuals with SPMI

in solitary confinement itself (*id*. at ¶¶ 75-94), but also the conditions to which these people are

subjected in solitary confinement (*id*. at ¶¶ 48-75), treatment of people with SPMI in solitary

confinement (*id*. at ¶¶ 48-123), the psychological, emotional and physical harms solitary

confinement causes them (*id*. at ¶¶ 95-108), Defendants' failure to provide equal access to

RIDOC's programs, services, and activities to individuals with SPMI (*id*. at ¶¶ 109-123),

Defendants' failure to provide access to services for individuals with SPMI in the most integrated

setting (*id*. at ¶¶ 109-123), and Defendants' criteria and methods of administration and mechanisms

of assessing the mental health of people in their custody, resulting in the perpetuation of

discrimination (*id*. at ¶¶ 123, 142, 149).  *See generally* Doc. 1.  Plaintiffs' Inspection Request is

closely tied to the allegations in the complaint and meets the standard imposed by Rule 34(a)(2).

Dr. Metzner will conduct an inspection to gather information about the mental health care

that is provided (1) in restrictive housing and (2) in RIDOC generally.  Ex. 1, Metzner Decl. at

¶¶ 6-7, 9 (explaining that this inspection is "critical to evaluating the quality of psychiatric care .

. . and the conditions of incarcerated individuals with mental illness.").  Both are relevant to the

claims.  For example, Plaintiffs allege that Defendants discriminate against people with SPMI

"by denying them access to programs and services because they are housed in solitary

confinement." Doc. 1 at ¶¶ 109, 121, 122.  To prove this claim, Plaintiffs will need evidence

about the programs and services offered in restrictive housing.  But Plaintiffs will also need

evidence about programs and services offered in general population for comparison, as people

are not denied access by being in restrictive housing if the programs and services are not offered

anywhere.  *See, e.g.*, *Rivera-Cartagena v. Walmart Puerto Rico*, 269 F.R.D. 169, 171 (D.P.R.

2010) (finding disciplinary files of comparator employees in employment discrimination case to

be relevant and ordering their production).

      Dr. Metzner will also inspect the physical conditions of the prisons to form an opinion on

how those conditions in restrictive housing may impact people.  Ex. 1, Metzner Decl. at ¶¶ 6, 11

("In-person inspection of institutional facilities . . . allows the psychiatric expert to form

objective qualitative opinions regarding environmental factors that impact institutional

conditions and the provision of psychiatric care.").  Understanding the differences between

restrictive housing and general population is important for this as well.  For example, Plaintiffs

have alleged that people in solitary confinement are kept in "extremely small," "filthy" cells in

which they "must sleep, eat, urinate and defecate." Doc. 1 at ¶¶ 1, 61.  Seeing the conditions of

the general population housing units, including seeing where people housed in them are able to

be outside of the cells, will bear on whether and how placement into restrictive housing risks

harming people with SPMI as a result of the living conditions in the cells. That is, if the physical

conditions in restrictive housing and general population are roughly equivalent, that may weaken

a claim that the physical condition in restrictive housing, as opposed to the physical condition in

RIDOC Facilities generally, poses a risk of harm to people with SPMI.[6]  If, on the other hand, the physical conditions in restrictive housing are significantly worse than those in general population, that would be part of the evidence of the ways people with SPMI are impacted and discriminated against by their placement into restrictive housing.

Mr. Horn will inspect the prisons to gather information on how the restrictive housing units are administered.  Ex. 2, Horn Decl. at ¶ 10 (explaining that this information is critical to "provide information about the differences or similarities between physical conditions in restrictive housing and general population.").   For example, he will determine visibility into cells in restrictive housing, which is relevant to the risk that restrictive housing poses for people with SPMI.  He will also make assessments of light, ventilation, and general cleanliness, all of which have an impact on the well-being of people in solitary confinement.  As discussed above, if the conditions in general population are similar to the conditions in restrictive housing, this impacts the degree to which the risks arise from placement into restrictive housing as opposed to being a risk to people throughout RIDOC.

Mr. Horn will also gather information about the reasons people are in restrictive housing and about the use of force.  Ex. 2, Horn Decl. at ¶ 11 ("[I]t is standard methodology for corrections experts to review such records during inspections.").  Plaintiffs have alleged that Defendants discriminate against people with SPMI by housing them in restrictive housing "based on behaviors and failures to comply related to their disabilities; and by using force to respond to

---

[6] This is not to say that if the conditions in the cells are similar, there is no claim relating to the physical condition of the cells.  The amount of time a person is kept in a cell affects the impact the conditions of the cell may have on the person.  *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (noting distinction between requirements for people "confined in small cells for almost 24 hours per day" with those for people who "had access to dayroom 18 hours per day.").

behaviors and failures to comply associated with psychiatric disabilities." Doc. 1 at ¶¶ 109, 111-121.

To gather the types of information discussed above, Plaintiffs have requested that the experts have access to restrictive housing units and other units or cells used for isolation (including mental health watches), the Residential Treatment Unit (which is one alternative to solitary confinement for people with SPMI), clinical space available for medical and mental health care; medication lines; intake or screening areas; infirmaries and other inpatient facilities; a sample of general population cells; and all areas to which people who are housed in isolation are taken or have access. Ex. 3 at 2. Nearly all of the areas Plaintiffs have requested their experts to see are areas where people in restrictive housing live or may go, and are therefore relevant to what their conditions of confinement are. Plaintiffs have also asked that the experts be able to see "a sample of general population cells." This limited request is necessary to understand the differences between restrictive housing and other parts of the RIDOC Facilities.

Plaintiffs have also requested that the experts be allowed to talk non-confidentially to mental health staff and correctional staff, and to meet confidentially with incarcerated people, to discover information about "the provision of mental health care and conditions of confinement in isolation."[7] Ex. 3 at 2. Also, Plaintiffs have requested that the experts be allowed to review certain documents relating to the custody operations and conditions of confinement in solitary confinement units and the provision of mental healthcare.[8] Ex. 3 at 2-3. As discussed above, the terms of Plaintiffs' Inspection Request are tailored to the allegations in the case and therefore

---

[7] The issue of Plaintiffs' experts talking to incarcerated people and staff is discussed below at §§ III.A.3, III.A.4.

[8] The issue of Plaintiffs' experts reviewing documents is discussed below at § III.A.6.

12

should result in the discovery of relevant information.  Additionally, by increasing the sources of information through the inspection process (multiple incarcerated people in multiple locations, correctional staff, mental health staff and records), the experts will be able to form more reliable and detailed opinions about the alleged constitutional and statutory violations, as they will be able to confirm and corroborate facts or identify discrepancies.  *See, e.g.*, *Braggs v. Dunn*, 317 F.R.D. 634, 651 (M.D. Ala. 2016) ("*Braggs I*") (explaining the helpfulness of information provided by an expert witness based on her observations during interviews with incarcerated people during her inspections); *Jama v. Esmor Corr. Servs., Inc.*, No. 97-3093 DRD, 2007 WL 1847385, at *26 (D.N.J. June 25, 2007) (finding that an expert's failure to review medical request forms from people beyond the named plaintiffs  "[went] to the weight of the evidence" from the expert).

Because the request for inspection is closely tailored to the allegations in the complaint, the information that will be discovered is likely to be relevant.  "Rule 26(b) permits a party to inquire into anything 'relevant' to the subject matter of the litigation."  *Bennett*, 112 F.R.D. at 13; *see also Parker Waichman LLP v. Salas LC*, 328 F.R.D. 24, 26 (D.P.R. 2018).

## 2.  Plaintiffs Inspection Request Is Proportional to the Needs of the Case

To determine whether the inspection request is proportional to the needs of the case, the court should consider "the importance of the issues at stake in the action, the amount in controversy,[9] the parties' relative access to relevant information, the parties' resources, the

---

[9] Because this is a case for injunctive and declaratory relief, not damages, the Court need not consider this factor.  *Guadalupe v. City of New York*, No. 15CIV0220CMJCF, 2016 WL 3570545, at *2 (S.D.N.Y. June 24, 2016) ("[N]ot all of the proportionality factors may be relevant in any particular dispute, and they certainly will not each carry the same relative weight in every context.").

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Smith v. Turbocombustor Tech., Inc.*, 338 F.R.D. 174, 176 (D. Mass. 2021) (citing Fed. R. Civ. P. 26(b)(1)).[10] Each of these factors weigh in favor of granting the inspections as requested by Plaintiffs.

### i.   The Civil Rights Issues at Stake Are Significant

This is a civil rights action, alleging that the conditions to which Defendants subject the Individual Plaintiffs and putative class members – people with serious and persistent mental illness confined to solitary confinement – jeopardize their mental, physical and emotional health and safety in violation of constitutional rights, the ADA and the Rehabilitation Act .

This case implicates life and death issues such as suicide and self-harm. *See generally* Doc. 1. The harms of solitary are not mere speculation. Research shows that solitary confinement is associated with self-mutilation and suicide.[11] It is associated with heart disease, anxiety,

---

[10] As the Advisory Committee on Civil Rules expressly noted, the 2015 amendment to Rule 26 "does not change the existing responsibilities of the court and the parties to consider proportionality, and the change does not place on the party seeking discovery the burden of addressing all proportionality considerations." Fed. R. Civ. P. 26(b)(1) advisory committee's note to the 2015 amendment. "Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional." *Id.* If the parties are unable to resolve a discovery dispute, under the amended Rule 26, the parties' responsibilities "remain as they have been since [proportionality was incorporated into Rule 26 in] 1983." *Id.* Thus:

> A party claiming undue burden or expense ordinarily has far better information — perhaps the only information — with respect to that part of the determination. A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery.

*Id.*

[11] Suicide rates and incidents of self-harm are much higher for people in solitary confinement, and those in solitary have an increased risk of death after release. A February 2014 study published in the American Journal of Public Health found that detainees in solitary confinement in New York City jails

14

depression, and psychosis.  People in solitary confinement deteriorate mentally and physically.

Even more importantly, research shows that people who spend even one or two days in solitary

confinement have a significantly heightened risk of death by accident, suicide, violence,

overdose, and other causes.[12] RIDOC, with the highest suicide rate of any prison system in the

country over the last 20 years, is not immune to that risk.  *See* Ex. 20, Carson. E.A (2021,

December 1) *Mortality of State and Federal Prisons, 2001-2019- Statistical Tables* (reporting a

suicide rate of 44 per 100,000 over the years 2001-2019, as compared to the national average of

18 per 100,000).[13]

---

were nearly seven times more likely to harm themselves than those in the general population. Fatos Kaba et. al*., Solitary Confinement and the Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 444 (2014).  In California prisons in 2004, 73% of all suicides occurred in isolation units—though these units accounted for less than 10% of the state's total prison population. *See* AMERICAN CIVIL LIBERTIES UNION, THE DANGEROUS OVERUSE OF SOLITARY CONFINEMENT IN THE UNITED STATES 5 (Aug. 2014) (citing Expert Report of Professor Craig Haney at 45-46 n.119, *Coleman v. Schwarzenegger*, 2008 WL 8697735 (E.D. Cal 2010) (No: Civ S 90-0520 LKKJFM P)).  In the Indiana Department of Corrections, the rate of suicides in segregation was almost three times that of other housing units. *Id.* (citing *Indiana Protection and Advocacy Services Com'n v. Commissioner, Indiana Dept. of Correction*, No. 1:08-CV-01317 TWPMJD, 2012 WL 6738517 at *16 (S.D. Ind. Dec. 31, 2012)).  A study published in *JAMA Network Open* in 2019 found that people placed in restrictive housing were 24% more likely to die in the first year after their release from prison. Lauren Brinkley-Rubinstein et. al*., Association of Restrictive Housing During Incarceration With Mortality After Release*, JAMA NETWORK OPEN (Oct. 4, 2019)*,* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350*,* doi:10.1001/jamanetworkopen.2019.12516.  The risk was particularly acute for certain causes of death; people exposed to solitary confinement were 54% more likely to die from homicide and 78% more likely to die by suicide. *Id.*  People who have been held in restrictive housing were 127% more likely to die of an opioid overdose in the first two weeks after their release. *Id.*

[12] *See* James Dean, *Solitary Confinement Heightens Post-Incarceration Risk of Death*, CORNELL CHRON.  (Feb. 2, 2020), https://news.cornell.edu/stories/2020/02/solitary-confinement-heightens-post-incarceration-death-risk; Robert Canning, *Report of Suicides in the California Department of Corrections and Rehabilitation: January 1, 2017, to December 31, 2019,* CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES,  https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_  https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf. ("Historically, in both CDCR [California Department of Corrections and Rehabilitation] and in national studies, segregated housing units have been a high-risk setting for suicide, particularly when inmates are housed alone. During 2017 through 2019, suicides in segregated housing accounted for 41% (N = 30) of the total suicides. On average, 3.6% of CDCR inmates were assigned to segregated housing during this time.")

[13] Only one other state, Utah, has a rate above 40, and only four other states have a rate above 30. *Id*.

15

Moreover, "[g]enerally, an action to vindicate a citizen's civil rights is considered of high importance." *Cratty v. City of Wyandotte*, 296 F. Supp. 3d 854, 860 (E.D. Mich. 2017) (analyzing proportionality and ordering requested discovery in an individual civil rights case); *Diaz v. Devlin*, No. 4:16-CV-40039-TSH, 2018 WL 1610541, at *6 (D. Mass. Apr. 3, 2018), objections overruled, 327 F.R.D. 26 (D. Mass. 2018) (ordering requested discovery in part because "a strong public interest in protecting constitutional rights against violations by others acting under color of state law also supports disclosure"); *Walls v. City of New York*, 502 F. Supp. 3d 686, 695 (E.D.N.Y. 2020) (finding "[t]he importance of the issues at stake in the action is significant, as they involve civil rights" and ordering the requested discovery); *Dunn v. Dunn*, 163 F. Supp. 3d 1196, 1206 (M.D. Ala. 2016) (finding that "lawsuits challenging allegedly unconstitutional mental-health care in prison and the alleged discrimination against, and failure to provide reasonable accommodations for, mentally ill prisoners" serve "important public interests" and ordering the requested discovery); *see also Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 3288058, at *11 (D. Kan. June 18, 2020), aff'd, No. 18-1100-EFM, 2020 WL 6939752 (D. Kan. Nov. 24, 2020) (finding that the importance of the issues at stake did not weigh in favor of discovery because the case did not "implicate [a] broader societal impact" or "involve matters of public policy such as prohibited forms of discrimination").[14]

---

[14] Similarly, in *Morales v. Turman,* the court acknowledged that "[w]hen important civil rights are in issue in complex litigation of widespread concern, a court must make every effort to enhance the fact-finding process available to counsel for both sides."  59 F.R.D. 157, 159 (E.D. Tex. 1972).  The *Turman* case challenged conditions in two juvenile correctional facilities.  The court permitted four of plaintiffs' experts to conduct a month-long "participant observation study" that involved living in the facilities with the young people. The court explained that an "extraordinary" request for discovery was supported by the circumstances of an "extraordinary case" wherein plaintiffs alleged that the conditions of their confinement violated the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.  *Id.*

The issues at stake – the violation of the prohibition on cruel and unusual punishment and unlawful disability discrimination, with potentially life-threatening consequences – weigh strongly in favor of finding the requested expert inspections to be proportional.

> ii.   **The Parties' Relative Access to Relevant Information Weighs in Favor of Granting Plaintiffs' Inspection Request**

The parties' relative access also weighs in favor of finding Plaintiffs' Inspection Request to be proportional.  Where one party seeks relevant information that is "solely in the possession" of the other party, this weighs in favor of finding that the requested discovery is proportional. *Albritton v. CVS Caremark Corp*., No. 5:13-CV-00218-GNS-LLK, 2016 WL 3580790, at *4 (W.D. Ky. June 28, 2016) (finding proportionality weighed in favor of the Plaintiff as "[i]t is highly unlikely that Plaintiff could discover similar information from another source or in another manner. Defendants are in the best position to produce these documents."); *see also United States ex rel. Long v. Janssen Biotech, Inc.,* No. CV 16-12182-FDS, 2022 WL 488493, at *5 (D. Mass. Feb. 17, 2022) (Where "[the resisting party] alone has access to relevant information," that weighs in favor of finding discovery requests to be proportionate).

Plaintiffs seek information about the conditions of and operations in RIDOC Facilities. Defendants have unfettered access to the operations of the RIDOC Facilities, whereas Plaintiff DRRI and Plaintiffs' Counsel have access to the facilities only if Defendants agree to such access, and the Individual Plaintiffs, while having access to information about their own experiences, have little opportunity to learn about other areas of the RIDOC Facilities or the way they operate.  Defendants have access to databases, including vast amounts of information about the putative class members and the operations of the Facilities.  They have access to RIDOC employees and contractors, who are able to explain their practices and the meaning of RIDOC

documents—documents that can often be cryptic and incomplete to those without institutional knowledge.

The information Plaintiffs seek through the expert inspections would include learning from people living in various housing units how those units function on a day-to-day basis, how they access mental health care if they need to, how they capture the attention of correctional staff, how being in solitary confinement affects them.  The information sought through the expert inspections would also include documents Plaintiffs' experts seek to review onsite to gain a better understanding of the documents and how they are created.  For example, seeing a log of the activities of a housing unit and where it is kept may provide useful, relevant information: if it is kept in the unit and it is current, that suggests something different about its reliability than if it is kept in an office off the unit or is not current.

It is also worth noting that if putative class members and other incarcerated witnesses were not in RIDOC custody, Plaintiffs and their experts could talk to them freely.  *See United States v. Erie Cty.,* No. 09-CV-849S, 2010 WL 986505, at *3 (W.D.N.Y. Mar. 17, 2010).  But, because they are incarcerated, RIDOC controls access to them.

The enormous advantage Defendants have over Plaintiffs as far as access to information weighs heavily in favor of finding Plaintiffs' Inspection Request to be proportional.

### iii.   The Parties' Relative Resources Weigh in Favor of Finding Plaintiffs' Inspection Request to Be Proportional

The parties' relative resources also weigh in favor of finding the request to be proportional.  RIDOC's total budget for FY 2022 is over $275 million.  Ex. 23, Excerpt of FISCAL YEAR 2023 BUDGET PROPOSAL, VOL. IV, PUBLIC SAFETY, NATURAL RESOURCES AND TRANSPORTATION, at 23.   RIDOC has over 1400 salaried employees, including

approximately 90 who work in the Administration Division.  *Id.* at 24; Ex. 22 FY2020 RIDOC

Annual Population Report at 7.  The Rhode Island Office of the Attorney General, one of the

largest law firms in the state, represents RIDOC when it is sued.[15]  *See*  R.I. Gen. L. § 42-9-6.

And RIDOC also has its own Office of Legal Counsel.

  The Individual Plaintiffs – people who are incarcerated at RIDOC Facilities and have an

SPMI – have negligible resources.[16]

  DRRI is a small, non-profit organization with an annual budget of approximately $1.5 for

2019 (and a similar budget for 2020) and a staff of 15 paid employees for the same period of

time.  Ex. 16, Declaration of Brian Adae at ¶ 3.

### iv. The Information Sought Is Central to the Issues in this Case

  Cases of this nature are largely dependent on expert testimony.  *See, e.g.*, *Madrid v.*

*Gomez*, 889 F. Supp. 1146, 1157-59 (N.D. Cal. 1995) (discussing the value of the ten experts in

reaching, among other things, its determination that conditions in a restrictive housing unit

violated the Eighth Amendment rights of people with mental illness, and collecting cases

regarding the role of experts); *see generally Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

1995) (referencing experts more than 100 times in its decision that the California Department of

Corrections was providing inadequate mental health care); *Braggs v. Dunn*, 257 F. Supp. 3d

1171 (M.D. Ala. 2017) ("*Braggs II*") (referencing experts more than 200 times in its decision

that the Alabama Department of Corrections was providing inadequate mental health care).

---

[15] According to the Rhode Island Office of Management and Budget, the Rhode Island Office of
the Attorney General had 247 employees and an overall budget expenditure of $38,708,814 in FY 2022.
*See* Ex. 23 at 3, 4.

[16] Unlike Defendants, the Individual Plaintiffs have no legal agency or law firm that is statutorily
obligated to represent them on request, and must instead rely on *pro bono* counsel.

To conduct adequate assessments, experts need access to areas, people, and documents to discover information relevant to Plaintiffs' claims in order to develop a comprehensive understanding of the facts helpful for the court. *See, e.g., Braggs I*, 317 F.R.D. at 651 (explaining the helpfulness of information provided by an expert witness based on her observations of incarcerated interviewees during her inspections); *see also* Ex. 13 and 14, Inspection Orders, *Busby v. Bonner*, No. 20-cv-2359-SHL (W.D. Tenn. Jun. 18, 2020 & Jun. 23, 2020) (ordering court expert to inspect jail and provide report to court, and allowing plaintiffs' expert identical access); Ex. 12, Inspection Order, *Malam v. Adducci*, No. 20-10829 (E.D. Mich. Dec. 3, 2020) (ordering expert to inspect jail and provide report). Interviews are invaluable in developing the facts. For example, if multiple people in Transitional Confinement tell the Plaintiffs' experts that they get out of their cells for four hours per day, this would help narrow the issues in the case as it would strongly suggest that Transitional Confinement is not solitary confinement and is therefore not part of the case. On the other hand, if multiple people tell the experts that they get out of their cells for an hour a day in Transitional Confinement, that would show the importance of this status to the case and the need for corroborating documentation.[17] Similarly, interviews can help the experts understand how the process of accessing mental health care works in practice, including for people with an SPMI. And interviews can also help identify witnesses to testify regarding the issues in the case.

---

[17] According to Defendants' Policy 12.27 DOC, Conditions of Confinement, people in Transitional Confinement are to receive two hours of out-of-cell recreation, five days per week, plus "participation in education and programming as determined by the facility Warden/designee." Ex. 4 (Excerpts of 12.27 DOC, Conditions of Confinement) at 8 of 20, § IV.B.3.b. The parties disagree as to whether Transitional Confinement and several other housing statuses and classifications are solitary confinement as defined in the Complaint.

One of the most critical benefits of interviews with staff and incarcerated people is to allow the experts to determine the degree to which stated policies and practices are being implemented and how.  For example, the expert report in *Malam v. Adducci*, a case regarding a detention center's response to COVID-19, highlights the difference between policies and actual practices.  Ex. 5 (Inspection Report of Dr. Homer Venters, *Malam v. Adducci*, No. 20-10829 (E.D. Mich.), ECF No. 483-1) at 44-46, 55.  The expert noted that although the facility's policy was to clean areas where COVID-19 patients had been living, detained people interviewed by the expert reported otherwise.  *Id*. at 44-45.  Similarly, despite the fact that the facility stated that it was conducting daily screenings of detained people on work crews, the detainees on work crews interviewed by the expert denied having daily symptom screening or vitals checks.  *Id*. at 45.  And the stated protocol was that people would have access to a language interpretation line for all health care services, but the people interviewed reported that this did not occur.  *Id*. at 46.

Additionally, interviews assist with the development of evidence supporting or negating Plaintiffs' claims that would not otherwise be clear upon review of documents without explanation.  For example, in *Braggs II*, the court found, among other things, that defendants did not adequately use their mental health units.  257 F.Supp.3d at 1205.  In making this finding, the court relied, in part, on plaintiffs' mental health expert who testified that, during her facility inspections, which included formal interviews of 77 incarcerated individuals and speaking with 25 other incarcerated persons at cell-front, she observed "multiple prisoners who needed residential treatment but were in general population," an observation that could only be made with the opportunity to talk with these people.  *Id*. at 1187 and 1206; *see also Braggs I*, 317 F.R.D. at 651 (discussing expert's opinion about one aspect of mental health care "based on chart reviews and interviews with and observations of prisoners").  Additionally, in finding that the

21

defendants lacked a "functioning process for screening out prisoners who should not be placed in segregation due to mental illness," the court relied in part on the testimony of two of plaintiffs' experts who had been "troubled by the number of prisoners with unaddressed mental illnesses they encountered in segregation units" – again, observations that were possible only because of the ability to talk to the incarcerated people.  *Braggs II*, 257 F. Supp. 3d at 1242.  Similarly, in its ruling on class certification in *Dockery v. Fischer*, the court relied in part on evidence from one expert report regarding access to care in urgent situations, which in turn relied on statements from incarcerated people the expert had interviewed.  253 F. Supp. 3d 832, 854 (S.D. Miss. 2015) (citing Report of Dr. Marc Stern); Ex. 7 (Excerpt of Report of Dr. Marc Stern) at 4-9.[18]

The information sought through Plaintiffs' Inspection Request is some of the most critical information in the case.  This factor also weighs in favor of finding that the requested discovery is proportional.

> ### v. The Benefit of Plaintiffs' Inspection Request Significantly Outweighs any Burden or Expense to Defendants

As discussed above, Plaintiffs' Inspection Request is tailored to gather information about mental health care and conditions of confinement in isolation, which is directly related to Plaintiffs claims and outweighs any limited burden on Defendants.  *See New York State Ass'n for Retarded Child. Inc. v. Carey*, 706 F.2d 956, 961 (2d Cir. 1983) (finding that the benefit of an inspection outweighed the burden where "claims of noncompliance were quite specific."); *Erie Cnty.*, 2010 WL 986505, at *3 (finding that the benefit of an inspection outweighed the burden where inspection would be focused "on the issues of suicide prevention and mental health processes and procedures.");  *Coleman v. Schwarzenegger*, 2007 WL 3231706, at *1 (E.D. Cal.,

---

[18] For exhibits pulled from the dockets of other cases, the page cited is the PACER page number.

N.D. Cal. Oct. 30, 2007) (finding that the benefit of an inspection outweighed the burden where request focused on "access to medical and mental health care" and "issues of housing, programming, exercise and activities for class members."); *cf. United States v. Territory of the Virgin Islands*, 280 F.R.D. 232, 237 (D.V.I. 2012) (distinguishing between the particularized inspection requests in *Carey*, *Erie Cnty*., and *Coleman* with an inspection request that included, without limitation, the ability to ask questions about "operations, premises, processes and procedures viewed during the facility inspection").

Plaintiffs seek to have their experts inspect locations where people are held in isolation, and a sample of other areas to develop an understanding of practices and conditions outside of isolation to enable comparison.  Plaintiffs' experts are experienced in touring prisons, and Mr. Horn is experienced in running prisons, and will conduct their inspection in a timely manner aimed at minimizing their impact on the functioning of the prisons. Ex. 2, Horn Decl., ¶ 10; Ex. 1, Metzner Decl., ¶ 6.  The tours will, as agreed, last three days.

Also, the inspection as proposed would lessen the overall discovery burden on Defendants.  As set forth in greater detail below, Plaintiffs have requested that Dr. Metzner have access to electronic health records during the inspection.  Allowing such a review would increase the benefit of the inspection and decrease the overall burden on Defendants.  For example, if Dr. Metzner talks with a putative class member and wants to confirm what the individual says, a quick review of the electronic health record may suffice and obviate the need for production of the record.  This also increases the reliability of the information, making the information provided by the expert more useful to the court.

Similarly, if people in the housing units that RIDOC does not call "Restrictive Housing" but that Plaintiffs believe to constitute solitary confinement consistently report to the experts that

23

they do in fact get out of their cells more than two hours per day on average, that could reduce or eliminate the need for document production and other discovery regarding those housing units.[19]

Defendants, as the party resisting discovery "bear[s] the burden of establishing that compliance with the [discovery] request is unduly burdensome."  *Aronstein*, 2017 WL 2818993, at *2; *see also Viscito*, 2019 WL 5318228 at *1.   Defendants have not in any way detailed the burden of the requested inspections, stating only that the lists Plaintiffs requested (*see infra*, § III.A.6) and access to documents onsite "are an unnecessary and undue burden".   Ex. 21 at 7. Such "generalized objections to an opponent's discovery requests are insufficient." *Autoridad de Carreteras y Transportacion v. Transcore Atl., Inc*., 319 F.R.D. 422, 427-428 (D.P.R. 2016).

This factor, like all the others, weighs in favor of finding the request to be proportional.

### 3.   Confidential Interviews with Incarcerated People Is Standard Practice and an Important Part of Plaintiffs' Expert Inspections in Cases Challenging Conditions of Confinement

Plaintiffs' Inspection Request asks that Plaintiffs' experts be permitted to "confidentially meet with incarcerated persons, to discover information regarding the provision of mental health care to incarcerated persons and conditions of confinement in isolation."  Ex. 3 at 2.  This is a standard practice by experts when inspecting the conditions of confinement in matters similar to this one.  *See, e.g., Ruiz v. Johnson*, 154 F. Supp. 2d 975, 993 (S.D. Tex. 2001) (describing practices, including interviews, of several experts); Ex. 6 (Excerpt of Report of Dr. Terry A. Kupers, MD., M.S.P., *Dockery v. Fischer*) at 12-13 (noting that during his pre-class certification[20] inspection tour in April 2014, he interviewed approximately 28 incarcerated

---

[19]Plaintiffs have requested discovery regarding Administrative Detention, Administrative Restrictive Status, Transitional Confinement, and Administrative Transfer.  Defendants have objected to such requests on the grounds that these housing units are not solitary confinement.

[20] Class certification was granted on September 29, 2015.  *Dockery v. Fischer*, 253 F. Supp. 3d 832, 856 (S.D. Miss. 2015).

people in a private meeting room and 27 at cell front, and in a subsequent tour in May 2016, he

interviewed another 23 incarcerated people in an office or classroom); Ex. 7 (Excerpt of Report

of Dr. Marc F. Stern, MD., M.P.H., *Dockery v. Fischer*) at 123-124 (noting that during his pre-

class-certification inspection tour in April 2014, he interviewed "numerous [incarcerated]

patients" and reviewed the records of 22 incarcerated individuals); Ex. 8 (Excerpt of Report of

Eldon Vail, *Dockery v. Fischer*) at 117-118 (noting that during his pre-class certification

inspection tour in March and April 2014, he interviewed over 80 incarcerated people); Ex. 9

(Excerpt of Supplemental Report of Dr. Kathryn A. Burns, M.D., M.P.H., *Braggs v. Dunn*) at 7-8

(noting that during her pre-class certification[21] inspection tours in May 2015-March 2016, she

conducted confidential individual interviews with 77 incarcerated people, and spoke with another

25 non-confidentially at cell front); Ex. 10 (Excerpt of Dec. of Dr. Pablo Stewart, M.D. in *Sabata

et. al, v. Nebraska Department of Correctional Service*) at 10 (noting that during his pre-class

certification[22] inspection tour, he "had the opportunity to speak with individual prisoners and

NDCS staff about the provision of mental health services at NDCS facilities."); Ex. 11 (Excerpt

of Dec. of Dr. Craig Haney, Ph.D., J.D. in *Sabata et. al, v. Nebraska Department of Correctional

Service*) at 5-7, 32 (noting that during his pre-class certification inspection tours, he "conducted

cell-front interviews with several dozen prisoners and also interviewed a number of prisoners on

an individual, confidential basis").  Notably, in *Braggs*, Defendants brought an unsuccessful

*Daubert* challenge on the basis that Dr. Burns did not interview enough incarcerated people.

*Braggs I*, 317 F.R.D. at 645.  Confidential interviews are part of the standard methodology for

---

[21] Class certification was granted on November 25, 2016.  *Braggs I*, 317 F.R.D. at 673.  At the time the expert reports were filed in July 2016, the name of the case was *Dunn v. Dunn*.
[22] Class certification was denied on June 8, 2020. *Sabata v. Nebraska Dep't of Corr. Servs.*, 337 F.R.D. 215, 271 (D. Neb. 2020).

25

experts in this field.  Ex. 1, Metzner Decl., ¶¶ 8, 10; Ex. 2, Horn Decl., ¶¶ 12, 16.   Moreover,

Eldon Vail, one of plaintiffs' experts in *Braggs* noted in his report that restrictions on

conversations with incarcerated people, though not absolute, were "completely unique in [his]

experience."  Ex. 15 at 13.

       Courts have recognized the appropriateness, and indeed the value, of expert inspections

that include confidential interviews with incarcerated people.  For example, in *United States v.*

*Erie County*, the court rejected the detention center's argument that the Department of Justice

could only speak with incarcerated people by deposing them.  Specifically, the court ruled that

"[a]n inmate, like any other non-party witness or potential witness, can be informally

interviewed (if willing) by either party.  Moreover, requiring that inmates be deposed (or

interviewed) in the presence of County attorneys or employees would likely chill their

willingness to speak to investigators or to speak candidly.  This, of course, defeats the whole

purpose of speaking to inmates in the first place."[23]  *Erie Cnty.*, 2010 WL 986505, at *3.

       Similarly, in *Alvarez v. LaRose*, petitioners sought expert inspections including

interviews with people detained by the United States Marshals Service.  *Alvarez v. LaRose*, No.

320CV00782DMSAHG, 2020 WL 5594908, at *10-11 (S.D. Cal. Sept. 18, 2020).  The court

ruled, over Defendants' objections, that the petitioners' experts could interview the detainees

"who are willing to speak to Petitioners' expert in confidence and outside the hearing of the

accompanying individuals assigned by Respondents."[24]  *Id.* at *11; *see also Coleman v.*

---

[23]*Erie County* was a case brought on behalf of the United States, not a class action.  As a result, no one incarcerated in the detention center was a plaintiff, class member or putative class member.

    [24] The *Alvarez* court instructed the parties to agree to certain limitations concerning COVID-19 safety, such as requiring the use of masks and maintaining social distancing but emphasized that this was not "a chance to seek reconsideration of the Court's decision to allow Petitioners' expert to interview detainees generally."  *Alvarez*, 2020 WL 5594908 at *11.  Plaintiffs are not opposed to, and agree with, taking reasonable safety precautions concerning COVID-19.

*Schwarzenegger*, 2007 WL 3231706 at *2 (holding that questions to class members "are properly included as part of an inspection of 'any operation' on the prison facilities to be inspected."); *Coleman v. Brown*, No. CIVS900520LKKJFMP, 2011 WL 13362492, at *3 (E.D. Cal. Aug. 1, 2011) (allowing interviews of class members).

In a phase of *Braggs*, after the one discussed above, plaintiffs sought expert inspections of the prisons, including confidential interviews, as discovery in preparation for a hearing on a motion to terminate. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 5909086, at *1-2 (M.D. Ala. Oct. 1, 2020), *vacated on other grounds*, 2:14CV601-MHT-JTA, Doc. 3007 ("*Braggs III*"). Over defendants' objections, the court ordered the expert be allowed to conduct inspections, including full interviews.[25]   *Braggs III*, 2020 WL 5909086 at *2-3.  In *Malam v. Adducci*, No. 5:20-cv-10829-JEL-APP (E.D. Mich.), the court ordered an expert inspection that included confidential interviews with "any immigration or criminal detainee at the facility, with their permission."  *See* Ex. 12 (Order granting and setting parameters for expert inspections in *Malam v. Adducci*,) at 4; *see also Malam v. Adducci*, No. 5:20-cv-10829-JEL-APP (E.D. Mich.), Doc. 427 (opposing inspections and specifically opposing interviews).  Similarly, in *Busby v. Bonner*, 2:20-cv-02359-SHL (W.D. Tenn.), the court ordered, over defendants' objections, that plaintiffs' expert could tour the jail that was the subject of the litigation with the "courtesies and support" as were to be provided to the court's expert, including the ability to conduct confidential interviews with detained people.   Ex. 14 (order regarding Plaintiffs' expert inspection) at 8; *see*

---

[25] "After the court granted the plaintiffs' motion for prison inspections, the defendants withdrew their motion to terminate." *Braggs v. Dunn*, No. 2:14CV601-MHT, 2021 WL 6112444, at *5 (M.D. Ala. Dec. 27, 2021).  As there was no longer a need for discovery, the court vacated the discovery order without prejudice. *Braggs*, 2:14CV601-MHT-JTA, Doc. 3007.

*also* Ex. 13 (order regarding court expert inspections); *Busby v. Bonner*, 2:20-cv-02359-SHL

(W.D. Tenn.), Doc. 64 (opposing plaintiffs' expert inspection).

In different but analogous contexts that implicate privacy rights at least as much as the

correctional cases do, courts have also allowed interviews with residents of the subject facilities.

For example, in *K.L. v. Edgar*, the court ordered permitted plaintiffs' experts to confidentially

interview patients in a mental hospital during their inspection, over defendants' objections. 945

F. Supp. 167, 168-169 (N.D. Ill. 1996).  Similarly, in *Carey*, the court found there was no error

in permitting, over defendant's objection, plaintiffs' experts to interview developmentally

disabled residents of the Staten Island Developmental Center confidentially during an inspection.

706 F.2d at 960-961.

One of the very few cases where plaintiffs' experts were precluded from interviewing

incarcerated people was *Amos v. Taylor*.  2020 WL 618824 (N.D. Miss. Feb. 10, 2020).  This

case, in which plaintiffs sought expedited discovery in support of a motion for a temporary

restraining order, is an outlier on this point (see above) and is poorly reasoned.  The entire

analysis of the question of interviewing incarcerated people reads as follows: "courts have

cautioned against allowing informal interviews during prison inspections because these unsworn

'roving depositions' offer 'small utility' to fact finding."  *Id.* at *5.  The only case to which the

court cited was *United States v. Territory of the Virgin Islands*, which does not address

interviewing of incarcerated people at all.  *Amos,* 2020 WL 618824 at *5; *see Territory of the

Virgin Islands*, 280 F.R.D. at 233-234.  *Territory of the Virgin Islands* was solely about

interviewing staff.  280 F.R.D. at 233-234.  Moreover, the court in *Territory of the Virgin Islands*

did not rule that such "interviews offer small utility to fact finding"; the court analyzed the

specificity of the request for inspection, found it lacking, and found that the lack of specificity

meant the interviews in that case would be of little utility, unlike in cases where the request specified that interviews would be related to the issues in the case. *Id*. at 236-238.

The fact that the discovery disputes in cases cited above arose at different points in the litigation does not matter because "the phase of the litigation is not material to the court's construction of what Rule 34 allows." *Erie Cnty.*, 2010 WL 986505 at \*3.  Nor does it matter that there is not yet a certified class in this case because class membership is not determinative of whether the incarcerated person has discoverable information. *See id*. (allowing experts to interview incarcerated people in a case that was not a class action).  In *Braggs*, *Dockery*, and *Sabata*, the expert inspections took place prior to class certification. *See* Exs. 6-11.  In *Malam* and *Busby*, although classes were certified, the court orders permitting experts to interview detained people did not limit the interviewees to class members. Ex. 12 at 4 (allowing plaintiffs' expert to confidentially interview "any immigration or criminal detainee at the facility, with their permission" even though the class was only immigration detainees); Exs. 13, 14 (allowing confidential interviews of any detainee, regardless of whether the person was a class member).[26]

It is well settled law that plaintiffs' counsel can communicate with potential class members prior to class certification, just as they would with any other witness or unrepresented party. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981).  Plaintiffs need access to people incarcerated in the prisons to develop their case and examine issues of commonality and

---

[26] Notably, here, merits and class discovery are being conducted simultaneously and Plaintiffs are permitted broad access to discovery related to class certification.  *See* July 1, 2020 Docket Entry, Pre-Trial Scheduling Order; *see also Johnson v. Nekoosa-Edwards Paper Co.*, 558 F.2d 841, 845 n.5 (8th Cir. 1977) (allowing broad access to discovery prior to class certification, particularly when the discovery is relevant to class certification); *Golan v. Veritas Ent., LLC*, No. 4:14CV00069 ERW, 2016 WL 5811292, at \*2 (E.D. Mo. Oct. 5, 2016) (citing *Johnson* and allowing the plaintiff discovery of unnamed plaintiffs to the extent relevant "to determine issues of typicality and commonality in class certification").

29

typicality among the class members. *Drake v. Aerotek, Inc.*, No. 14-CV-216-bbc, 2014 WL 7408715 at *2 (W.D. Wis. Dec. 30, 2014) (noting the permissibility of allowing discovery before class certification, stating it "may be necessary to determine typicality and commonality"); *Brum v. Marketsource, Inc.*, No. 2:17-cv-241-JAM-EFB, at *6 (E.D. Cal. Aug. 14, 2018) (same). The people Plaintiffs seek to speak with are putative class members and witnesses, any of whom may have discoverable information, and are, therefore, appropriate interview subjects. *Erie Cty.*, 2010 WL 986505 at *3.

Moreover, under Fed. R. Civ. P. 23, and as affirmed by the Supreme Court, counsel generally is not required to obtain leave of court before communicating with potential class members before certification. *See Gulf Oil*, 452 U.S. at 99-102; *Agerbrink v. Model Serv. LLC*, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015) ("[T]here is nothing inherently improper about a party's communication with potential class members prior to certification."), *vacated on other grounds sub nom Agerbrink v. MSA Models,* 2017 WL 4876221 (S.D.N.Y. May 23, 2017). Indeed, in *Gulf Oil*, the Supreme Court held that communications between class counsel and putative class members should be unimpeded absent clear findings reflecting the need for limiting that communication. 452 U.S. at 104.[27]

Allowing confidential interviews will not prejudice Defendants. Defense counsel will be able to obtain all interview notes taken by the experts through standard discovery. Defendants will also be able to depose and cross-examine Plaintiffs' experts about the interviews and the

---

[27] If this were a putative class action outside of the corrections context, Plaintiffs would be able to have their experts meet confidentially with putative class members whenever they so choose, unless Defendants could meet the high bar for preventing such communications set forth in *Gulf Oil*. *See id*. The issue arises here only because the putative class members are in the physical custody of Defendants. As noted above in § III.A.2.ii, this is one of the proportionality factors that weighs in favor of granting the requested discovery.

even depose the interviewees themselves if they so choose.  These discovery tools provide ample

opportunity for Defendants to obtain any necessary information without suffering any prejudice.

### 4. Interviewing Staff Is Standard Practice for Expert Inspections in Civil Rights Cases Challenging Conditions of Confinement

Plaintiffs seek leave to "confer with and interview mental health staff and correctional

staff … to discover information regarding the provision of mental health care to incarcerated

persons and condition of confinement in isolation" in the presence of defense counsel.[28]  *See* Ex.

3 at 2 (Plaintiffs' Inspection Request).  In so doing, Plaintiffs seek to establish a common

baseline of information about the facilities' operations, especially as it relates to living and

treatment conditions of the Individual Plaintiffs and putative class members.[29]

There is ample precedent for allowing Plaintiffs' experts  to "confer with staff" as part of

a Rule 34 site inspection in the correctional context and especially when, as here, Plaintiffs seek

to do so in the presence of defense counsel.  *See, e.g.*, Ex. 1, Metzner Decl., ¶ 8; Ex. 2, Horn

Decl., ¶¶ 12, 16; Ex. 15 at 12-13; Ex. 9 at 7-8; Ex. 7 at 123-124; Ex. 6 at 12; Ex. 11 at 6-7.

And, in numerous cases, courts have ordered that experts could interview staff.  In *Erie*

*County*, an action brought by the Department of Justice ("DOJ") challenging the conditions of

---

[28] Plaintiffs did not explicitly state in the request that the interviews with staff would not be confidential.  However, Plaintiffs explicitly stated that interviews with incarcerated people would be, and did not have such a requirement for interviews with staff.  Plaintiffs stated in both the meet and confer and in the letter to the court requesting a discovery conference that the interviews they sought with staff would not be confidential.

[29] For the same reasons, Plaintiffs do not object to Defendants' experts interviewing putative class members, but request that it be done only in the presence of Plaintiffs' counsel.  For instance, the *Coleman* court ordered that plaintiffs be notified and given access to defendants' experts inspection because it would "promote efficiency and fairness 'by *inter alia*, helping establish a common factual baseline' of what took place during the inspections, as well as ensuring protection for their clients."  2007 WL 3231706 at *2.  In a subsequent proceeding, defendants' expert reports were stricken because the experts had interviewed class members without plaintiffs' counsel's knowledge or consent. *Coleman v. Brown*, 938 F. Supp. 2d 955, 962-966 (E.D. Cal. 2013).

confinement at a detention center, the court ruled that the DOJ's consultant experts were permitted to interview and question employees during the course of the site inspection on relevant issues of suicide prevention and mental health processes and procedures.  2010 WL 986505 at *3 .  The court explained that "[r]easonable access to employees is necessary for the consultants to form an understanding and opinion about the suicide practices and protocols at the [detention center].  Moreover, there is no danger of prejudice or element of surprise to Defendants because the county's attorneys are permitted to accompany the consultants and advise County employees as they see fit."  *Id*.

Likewise, in *Alvarez*, the court ruled that "Petitioners' expert will also be permitted to speak to [facility] staff members, but these conversations shall not be confidential.  If Petitioners wish for their expert to speak to [facility] staff, one attorney for Respondents shall be permitted to attend the site inspection and may be present for any interviews of staff members by Petitioners' expert."  2020 WL 5594908 at *12.

In *Coleman*, Plaintiffs sought permission for their experts to question staff and incarcerated people about "access to medical and mental health care and as to issues of housing, programming, exercise and activities for class members" in order to assess the impact overcrowding had on mental health and medical care.  2007 WL 3231706 at *1.  The court held, over defendants' objections, that "questions by the experts directed to prison employees and to class members concerning those matters identified in plaintiffs' inspection request are properly included as part of an inspection of 'any operation' on the prison facilities to be inspected."  *Id*. at *2.  In *Malam*, the court ordered that defendants "make the appropriate staff (including contractor staff) available during the [plaintiffs' expert] inspection to answer questions regarding medical care and [the facility's] COVID-19 response."  Ex. 12 at 4.  Taking it a step further, the

court also allowed the expert to "provide the parties with a list of staff he wishes to interview" and ordered defendants to "ensure that [the expert] has the opportunity to interview those individuals, confidentially in persons or via telephone or video either before or after the inspection, as requested by [the expert]." *Id*.  Similarly, in *Busby*, the court ordered that the court-appointed expert be allowed to speak with staff, and that the plaintiffs' expert was to have the same access to the facility as the court-appointed expert, except that the plaintiffs' expert could not be accompanied by counsel or take videos or photos.  Ex. 13 at 2 (stating that the court-appointed expert "shall be permitted to speak with staff . . . in confidence"); Ex. 14 at 8 (ordering defendant to "provide the same courtesies and support" to the plaintiffs' expert as to the court-appointed expert).  Such access is routinely granted.  *See, e.g., Coleman*, 2011 WL 13362492 at *3  (allowing plaintiffs' experts to interview staff); *Franklin v. D.C.*,  960 F. Supp. 394, 401 nn.13-14 (D.D.C. 1997), *supplemented*, No. CIV. A. 94-0511 (JHG, 1997 WL 403418 (D.D.C. July 8, 1997), *vacated in part on other grounds*, 163 F.3d 625 (D.C. Cir. 1998), and *rev'd in part on other grounds, vacated in part on other grounds*, 163 F.3d 625 (D.C. Cir. 1998) (discussing staff interviews conducted by plaintiffs' expert during inspections); *K.L.*, 945 F. Supp. at 168-169 (allowing plaintiffs' experts to interview staff in a mental hospital in the presence of defense counsel over defendants' objections); *Lizotte,* 1990 WL 267421 at *1 (allowing plaintiffs' experts to ask staff about "the operations of the emergency room, the nature of the functions carried out by the employees, the type of care being provided, and the policies and procedures followed there" during his inspection over defendants' objections); *Carey,* 706 F.2d at 960-61 (finding no error in court's order that plaintiffs' experts could interview staff).

### 5.   Experts Should Be Granted Access to Areas Essential to Form Expert Opinions

Plaintiffs' experts seek to view the areas of RIDOC Facilities relevant to forming their opinions on the issues presented in this case.  In addition to seeing the areas that are the most relevant to the case—the housing units where people are held in solitary confinement, mental health and medical treatment areas, and recreation areas—experts also need to see other parts of the prisons, such as general population.[30]  Defendants object to Plaintiffs' request to inspect parts of the prisons where persons who are in restrictive housing or the Residential Treatment Unit do not go.  Ex. 21.

Understanding the structure and administration of a general population housing unit is necessary to understanding the differences between being housed in general population and being housed in solitary confinement.  Ex. 1, Metzner Decl., ¶¶ 6, 11; Ex. 2, Horn Decl., ¶¶ 10, 13, 15.  The inspection of such areas would be quicker and less detailed than inspection of the restrictive housing units, but it is nonetheless an essential part of developing an understanding of how the RIDOC Facilities function, including the constitutional violations associated with restrictive housing in RIDOC and the impact of such deficiencies on persons with SPMI.

Moreover, Plaintiffs are entitled to discover information related to their claims under the ADA and the Rehabilitation Act, which includes, information about the conditions in general population in comparison with conditions in restrictive housing.  For example, Plaintiffs have alleged that they are being discriminated against by being denied access to programs and services because they are housed in solitary confinement.  Doc. 1 at ¶ 109.  Seeing the places where programs and services are provided for people in general population and those where programs

---

[30] Plaintiffs do not request that their experts be permitted to tour the Minimum Security Facility. There is no restrictive housing in that facility.  Doc. 1 at ¶ 55.

34

and services are provided for people in restrictive housing, if they are, will be important for understanding how the spaces compare, and what that says about the provision of programs and services.  If the program areas in general population have chairs and the locations presented as program areas in restrictive housing do not, that would indicate that there is a significant difference in the provision of programming.  If the program areas were essentially identical, that would suggest that there may not be a significant difference.  But Plaintiffs' experts cannot know the differences between conditions in restrictive housing and conditions in general population without knowing the conditions in general population.  A party "has a right to inspect and record the areas of [a prison] that may be relevant to [its] claims." *DuPonte*, 384 F. Supp. 3d at 227.

Courts routinely grant access to experts according to the experts' assessment of their needs. *See, e.g., Alvarez*, 2020 WL 5594908, at *12 (allowing inspection of "Areas where cleaning supplies and personal protective equipment are maintained"); *Dang v. Eslinger*, No. 6:14-cv-37-Orl-31TBS, 2015 WL 13655675 (M.D. Fla. Jan. 20, 2015) (court overruled county's objection and allowed  plaintiffs' expert to inspect the jail's mental health housing and medical unit where defendants had failed to diagnose plaintiff's meningitis); *see also Erie Cnty.*, 2010 WL 986505, at *2 (ruling that access to the holding facility relates to the scope of inspection afforded a consultant or expert to inspect an "operation" on the property."); Ex. 12 at 6-7; Ex. 13 at 2; Ex. 14 at 8.

Plaintiffs' expert Horn also seeks access to the control rooms to be able to see what is visible in the housing units from the control rooms.  Ex. 2, Horn Decl., ¶ 10.  Understanding the degree of supervision in a housing unit is important to understanding the risk to people housed in the unit from self-harm, medical emergencies, or violence.  This, again, is something routinely done by correctional administration experts. Ex. 2, Horn Decl., ¶¶ 10, 15-16.  It is also

permitted by courts.  In *Dang*, an individual plaintiff requested access to a jail's surveillance system of the housing units where the plaintiff had been housed during the relevant period. 2015 WL 13655675 at *3.  The sheriff objected, saying that this was "sensitive information." *Id.*  The court allowed the inspection, including of the surveillance system, finding that "[s]eeing the inside of the jail and understanding how the jail surveillance system works (or at least how it worked when Plaintiff was confined there) will help Plaintiff's expert prepare his or her report." *Id*.  Similarly, in *Erie County*, defendants (a county jail) objected to the Department of Justice's Rule 34 Request for its experts to inspect the booking, holding and security areas, arguing they lacked space to accommodate the onsite inspection and raising security concerns.  The court rejected Defendants' arguments, finding that given the important issues at play, any burden would be limited and temporary, and should be borne by Defendants during the onsite inspection *Erie Cnty.*, 2010 WL 986505 at *4. *Id.*

Here, although Plaintiffs explained to the Defendants the reason for seeking access to a limited number of places where people who are in solitary confinement do not go, Defendants objected without stating the reason.  The experts should be permitted to go to the places they, as experts, determine they need to go to form their opinions.

### 6.  Plaintiffs' Experts Should be Permitted to Review Selected Documents Relative to Putative Class Members and Prison Operations While Onsite

Plaintiffs' Inspection Request seeks permission for their experts to review certain, identified documents during the inspections, including the electronic medical records system; mental health needs requests received; grievances received related to the provision of mental health care or the conditions of confinement in isolation; incident reports; logbooks relating to incarcerated persons' movement and activities within isolation units; and logbooks relating to the mental health care of incarcerated persons.  Plaintiffs asked for the production of certain lists,

36

lists which most prisons have, to facilitate the process of identifying people to talk to and records to review. Ex. 1, Metzner Decl., ¶ 7; Ex. 2, Horn Decl., ¶ 11; *see also* Ex. 6 at 11 (discussing his reliance on "rosters, logs and other documents" in the course of inspections).

Again, this process is part of the standard methodology for experts in this field and provides the experts with a comprehensive view of issues that may be shared by the class.  Ex. 1, Metzner Decl., ¶¶ 7, 12; Ex. 2, Horn Decl., ¶¶ 11, 16; *see, e.g., Coleman*, 2007 WL 3231706 at *1 n.1 (noting lack of dispute regarding the review of medical records during expert inspections); *Braggs v. Dunn*, 2017 WL 659169 at *6 (M.D. Ala. Feb. 17, 2017) (noting that the experts requested and reviewed "medical, dental, or mental-health records …during an inspection");  Ex. 9 at 8; Ex. 7 at 123-124; Ex. 6 at 11-12; Ex. 11 at 6-7, 32.

Such a review allows the experts to see how documents are created, including how timely they are—information that is material and relevant to Plaintiffs' claims. Permitting an expert to review such records during the inspection, allows them to review the documents in real time and gives them the opportunity to observe the accuracy of such records.  For example, it is common practice for facilities to maintain observation records documenting each time a person on mental health watch has been observed. Ex. 1, Metzner Decl., ¶ 7; Ex. 2, Horn Decl., ¶ 11.  Such records are supposed to be documented contemporaneously with each check-in of the person on watch and the timing of when the records are completed is material.  If an expert observed a check-in at 10:00 a.m., but sees that the check-in of the person on mental health watch was not recorded until later in the day, that is important evidence that is not ascertainable through the production of documents.  *See, e.g., Braggs II*, 257 F. Supp. 3d at 1264 (noting that the pre-filling of such forms was "witnessed firsthand" during an inspection tour by the court).

37

Similarly, if an expert is permitted to review a current log of scheduled mental health appointments during the inspection, he can confirm whether or not the scheduled appointments are actually occurring. For example, if the inspection occurs in April, and the log shows no appointments after January, this provides different information than if a log that is produced in response to a document request shows appointments through January. In the first instance, the log would indicate no appointments in February or March, whereas in the second instance it would likely appear that this was a log from January, and thus indicates nothing about February or March.

Finally, as noted above, access to records during the inspection can reduce the overall burden. An expert can look at a record to quickly determine whether there is documentary evidence of something he or she has been told, thereby eliminating the need to request the production of the documents. For example, if an incarcerated person reports that he has schizophrenia, the psychiatric expert can look at the medical record to see what the person's diagnosis is, rather than requesting production of the medical record.

Reviewing relevant documents on-site during the inspections is a common practice and ultimately limits rather than expands the burden on the party being inspected.

**7. Disability Rights Rhode Island Has a Statutory Right of Access to RIDOC Facilities, People with Disabilities Housed Therein, and Records Relating to Such People**

Disability Rights Rhode Island ("DRRI"), the Protection and Advocacy ("P&A") agency for the State of Rhode Island, is a Plaintiff in this action. Doc. 1 at ¶¶ 30-43.

"The Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801–10851 (2000), the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD"), 42 U.S.C. §§ 15001–15115 (2000), and the Protection and Advocacy of

Individual Rights Act ("PAIR"), 29 U.S.C. § 794e (2000) (collectively, the "P & A Acts")

authorize P&As to 'monitor the care of and advocate on behalf of individuals with mental illness

and developmental or other disabilities.'" *Disability Rts. Ohio v. Buckeye Ranch, Inc.*, 375 F.

Supp. 3d 873, 877 (S.D. Ohio 2019) (quoting *Connecticut Off. of Protec. and Advoc. For*

*Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 (2d Cir. 2006)). "To

further these objectives, the P & A system has extensive authority to access individuals, patient

records, and public and private facilities." *Id.* (quoting *Matter of Disability Rights Idaho Req.*

*for Ada County Coroner Records Relating to the Death of D.T.*, 168 F.Supp.3d 1282, 1286 (D.

Idaho 2016)); *see also Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental*

*Ctr.*, 97 F.3d 492, 497 (11th Cir. 1996) ("It is clear that [PAIMI] provides express authority for P

& As to gain broad access to records, facilities, and residents to ensure that [PAIMI's] mandates

can be effectively pursued.").

  As the P&A for Rhode Island, DRRI and its authorized agents are entitled to access to

facilities that "render care or treatment for individuals with mental illness" and the residents of

such facilities. 42 CFR § 51.42. Facilities include jails and prisons. *Indiana Prot. & Advoc.*

*Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, 642 F. Supp. 2d 872, 875 (S.D. Ind.

2009) (citing 42 U.S.C. §§ 10802(3), (4); 42 C.F.R. § 51.2).

  DRRI and its authorized agents also have a right to access records. Generally, P&As are

authorized to obtain individual records with the written consent of the individual or guardian.

Such records, when obtained with permission, can be used throughout the course of the

litigation. However, P&As also have access to records of people with disabilities even, in some

circumstances, without consent. For example, a P&A may have access in certain emergency

situations, even when the guardian objects or in some other circumstance. *See, e.g.*, *Disability*

*Law Center v. Riel, 130 F. Supp. 2d 294, 300* (D. Mass. 2001) (access to record in spite of

guardian's objection) and *Connecticut Office of Protection and Advocacy for Persons with

Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 317-20 (D. Conn. 2003) (access without consent

to records of prison inmates who had committed suicide or otherwise died in prison).

       Moreover, the PAIMI empowers P&As to "pursue administrative, legal, and other

appropriate remedies to ensure the protection of individuals with mental illness who are

receiving care or treatment in the State," and provides that they shall "have access to facilities in

the State providing care or treatment." *Monaco v. Stone*, 2002 WL 32984617, at \*34–35

(E.D.N.Y. Dec. 20, 2002), *aff'd sub nom. Monaco v. Sullivan*, 737 F. App'x 6 (2d Cir. 2018)

(citing 42 U.S.C. § 10805(a)); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1166 (M.D. Ala.

2016).   A P&A "can bring claims not only pursuant to its enabling statutes, but also pursuant to

other statutes and constitutional provisions."  *Dunn*, 219 F. Supp. 3d at 1166 (citing *Ind. Prot. &

Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F.Supp.2d 872, 874 (S.D. Ind.

2009) (Eighth Amendment, ADA, and Rehabilitation Act claims); *Doe v. Stincer*, 175 F.3d 879,

880 (11th Cir. 1999) (ADA); *N.J. Prot. & Advocacy, Inc. v. Davy*, 2005 WL 2416962, at \*4

(D.N.J. Sept. 30, 2005) (due process); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir.

2003) (due process); *Aiken v. Nixon*, 236 F.Supp.2d 211, 220–21 (N.D.N.Y. 2002) (Fourth

Amendment, ADA, and Rehabilitation Act); *Unzueta v. Schalansky*, 2002 WL 1334854, at \*3

(D. Kan. May 23, 2002) (due process); *Risinger v. Concannon*, 117 F.Supp.2d 61, 64 (D. Me.

2000) (civil rights claims regarding violations of the federal Medicaid Act provisions brought

pursuant to § 1983); *Brown v. Stone*, 66 F.Supp.2d 412, 416 (E.D. N.Y. 1999) (First Amendment

and equal protection); *Rubenstein v. Benedictine Hosp.*, 790 F.Supp. 396, at 398 (N.D.N.Y.

1992) (due process and equal protection); *Goldstein v. Coughlin*, 83 F.R.D. 613, 614 (W.D.N.Y. 1979) (Rehabilitation Act and unspecified constitutional claims)).

When litigation has commenced and the P&A seeks discovery, including access to a facility and its residents, such discovery may be tailored to the rules of discovery, but the right to access remains. *See, e.g.*, *Monaco*, 2002 WL 32984617 at *34–35 (treating the P&A's request for access as a motion to compel under Rule 34 and authorizing access, over defendants' objection); *Univ. Legal Servs., Inc. v. St. Elizabeth's Hosp.*, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005) (holding that a P&A had standing in a lawsuit in part because it retained its access authority). Accordingly, DRRI and its authorized agents have a right to access RIDOC Facilities, speak with persons who are mentally ill, and review records. Such access to incarcerated people, including confidential interviews, falls squarely within the statutory authority of DRRI and the scope of Rule 34(a)(2). *See Eirhart*, 93 F.R.D. at 371 (N.D.Ill.1981). Indeed, P&A statutes generally authorize access to residents and staff, although it is generally accepted that a P&A cannot require a facility staff person (or a resident) to talk to the P&A. However, in several instances some courts have permitted experts to ask questions of staff and residents. *See, e.g., Lizotte v. New York City Health & Hospital Corp.*, 1990 WL 267421 at *1 (S.D.N.Y. March 13, 1990) (finding that the expert's experience "is sufficient to justify permitting him to ask purely factual questions of staff members during his tour concerning the operation of the emergency room, the nature of the functions carried out by the employees, the type of care being provided, and the policies and procedures followed there."). Accordingly, DRRI and its authorized agents have a statutory right to access to RIDOC Facilities, to speak with incarcerated people with disabilities and staff, and to review documents.

41

### B.  The Privacy of Incarcerated People Will Be Protected

The privacy rights of incarcerated people will be adequately protected throughout this

process.  First, Plaintiffs' experts' interviews will be limited to those who agree to speak with

them, and the incarcerated person will be permitted to cut off the interview or decline to answer

if they so choose, allowing each individual to exercise their own autonomy to choose the

information he or she shares.  Ex. 1, Metzner Decl., ¶ 8; Ex. 2, Horn Decl., ¶ 12.

Second, with regard to documents, Plaintiffs have offered to obtain HIPAA releases

obtaining the individual's consent before reviewing individual medical records.  If there is a

release, signed by the individual whose records are to be reviewed, this should eliminate the

privacy concern relating to medical records.

Additionally, there is a protective order already in place in this case.  Doc. 30.  The

relevant HIPAA regulation allows disclosure of protected health information "in the course of

any judicial or administrative proceeding," in response to a "discovery request" when there is a

qualified protective order in place, as there is here.  45 C.F.R. § 164.512(e)(ii)(B).  To be a

qualified protective order, a protective order must:

> (A) Prohibit[ ] the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and
>
> (B) Require[ ] the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

45 C.F.R. § 164.512.  The existing protective order meets these two requirements. [31]

---

[31] Plaintiffs believe that the protective order in this case is fully adequate, including for information protected under HIPAA.  Nonetheless, Plaintiffs are willing to augment it to address any confidentiality concerns raised by Defendants and/or this Court.

The use of HIPAA-compliant protective orders to provide access to health care records is routine.  *See, e.g.*, *Brown v. Providence Med. Ctr.*, 2011 WL 2259746, at *1 (D. Neb. June 6, 2011);  *Korbel v. Extendicare Health Servs., Inc.*, 2015 WL 13651194, at *23 (D. Minn. Jan. 22, 2015);  *In re Cantrell v. U.S. Bioservices Corp.*, 2009 WL 1066011, at *1 (W.D. Mo. Apr. 21, 2009).

Finally, to further protect individuals' privacy rights, Plaintiffs have offered to blur out the faces of any incarcerated people in photographs taken at the facility as part of the inspections.

### C.  The Limited Impact on Defendants' Operations Is Not a Valid Basis for Denying Plaintiffs Inspection Request

In *Alvarez*, similar to the circumstances here, the parties sought the district court's intervention in resolving a discovery dispute involving petitioners' request to conduct an expedited on-site inspection of a detention center pursuant to Rule 34(a)(2) for their correctional healthcare consultant.  2020 WL 5594908.  Petitioners sought to assess the facility's compliance with CDC guidance to minimize the spread of COVID-19 at the facility.  The *Alvarez* court allowed the inspection request – including a physical inspection of all areas of the facility, finding that "any burden on Respondents is outweighed by the need for objective discovery regarding the conditions of confinement at [the facility."  *Id.* at *9.  In so ruling, the court concluded that if the expert inspection established the conditions at the facility are constitutionally sufficient "it would have effectively 'provid[ed] a measure of clarity to the parties' and saved both sides time that might otherwise be wasted …on [motion] for conditions reforms that are unnecessary, thus facilitating effective case management."  *Id.* at *8 (citing *NobelBiz, Inc. v. Wesson*, 2014 WL 1588715 (S.D. Cal. April 18, 2014).

Similarly, as discussed above, the court in *Erie County* also considered Department of Justice's Rule 34 request for access to the county's holding facility to conduct an expert

43

inspection and review of records onsite and concluded neither fell outside of the scope of the

Federal Rules.  2010 WL 986505.  In *Erie County*, the Department of Justice sought onsite

access for its experts to review the booking, holding and security areas of the county jail; *Erie*

*County* involved allegations of 4th and 8th Amendment violations regarding the local jails' strip

search policies and practices related to people admitted to the jail.  Defendants objected to the

Rule 34 Request, arguing they lacked space to accommodate the inspection and raising security

concerns.  The court rejected Defendants' arguments, stating: "If additional staff and security are

required on March 22 and 23 to accommodate the inspection and interview process, Defendants

are ordered to provide it." *Erie Cnty.*, 2010 WL 986505 at *4.  Just as the *Erie County* court

found, given the important issues at play, any burden here would be limited and temporary, and

should be borne by Defendants during the onsite inspection.

Moreover, Defendants' claim that the requested inspections are unduly burdensome is

undercut by their own practices and policies.  Notwithstanding RIDOC's claims that allowing

experts' inspection will be burdensome, plans to allow family members and friends to tour the

prison in August 2021 as part of the celebration of Correctional Officers' Week were set to

proceed until the public outcry about the event caused the event to be canceled. *See* Antonia

Farzan, *Celebration of ACI officers will mean more time in cells for inmates, critics say*,

PROVIDENCE JOURNAL (Sept. 10, 2021),

https://www.providencejournal.com/story/news/crime/2021/09/10/national-correctional-officers-

week-plans-aci-face-criticism/8279357002/; *see also* Ex. 17 (Facebook screenshot from Rhode

Island Correctional Officers Brotherhood page).  Additionally, Defendants' High Security Center

Inmate Rulebook states:

44

**Tours**

Tours of the H.S.C. will be conducted frequently. These tours are not intended to place inmates on display. In order for the Department to assist with inmates' socialization and to obtain necessary improvements and/or equipment, support from the surrounding communities and citizens of Rhode Island is necessary. These tours are designed to highlight the various programs and treatment activities in effect at this facility in order to help gain support for RIDOC's goals.

Ex. 18 (Excerpt of RIDOC High Security Center Inmate Rulebook) at DOC-000342.  And the

Maximum Custody Inmate Rulebook provides:

**Tours**

Tours of Maximum Security will be conducted frequently. These tours are designed to explain the various programs, treatment and activities at this facility.

**Inmate(s) will be subject to disciplinary action for swearing, cursing, or use of vulgar, abusive, rude, threatening or any other improper language toward any person or persons visiting the institution. Such actions will not be tolerated. Inmates are expected to treat all visitors with respect.**

Ex. 19 (Excerpt of RIDOC Maximum Security Inmate Rulebook) at DOC-001166.  Both of these

provisions indicate that tours are in fact routine, and that they involve interactions with

incarcerated people and staff talking with outside individuals about the "programs and treatment

activities" at the facilities.

### D.  The COVID-19 Pandemic Is Not a Reason to Limit the Expert Inspections

COVID-19 is currently waning.  Plaintiffs have proposed May 16-18, or June 1-3 2022

for the expert inspections.  If there is an increase in COVID-19 cases at the time of the

inspections, all parties have agreed on appropriate precautions.

Plaintiffs preemptively proposed onsite safety restrictions for the inspection in

recognition of COVID-19 concerns.  During the parties' December 9, 2021 meet and confer,

Plaintiffs voluntarily sought Defendants' assent to incorporate several safety restrictions as part

of the onsite inspection to promote the safety of incarcerated persons, RIDOC staff, and

Plaintiffs' and Defendants' experts and counsel.  For example, Plaintiffs' sought agreement that

all participants for Plaintiffs' and Defendants be fully vaccinated and, if possible, that any of

Defendants' correctional staff  accompanying the experts likewise be vaccinated.  Plaintiffs agreed to the suggestion by Defendants' counsel that all parties wear KN95 masks at all times onsite.

Moreover, during the COVID-19 pandemic, courts have allowed Rule 34 inspections (with appropriate precautions) in correctional settings.  *See, e.g.*, *Braggs III*, 2020 WL 5909086, at *2; *Frazier v. Graves*, No. 4:20-CV-00434-KGB, 2022 WL 273458, at *4 (E.D. Ark. Jan. 28, 2022) (noting that plaintiffs' medical expert had conducted approximately 35 in-person inspections of the COVID-19 response in jails, prisons, immigration detention facilities, and psychiatric hospitals since April 2020); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *3 (D. Md. Sept. 18, 2020) (describing inspection of a detention facility by a court-appointed expert in case regarding the response to COVID-19); *Malam v. Adducci*, No. 20-10829, 2021 WL 5754545, at *3 (E.D. Mich. Feb. 23, 2021) (noting that the court had "given [p]laintiffs an opportunity to conduct an expert inspection of [the detention facility]"); *Baxley v. Jividen*, No. CV 3:18-1526, 2021 WL 5867412, at *4 (S.D.W. Va. Dec. 10, 2021) (noting that the plaintiffs' expert had inspected three of defendants' jails and formed opinions regarding the COVID-19 response).

As noted above, Plaintiffs do not disagree that certain safety precautions are necessary for all parties involved as well as to safeguard the safety of the incarcerated population and RIDOC staff.

**CONCLUSION**

For the foregoing reasons, the Court should order that Plaintiffs' experts are permitted to conduct their inspection of RIDOC Facilities according to the terms set forth in Plaintiffs' Inspection Request, including having the ability to talk confidentially with incarcerated people, talk with staff members in the presence of Defense Counsel, review documents and visit the parts of the facilities set out in the Request.

Respectfully submitted,

By their attorneys,

/s/*Maria V. Morris*
Maria V. Morris (D.C. Bar No. 1697904)
Admitted Pro Hac Vice
Tammie Gregg (MN Bar No. 262420)
Admitted Pro Hac Vice
ACLU NATIONAL PRISON PROJECT
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005-2302
Telephone: (202) 548-6618
Facsimile: (202) 393-4931
Email: mmorris@aclu.org tgregg@aclu.org

/s/*Anne V. Mulready*
Anne M. Mulready (RI Bar No. 4738)
Brian Adae (RI Bar No. 2536)
DISABILITY RIGHTS RHODE ISLAND
33 Broad St., Suite 601
Providence, RI 02903
Telephone: (401) 831-3150
Facsimile: (401) 274-5568
Email:  amulready@drri.org badae@drri.org

/s/ *Patrick T. Uiterwyk*
Patrick T. Uiterwyk (RI Bar No. 7461)
James S. Rollins (MA Bar No. 569422)
Admitted Pro Hac Vice
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, MA 02111
Telephone: (617) 417-4700
Facsimile: (617) 217-4751 Email:

Patrick.uiterwyk@nelsonmullins.com
James.rollins@nelsonmullins.com

Dated: March 15, 2022                ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on March 15, 2022, the foregoing Plaintiffs' was sent electronically and by mail to counsel of record at the following addresses:

Brenda Baum
Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, RI 02903
Email: bbaum@riag.ri.gov

Rebecca Partington
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
Email: rebecca@desistolaw.com

Marc DeSisto
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
Email: marc@desistolaw.com

By: /s/ *Maria V. Morris*

49