UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHARLENE LIBERTY, JOHN DAPONTE,
JOHN DAVIS, DUANE GOMES, ADAM
HANRAHAN and CHARLES KENNER,
on behalf of themselves and all others
similarly situated; and
DISABILITY RIGHTS RHODE ISLAND,
on behalf of its constituents,
                    *Plaintiffs,*

v.                                                    C.A. No. 19-cv-0573-JJM-PAS

RHODE ISLAND DEPARTMENT OF
CORRECTIONS; PATRICIA COYNE-
FAGUE in her official capacity as the
Director of the Rhode Island Department of
Corrections; MATTHEW KETTLE,
Official Capacity as the Assistant Director of
Institutions and Operations; and BARRY
WEINER in his Official Capacity as the
Assistant Director of Rehabilitation Services
                    *Defendants*.

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
OBJECTION TO PLAINTIFFS' MOTION TO COMPEL INSPECTION**

**INTRODUCTION**

From the beginning of this case, all parties, as well as the Court, have acknowledged that

discovery would involve facility inspections at the Rhode Island Department of Corrections

("RIDOC"). While the "meet and confer" process has yielded some areas of agreement, the parties

are far apart on their interpretation of what the Federal Rules of Civil Procedure ("Rules") allow

during discovery in an adversarial cause of action. "If the parties differ as to whether an inspection

is appropriate, the court must balance the respective interests by weighing the degree to which the

proposed inspection will aid in the search for truth against the burdens and dangers created by the

1

inspection." *Scruggs v. Int'l Paper Co.*, 278 F.R.D. 698, 700 (S.D. Ga. 2012). Defendants submit that the scope of the inspection requested by the Plaintiffs far exceeds the very real security, confidentiality and medical interests that would be negatively affected by such boundless inspections. Defendants therefore respectfully request that this Court deny Plaintiffs' Request as it is phrased, as set out below.

On September 16, 2021, Plaintiffs filed their "Request for Entry onto the Defendants' Premises for Inspection and Testing," seeking access to six RIDOC facilities, relying on Rules 26 and 34(a)(2) of the Rules. (Exhibit 1)[1] While in the facilities, Plaintiffs seek to "confer with and interview" RIDOC mental health care and correctional staff, as well as "to confidentially meet with" random inmates (presumably including mentally ill inmates), "to discover information regarding the provision of mental health care to incarcerated persons and conditions of confinement in isolation." (Exhibit 1, p. 3) As set out in their Request, Plaintiffs also seek access to documents while they are in each of the facilities:

- Mental health needs requests received;[2]

- Grievances received related to the provision of mental health care or the conditions of confinement in isolation;[3]

- Incident reports;[4]

- Logbooks relating to incarcerated persons' movement and activities within isolation units;[5]

---

[1] Plaintiffs have since rescinded their request to inspect the Minimum Security Facility, *Memorandum of Law in Support of Plaintiffs' Motion to Compel Inspection,* (hereinafter "*Plaintiffs' Memorandum*") p. 2, fn. 2.
[2] This term is not defined by the Plaintiffs and it is unclear to what it refers.
[3] Grievances are not kept in any of the facilities that will be inspected by the Plaintiffs, and not in the form or manner that they seek. (Declaration of Rui Diniz, Exh. 2)
[4] Plaintiffs have not specified what incident reports they want RIDOC employees to provide to them during these "tours." Many have been provided during the course of discovery.
[5] Numerous logbooks have been produced in discovery. (Declaration of Kasey Pereira, Exh. 3)

- Logbooks relating to the mental health care of incarcerated persons;[6]

Plaintiffs then indicate that for every facility, they want Defendants to provide a *list* "of all RIDOC INCARCERATED PERSONS who fit the below criteria, and a subset of these INCARCERATED PERSONS' records will be selected for review:[7]

a. INCARCERATED PERSONS who currently are prescribed psychotropic medications, including for each incarcerated person the mental health diagnoses and the medication and dosages;

b. INCARCERATED PERSONS who currently are on the mental health caseload, INCLUDING for each incarcerated person the mental health diagnoses;

c. INCARCERATED PERSONS in ISOLATION who have mental health diagnoses, INCLUDING for each incarcerated person the mental health diagnoses;

d. INCARCERATED PERSONS who were placed on Constant Observation, Crisis Management Status, or Psychological Observation in the last year;

e. INCARCERATED PERSONS who were admitted to outside hospitals and emergency rooms in the last two years as a result of self-harm;

f. INCARCERATED PERSONS who were admitted to any inpatient mental health facility in the last two years;

---

[6] As stated above, numerous logbooks have been produced in discovery. Defendants object to production of documents regarding the provision of medical or mental health care to all incarcerated persons, as this subset seeks.

[7] (Exh. 1, p. 5) Plaintiffs do not indicate who will create or select the subset or what the selection criteria may be. Nor do they provide any authority for requiring Defendants to create a document for them to use in selecting inmates to secretly interview. As phrased, this portion of the Motion would require the creation of seven separate lists for each of the six facilities. The information gathering process would be time consuming, and the results would not include all information sought.

g.  Documents listing the duration of ISOLATION for INCARCERATED PERSONS.

Plaintiffs' request does not end there.  They also ask for unfettered access to RIDOC's system of electronically stored medical records, and an employee who can assist them in meandering through that system.  (Exh. 1, pages 2-4)

In support of the breathtaking scope of their request, Plaintiffs rely in large part on incomplete, unsworn statements offered by persons designated as experts in other matters and in unknown circumstances. The partial "declarations" refer the reader to other, unnamed cases where they claim they had access to inmates.  None of those statements indicate that they were offered during a discovery dispute, were pre or post class certification, or whether there was an agreement.  These few pages are not helpful or of legal significance and Defendants urge this Court to disregard them in their entirety.

On September 22, 2021 Defendants objected to the unbounded nature of the Plaintiffs request.  That Objection was based on the lack of a provision in the Rules to support the inspections and interviews of documents and people demanded by the Plaintiffs, as well as on relevance, privacy and proportionality grounds.    (Defendants' Objection, Exh. 4)    The parties had a discovery dispute conference with the Court on December 20, 2021.  No consensus was reached, and the instant Motion followed on March 15, 2022.  Plaintiffs have submitted a wildly general proposed order (to which Defendants object) to this Court proposing to allow:

1. Inspection of all locations requested by Plaintiffs' experts;

2. Cell-front and out-of-cell confidential interviews with incarcerated persons;

3. Interviews with correctional and mental health staff in the presence of defense counsel;

4. Review of records, including Electronic Health Records, as requested by Plaintiffs' experts; and

5. Provision of requested lists and rosters prior to the Inspection.

(Plaintiff's Proposed Order, ECF No. 61)

Before discussing the disagreements between the parties, the Court should be aware that Defendants have agreed to numbers 1-6 below for the facility inspections that comply with the discovery rules and that would result in the exchange of reliable, probative information. The Defendants suggest the remainder should apply during any inspection:

1.    A guided tour would be provided to Dr. Metzner, Prof. Horn and Defendants' expert(s) collectively through Restrictive Housing cells and recreation areas in the following facilities:

    •    The Anthony P. Travisono Intake Service Center (ISC)[8];
    •    The Gloria McDonald Women's Facility;
    •    The High Security Center (HSC);
    •    The Maximum Security facility; and
    •    The John J. Moran Medium Security Facility

2.    Cells in which incarcerated persons are housed during Constant Observation, Crisis Management Status, or Psychological Observation occur in the following facilities:
    •    The Anthony P. Travisono Intake Service Center (ISC);
    •    The Gloria McDonald Women's Facility;
    •    The High Security Center (HSC);
    •    The Maximum Security facility; and
    •    The John J. Moran Medium Security Facility

3.    The Residential treatment Unit ("RTU");

4.    Clinical space available for mental health care in the following facilities:
    •    The Anthony P. Travisono Intake Service Center (ISC);
    •    The Gloria McDonald Women's Facility;
    •    The High Security Center (HSC);
    •    The Maximum Security facility; and
    •    The John J. Moran Medium Security Facility

---

[8] It is imperative to note that ISC is the equivalent of a state-wide "jail" housing mostly pre-trial detainees. Rhode Island operates an unusual, unified correctional system, meaning that its municipalities do not operate jails. For this reason, Plaintiffs' "statistics" concerning suicides at RIDOC are misleading, as they encompass suicides in the prison setting, and in what amount to 38 municipal jails. *Plaintiff's Memorandum* at 15.

5.     The intake processing area of the The Anthony P. Travisono Intake Service Center (ISC);

6.     Should the Plaintiffs' experts desire a photograph of any part of #1-5, they would make the request for a photograph to the designated RIDOC representative on the tour and a photograph will be taken. RIDOC will examine the photograph to ensure confidentiality and security have not been implicated and, if not, will produce to the Plaintiffs. RIDOC does not agree to include any inmate or employee in a photograph. The RIDOC cannot agree to take pictures of inmates in their Restrictive Housing or CMS/psych obs status cells. Should the photograph requested implicate security concerns, the photograph can be taken and the release of it to Plaintiffs' counsel and experts be discussed or litigated thereafter. Should a picture be taken that happens to include an inmate, their face, etc. will be redacted or blurred to protect their privacy.

7.     There should be no interviews of inmates allowed.

8.     Plaintiffs should be allowed no more than two attorneys and their two experts.

9.     No electronic devices should be allowed into any facility.

10.    There should be no splitting into sub-groups to go in different directions during the tours.

11.    Defendants will allow a review of logbooks in use on the day of the tour(s) with identifying information covered.

12.    Defendants will provide designated RIDOC employees to answer very basic questions about the operations and physical layout of the various facilities, subject to the objection and instructions of defense counsel, much like a jury view.

13.    There must be a firm schedule in place for each facility that must be followed by Plaintiffs' experts and counsel. No tour should occur during critical times during the day, such as counts, shift changes or chow. The time spent in each facility should be a maximum of 3 hours per facility.

As will be discussed below, Defendants do not agree, and vehemently object to, creating any documents for the Plaintiffs or allowing them access to documents concerning non-Plaintiff inmates; to accessing the electronic medical records system in any way; to questioning or

interviewing any RIDOC staff, including mental health staff; or to speaking with any inmates at any time during the tours. Defendants object to any requests discussed in Plaintiffs' Memorandum that were not contained in their original Motion, such as access to the control centers in any facility. (Declaration of Rui Diniz, Exh. 2).

Finally, Plaintiffs opened the door to an examination of the resources of the respective parties that cannot go without remark. *See, Plaintiffs' Memorandum* at 18-19. This argument is disingenuous and highlights Plaintiffs misunderstanding or mischaracterization of the relative resources and function of the parties and their counsel. First, although the Attorney General represents RIDOC, that office has many other functions, of which this Court is well aware. Plaintiffs compare the Attorney General's office to DRRI, not a fair comparator at all, since counsel in this case come not only from DRRI, but also the ACLU's National Prison Project and the law firm of Nelson, Mullins. The budgets of the Attorney General and the Plaintiffs' representatives are not even close. The NPP falls under the umbrella of the ACLU, with its affiliates in every state and Puerto Rico. As reported on their website, the ACLU's "Gross Receipts" for the year 2020-2021 of $264,334,256 far outweigh anything available to the Defendants. According to its website, the law firm of Nelson, Mullins, representing the Plaintiffs, has 925 attorneys in 31 locations. According to its website, DRRI has fourteen staff members. Plaintiffs' resources would clearly allow them to take depositions that they feel are necessary to advance their case and these expert tours need not strain Defendants' limited resources at RIDOC facilities in order to obtain information of questionable reliability.

**THE FEDERAL RULES PROVIDE FOR THE INSPECTION OF PREMISES, THE EXAMINATION OF PERSONS, THE PRODUCTION OF DOCUMENTS, AND THE GATHERING OF SWORN TESTIMONY FROM WITNESSES. THERE IS NO MECHANISM FOR COMBINING THE METHODS OF INFORMATION GATHERING, NOR SHOULD THERE BE.**

Plaintiffs' Motion to Compel implicates several discovery rules. Plaintiffs do not address why they should be allowed to skirt or combine any of these rules. Their argument seems to be that their method has been employed before, so they should be allowed free reign of RIDOC, its employees and those committed to its care, custody and control. For many reasons, their overly broad and unsupported request should be rejected.

Rule 26 requires that discovery be "relevant to any party's claims or defense and proportional to the needs of the case" and cautions that "the burden or expense of the proposed discovery" cannot "outweigh[] its likely benefit." Fed. R. Civ. P. 26(b)(1). Discovery must be proportional to the needs of the case, and the courts are guided by the non-exclusive list in Rule 26(b)(1).[9] "'Any application of the proportionality factors must start with the actual claims and defenses in the case, and a consideration of how and to what degree the requested discovery bears on those claims and defenses.'" *Bartolotti v. Gracepoint,* No. 8:19-cv-1072-T-24AAS, 2020 U.S. Dist. LEXIS 32733 *6 (M.D. Fla. Feb. 26, 2020) (citations omitted).[10] On a motion to compel discovery, "it is incumbent upon the moving party to provide the necessary linkage between the discovery sought and the claims brought and/or defenses asserted in the case." *Cameron v. Menard*, 2021 U.S. Dist. LEXIS 125565 *26 (D. Vt. July 6, 2021)(rejecting request for wide-

---

[9] The court considers these factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1).

[10] As argued in detail in Defendants' Objection to Motion to Compel (ECF 53), this case is about inmates who have been designated SPMI and their placement and treatment in restrictive housing. Defendants incorporate their arguments against that Motion into this one, as any decision on that Motion will impact this one.

ranging inspection of prison facilities and file of non-party inmate based on the Second Circuit's "longstanding recognition that inmates have a constitutional right to privacy protecting against unwarranted disclosure of their medical records and other sensitive information."). One court rejected an expansive inspection request of a secure federal courtroom, noting that a "heightened showing of relevance [is] required to enter secure premises or to inspect 'areas or equipment within Defendants' control that are used for security purposes,' including the control room when the relevant information may be obtained through less intrusive means." *Abadia-Peixoto v. United States Dep't. of Homeland Security,* No. CV 11-04001 RS (KAW), 2013 U.S. Dist. LEXIS 98578 (N.D. Cal. July 12, 2013). "Since entry upon a party's premises may entail greater burdens and risks than mere production of documents, a greater inquiry into the necessity for inspection would seem warranted." *Belcher v. Bassett Furniture Indus., Inc.*, 588 F.2d 904, 908 (4th Cir. 1978). Rule 26 "vests the district court with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit." *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 361 (8th Cir. 2003).

To begin, Rule 26 provides the limits applicable to all discovery, and those limits are presently the subject of a Motion to Compel (ECF 43) pending decision by this Court. Much of what should be allowed during the proposed inspection will be shaped by what this Court decides is relevant. Most applicable will be whether Plaintiffs' newly articulated theory that not enough inmates are designated as SPMI has been pled or is relevant to the instant action.[11] Their request to review the medical records and history of present and former non-plaintiff inmates and to interrogate random inmates in secret for an unlimited length of time will be impacted by the

---

[11] For example, Plaintiffs' request that RIDOC create a list of inmates who currently are prescribed psychotropic medications will be impacted. (Exhibit 1, p. 3) As this Court knows, Defendants have produced pharmacy lists, and object to creating and providing broader lists.

Court's decision. Defendants maintain that any inquiry into non-Plaintiff inmates is simply not relevant or proportional to the needs of this case.

As for interviews of staff and inmates, Rule 30 explains how testimony from witnesses may be obtained during the discovery process—by deposition. There is a specific procedure for obtaining information from an organization—Rule 30(b)(6). Plaintiffs have not explained why this tried and true method with its procedure and safeguards cannot be utilized in this case.

Rule 33 sets out the procedure for obtaining information from a party via Interrogatories. Each of the seven Plaintiffs has propounded Interrogatories, and have received sworn answers, along with objections.

Rule 34 provides for the exchange of documents and, most importantly for the instant Motion, entry upon and inspection of premises. It provides:

A party may serve on any other party a request within the scope of Rule 26(b):

(2) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

A request for in-person inspections, especially of a correctional facility, require increased scrutiny, as such an event places a burden on RIDOC and its staff due to the undeniable disruption of facility operations. (Declaration of Rui Diniz, Exh. 2) In *Belcher,* 588 F.2d at 908, the Fourth Circuit Court of Appeals recognized that "a greater inquiry into the necessity for inspection" was warranted because "entry upon a party's premises may entail greater burdens and risks than mere production of documents." Accordingly, "the degree to which the proposed inspection will aid in the search for truth must be balanced against the burdens and dangers created by the inspection." *See also Cody v. City of St. Louis,* No. 4:17-cv-2707-AGF,

2019 U.S. Dist. LEXIS 188923 at *3 (E.D. Mo. October 31, 2019) ("[p]hysical inspections are more burdensome and intrusive than other forms of written discovery").

All RIDOC facilities are secure facilities that must operate on strict and defined schedules. An in-person tour, especially with numerous outside attendees, requires RIDOC personnel to increase security precautions, including additional attention to all attendees of the tour as well as the inmates along their way. This is true inside the residential areas, but even more so in the recreational yards that Plaintiffs have requested to visit. Given the COVID protocols and staffing issues, the Court should be wary of allowing Plaintiffs the ability to depart from a carefully crafted agenda.

Finally, Rule 35 allows for they physical and mental examination of parties. It appears that Rule 35 would apply to interviews of non-party inmates and would require leave of Court, not indiscriminate, random conversations:

> The court where the action is pending may order a party whose mental or physical condition—including blood group—is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody or under its legal control.

> In short, there is no rule, and no combination of rules, that would allow for the type

of roaming evidence gathering proposed by the Plaintiffs.

## PLAINTIFFS ARE NOT ENTITLED TO THE CREATION OF DOCUMENTS, NOR ARE THEY ENTITLED TO UNFETTERED ACCESS TO MEDICAL AND MENTAL HEALTH RECORDS

As set out above, Plaintiffs' Request for Inspection asks Defendants to create several "lists" from which they will pluck inmates to interview privately. Much is wrong with that request. First, while a party is obliged to produce documents in their possession, the federal rules do not obligate a party to create a new document. *Rivot-Sanchez v. Warner Chilcott Co.,* 707 F.Supp.2d 234, 259

(D.P.R. 2010). Defendants have consistently opposed providing *carte blanche* access to all inmate medical records to the Plaintiffs. *See, Defendants' Memorandum in Support of their Objection to Plaintiffs' Motion to Compel*, ECF 53-1.[12] As explained in the Declaration of Dr. Pauline Marcussen, there are over 50,000 inmate medical records kept on RIDOC's EMR system, encompassing myriad physical and mental health concerns. The medical records may also contain information about an inmate's family history and family member's medical conditions. Giving Plaintiffs the power to enter and review medical records as they wish would violate a number of state and federal laws and policies.

Next, discovery in this case has already yielded the relevant information that would be contained in any such "list", or an objection has been lodged. Specifically, Plaintiffs want Defendants to create the following lists for each facility:

    a.   *INCARCERATED PERSONS who currently are prescribed psychotropic medications, including for each incarcerated person the mental health diagnoses and the medication and dosages.* (Exh. 1, p. 3) Plaintiffs' Second Request for Production No. 102 sought pharmacy lists, which were produced in the form they are kept by RIDOC. Defendants have objected to the breadth of this Request, and that issue is pending with the Court. The pharmacy lists do not provide the mental health diagnoses for each inmate. That would necessitate a cross-referenced review of each inmate's medical record by a DOC staff member with access to the EMR system.

    b.  *INCARCERATED PERSONS who currently are on the mental health caseload, INCLUDING for each incarcerated person the mental health diagnoses.* (Exh. 1, p.

---

[12] Defendants rely on their arguments made in that Memorandum regarding the relevant scope of discovery and the confidentiality concerns as if fully set forth herein.

3). Defendants have previously objected to the term "mental health caseload" as used by the Plaintiffs in their Request for Production. Defendants have provided the Plaintiffs with an accurate definition for use on a going forward basis, as Plaintiffs' definition did not accurately reflect how RIDOC provides mental health care. Plaintiffs' Second Request for Production, No. 100 asks for "the patient roster [whatever that is] for each prisoner on the mental health caseload [not defined] including name, number, diagnosis, and list of medications **one week prior to each of Plaintiffs' experts' Rule 34 inspection."** (emphasis added). As with other requests, Defendants have objected to the breadth and relevance of this request and assert confidentiality concerns.

c. *INCARCERATED PERSONS in ISOLATION who have mental health diagnoses, INCLUDING for each incarcerated person the mental health diagnoses.* Defendants have provided monthly spreadsheets listing SPMI inmates in restrictive housing for 2018 and 2019 in response to Requests no. 49, 70 and 74. These lists do not reflect non-SPMI inmates with a "mental health" diagnosis, and Defendants have objected to the breadth of that request.

d. *INCARCERATED PERSONS who were placed on Constant Observation, Crisis Management Status, or Psychological Observation in the last year.* Plaintiffs have not requested documents on these issues. Defendants object, as these statuses are not at issue in this case, and the request implicates serious privacy concerns. This inspection request should not be allowed to supplement Plaintiff's document production requests.

e. *INCARCERATED PERSONS who were admitted to outside hospitals and emergency rooms in the last two years as a result of self-harm.* Plaintiffs requested this

information in Request no. 45. As Dr. Marcussen explains, this information is not kept in a manner that could be produced to the Plaintiffs, and especially not on the fly.

f. *INCARCERATED PERSONS who were admitted to any inpatient mental health facility in the last two years.* See response to "e," above.

g. *Documents listing the duration of ISOLATION for INCARCERATED PERSONS.* This list would not be relevant, as it is not limited to SPMI inmates, or even mentally ill inmates. The SPMI restrictive housing lists produced to the Plaintiffs and referenced in "c" above show the duration of confinement.

In its objections aimed at protecting the confidentiality of inmate records DOC has relied on numerous federal and state laws and policies in place to protect the confidentiality of patient and inmate healthcare and incorporate those arguments herein. Dr. Marcussen explains the safeguards in place before anyone can utilize the EMR system. (Declaration of Dr. Pauline Marcussen, Exh. 5). Plaintiffs' request asks RIDOC to abandon those processes for no good reason.

Incorporating their earlier arguments, Defendants believe that an unrestricted review of medical records or other records specific to medical or mental health status of non-Plaintiffs should not be subject to review by Plaintiffs' counsel or experts. Since Plaintiffs have their own records, as well as the records of identified constituents, there is no need for access to RIDOC's EMR system.

## PLAINTIFFS ARE NOT ENTITLED TO INTERVIEW RIDOC EMPLOYEES OR TO INTERVIEW OR PHOTOGRAPH OR OTHERWISE RECORD INMATES

To the extent that the Court allows in-person inspection and facility tours, RIDOC vehemently opposes Plaintiffs' plan to randomly interrogate RIDOC staff and inmates. Neither

staff nor inmates are "land[s]", "object[s]", or "property" that a Plaintiff may "inspect, measure, survey, photograph, test, or sample…". Rule 34(a)(2). Rule 34 does not permit Plaintiffs to conduct "roving depositions," disregarding the procedural safeguards set forth in Rule 30, which are geared toward accuracy and reliability. *See, e.g., Belcher,* 588 F.2d at 907 (finding that the danger that "interrogation of the employees [during a Rule 34 site inspection], conducted informally" could amount to "a roving deposition, taken without notice, throughout the [facilities], of persons who were not sworn and whose testimony was not recorded, and without any right by the defendant to make any objection to the questions asked" outweighed the benefits to the litigation); *Curry v. Goodman,* 2003 U.S. Dist. LEXIS 17861, at *1(D. Conn. 2003)("The visit shall be limited to measurements and observations and is not to be treated as a hybrid visit/deposition. If plaintiff wants to question managerial personnel, questions will be presented through formal discovery mechanisms."). In *Belcher* the district court permitted a party's request that its expert have the right to roam through a manufacturing facility, to stop when he chose and for how long it suited him, and to make such inquiries as he deemed appropriate of any supervisors or employees in the area. *Belcher,* 588 F.2d at 906. The Fourth Circuit reversed, holding that the trial court had abused its discretion in granting such a request, finding that it was burdensome, prejudicial, and that the requests only sought to circumvent the safeguards provided in Rule 30. *Id.* at 907. As in *Belcher*, the instant request for interviews should be denied because the same concerns apply—serious safety and security hazards, interference with operations at secure facilities operating on rigid schedules, and that "roving depositions, taken without notice, throughout the [facilities] of persons who were not sworn and whose testimony was not recorded, and without any right by the defendant to make any objection to the questions asked[,]" needlessly circumvent Rule 30. *Id.* at 907.

RIDOC believes that interviews of staff will in essence become a series of unsworn depositions conducted outside of the protections offered by Rule 30 and is concerned that interviews of inmates will result in any number of issues, including the rights of inmates with pending cases (as RIDOC is a unified facility housing "awaiting trial" inmates as well as sentenced inmates) or discipline incriminating themselves in some way, without their attorney present. As for inmates with mental illness, having strangers sit down to discuss their diagnoses and treatment would not result in credible and probative evidence,[13] and could also actually harm the inmate's mental state, as has happened. (Declaration of Caitlin Bouchard, Exh. 6). It is also unclear how informed consent could be obtained in such a setting, especially with mentally ill inmates.

Exhibit 5 to the instant motion appears to be a portion of a declaration of Dr. Homer Venters offered in *Malam v. Adducci*, No. 5:20-cv-10829-JEL-APP (E.D. Mich). Dr. Venters was also an expert in *Chunn v. Edge,* No. 1:20-cv-01590, 2020 U.S. Dist. LEXIS 67896 (E.D.N.Y. Apr. 15, 2020)*.* In Exhibit 5, Dr. Venters describes a process specific to *Malam* that he claims allowed interviews. He did not mention his involvement in *Chunn,* or that he was *not* allowed free ranging inmate interviews there. The court in *Chunn* restricted facility tours in the way that RIDOC is suggesting, refusing to compel the Defendant Warden of the Metropolitan Detention Center in Brooklyn to permit Plaintiffs' expert and counsel to conduct interviews of correctional

---

[13] In the Motion to Compel that is currently under advisement with this Court, Plaintiffs provided several Declarations of inmates who swore to their diagnoses and medications received. For the most part, they were incorrect about their diagnoses, their medications, or both. Since the informal interviews will ostensibly be used as a basis for a later expert opinion, the RIDOC will have to review all records of whatever inmate the Plaintiffs choose to speak with. Reliability is a concern of the Defendants, since Rule 702 of the Rule of Evidence requires that expert testimony should be not only "relevant, but reliable." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). It is anticipated that these informal discussions will do nothing but generate questionable testimony and opinions that will not advance this case one bit. *See also Belcher* ("[a]ny opinions gathered by the expert through such one-sided questioning…would consist in large part of unsubstantiated hearsay").

staff during an inspection, in part because "attempts to interview[] staff who are on duty during petitioners' inspection would risk unduly burdening [facility] operations during a crisis." *Id.* at *1.[14] This is yet another reason to disregard the cherry-picked snippets of declarations from other cases—in addition to being incomplete, they omit significant truths.

Most instructive to the instant motion is the reasoning of *United States v. Territory of the Virgin Islands*, 280 F.R.D. 232 (D.V.I. 2012), an action brought by the United States pursuant to the Prison Litigation Reform Act. During the discovery phase of that case, the United States proposed to interview staff members of a correctional facility during an inspection, relying on Rule 34. The facility objected, raising the same arguments RIDOC has in response to the present motion. In rejecting the proposed informal interviews, that Court first noted that Rule 30, governing depositions, requires notice to be given to the deponent, the recording of the deposition, and an oath or affirmation that the deponent's testimony be truthful. The court noted that Rule 34 did not permit Plaintiff to "*carte blanche* conduct an untailored survey of the staff at [the facility], especially without the protections afforded by procedures provided in Rule 30 depositions designed to help promote accuracy and reliability." *Id.* at 237. The Court specifically noted that Plaintiff "could recast any number of far-reaching inquiries as falling within" the proposed line of questioning, creating the same danger of "roving depositions" rejected in *Belcher. Id.* at 232. Rule 30 also provides for objections to be lodged on the record, the opportunity to assert privileges, and would allow the deponent to review the testimony to ensure accuracy. In the case of litigation involving an organization, the Court noted that Rule 30(b)(6) provides a defendant

---

[14] *Chunn* allowed inspection, but not interviews of staff (based on part on failure to comply with *Touhy* regulations). In any event, "attempts to interview…staff who are on duty during petitioners inspection would risk unduly burdening MDC operations during a crisis." *Id.* at 4. As to the interview of inmates, the Court instructed the parties to confer only after the federal public defender gave consent to speak with their clients.

with a measure of control over who is authorized to speak on behalf of the entity.  In agreeing with Defendants that they were not "required to permit Plaintiff to conduct such questioning of their staff, particularly in light of the potential lack of reliability, resulting from Plaintiff's proposed informed and broad-sweeping questioning," the Court instructed:

> As a threshold matter, Rule 34(a)(2) of the Federal Rules of Civil Procedure—the authority upon which Plaintiff predicates its request does not entitle Plaintiff to interview Defendants' staff during an inspection.  Instead, the rule states that a party may serve on another party a request to enter land or property to 'inspect, measure, survey, photograph, test or sample the property or any designated object or operation on it."  Fed.R.Civ.P. 34(a)(2).  While Defendants are not at liberty to refuse the on-site visit pursuant to Rule 34(a), nothing in the rule requires Defendants to provide Plaintiff with access to interview its staff.

*Id.* (Citation omitted)

That Court rejected the notion that Rule 34 allowed what the Plaintiffs here propose: "Considering that Rule 34 does not vest Plaintiff with an entitlement to informally interview Defendants' staff members, and given the dual concerns of overbreadth and unreliability, the Court rejects Plaintiffs' Motion [to Compel Entry Upon Land]".  *Id.* at 237.

Plaintiffs cite a good many cases for general propositions that Defendants agree with, or cases where "interviews" of staff and inmates are referenced, but not discussed.  *See, e.g., Dupont v. Coyne-Fague,* 384 F.Supp. 3d 225, 227 (D.R.I 2019), cited in *Plaintiff's Memorandum* at 4 (allowing access to inspection and photography/videotaping of two modules in a single facility, with no mention of interviews.  No inspection actually took place as the case settled); *Braggs I,* 317 F.R.D. 634, cited in *Plaintiffs' Memorandum* at 13  (discussing statistical analysis in a *Daubert* challenge); *Dunn,* 163 F.Supp. 3d 1196, cited in *Plaintiffs' Memorandum at 16* (overruling claim of privilege as to certain documents); *Dockery v. Fisher*, 253 F.Supp. 3d 832, cited throughout *Plaintiffs' Memorandum* (not a discovery decision) and so on.  Plaintiffs also rely on *Alvarez v.*

*LaRose,* No. 3:20-cv-00782-DMS-AHG 2020 U.S. Dist LEXIS 171567 (S.D. Ca. Sep. 18, 2020) for the proposition that plaintiff's experts could speak with detainees "who were willing" in a case involving COVID-19 precautions.  What the Plaintiffs do not explain is that *Alvarez* "agree[d] with Respondents that Petitioners' request to speak with criminal detainees confidentially without the consent of their defense counsel 'raises serious attorney-client privilege issues,'" and

> ORDERED [plaintiffs' counsel] to meet and confer with the Federal Defenders to determine whether they consent to interviews of Federal Defenders' clients regarding conditions of confinement at OMDC. Any detainee represented by another attorney may not be interviewed without consent of his or her counsel. *See, e.g., Chunn*, 2020 U.S. Dist. LEXIS 67896, 2020 WL 1872523, at *2 (noting that the Attorney-in-Charge of the Federal Defenders for the Eastern District of New York consented to interviews of the Federal Defenders' clients during the site inspection).  Plaintiffs' counsel herein has offered no solution to the ethical problems posed by their request.

Alvarez v. LaRose, No. 3:20-cv-00782-DMS-AHG, 2020 U.S. Dist. LEXIS 171567, at *36 (S.D. Cal. Sep. 18, 2020)

*Braggs v. Dunn,* 2020 U.S. Dist. LEXIS 186833 (M.D. Ala. 2020 U.S. Dist. LEXIS 186833 Oct. 1, 2020), cited by the Plaintiffs in support of their position, was not a decision issued during a discovery dispute, and was apparently immediately vacated by that court.  When the decision cited by the Plaintiffs was issued, the Defendant had moved to terminate earlier remedial orders entered by the Court, and Plaintiffs countered with an inspection request.  This was not a discovery dispute, as that phase was over.   After vacating its earlier order, the court required the parties to make "every possible effort to develop the necessary evidence of current conditions without on-site inspections." *Braggs v. Dunn,* 2020 U.S. Dist. LEXIS 243278 at *7 (M.D. Ala. Dec. 29, 2020), amended *Braggs v. Dunn,* 2021 U.S. Dist. LEXIS 4438 (M.D. Ala. Jan. 7, 2021).  The issue facing

the Court at that time was the time frame to consider the termination of previous orders, and the extent to which COVID-19 affected any tours. While the Court did initially allow roving cell front confidential interviews, the Defendants withdrew their termination motions and the matter went no further. Also, there was an evidentiary hearing that limited the process and would not have looked like what the Plaintiffs here seek.

Plaintiffs rely on *United States v. Michigan,* 1985 U.S. Dist. LEXIS 15336 (W.D. Mich. October 2, 1985) to support their demand to roam RIDOC's facilities. That decision did not involve the discovery process. Rather, the individual touring prison facilities was a court-appointed independent expert who was to determine compliance with earlier orders after a consent decree had entered. That expert conducted tours without the presence of counsel for either side, reviewed documents of both the state facilities *and* the Department of Justice and answered only to the Court. That decision has no application to this case.

This Court should carefully scrutinize the breadth of Plaintiffs' request. One court examined a request for a prison inspection that contemplated still and video photography, severely curtailing the Plaintiff's request:

> Caselaw places some limits on this type of discovery. In *Keith H. v. Long Beach Unified Sch. Dist.*, 228 F.R.D. 652, 658-59 (C.D. Cal 2005) (citation omitted), the court cautioned, 'Since entry upon a party's premises may entail greater burdens and risks than mere production of documents, a greater inquiry into the necessity for inspection would seem warranted." Similarly, in *De Abadia-Peixoto [v. U.S. Dep't of Homeland Sec.,* Case No. CV 11-04001 RS (KAW), 2013 U.S. Dist. LEXIS 98578, 2013 WL 3555668, at *3 & n. 1 (N.D. Cal. July 12, 2013], 2013 U.S. Dist. LEXIS 98578, 2013 WL 3555668 at *2 (emphasis added)…the court stated that a 'heightened showing of relevance [was] required to enter secure premises or to inspect 'areas or equipment within Defendants' control that are used for security purposes.'' In another case, the court dealt with inspecting and photographing prison cells. *See, Silverstein v. Fed. Bureau of Prisons*, Civil Action No. 07-cv-02471-PAB-KMT, 2009 U.S. Dist. LEXIS 47646, at *12 (D.Colo. May 20, 2009)(requiring the defendants to produce photographs and diagrams of cells, which they previously agreed to do in their discovery response).

*Soler v. Cnty. Of San Diego*, 2016 U.S. Dist. LEXIS 82614 (No. 14cv2470-MMA (RBB), at *10. *Soler* allowed still photography of cells, but not videography, finding that the "burden and disruption of a video and audio inspection and recording outweigh the benefits to the Plaintiff," reasoning that "protecting the privacy of inmates and jail staff is a concern," and that Defendants had raised "legitimate safety and security considerations." *Id.* at *11-12.

*Bortolotti v. Gracepoint, supra,* denied interviews of the kind sought here in the healthcare context, finding that "[d]isrupting the routine of the patients puts an enormous burden on the Defendants and also implicates many privacy laws in exchange for what little (if any) benefit the inspection has to [Plaintiff's] case." *Id.* at *8. In summary, the law is not as clear as Plaintiffs assert—indeed, Courts far and wide have been extremely cautious when deciding Rule 34 motions seeking to enter and inspect prisons and medical facilities. As RIDOC has both, the Court should deny the request as made by the Plaintiffs.

"[T]he purpose of pretrial discovery 'is to make trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable intent.'" *Macaulay v. Anas,* 321 F.3d 45, 53 (1st Cir. 2003). No discovery rules contemplate secret interviews, especially of mentally ill non-parties. The confidentiality concerns are staggering, as are the security implications. Such a procedure would implicate staffing allocations and could impact the inmates' constitutional rights. Finally, unfamiliar people confronting mentally ill inmates (many with trust issues) can have an adverse effect on their well-being. Two real-world examples are discussed in the Declaration of Caitlin Bouchard (Exh. 6; Report, Exh. 8).

Additionally, since grievances have been mentioned in Plaintiffs' Complaint, it is not outside the realm of possibility that inmates would be asked about grievances that they have filed,

their progress and outcomes. In response, an inmate may discuss their version of the grievance and the facts that support it. Some inmates may make incriminating statements regarding the grievances (or even worse, a crime) which may be under an active investigation. Plaintiffs know of this concern—first raised by the Court on December 20, 2021--and have not addressed it.

Plaintiffs rely on *Jama v. Esmor Corr. Svcs.,* No. 97-3093 (D.N.J. 2007), 2007 WL 1847385 and *Braggs v. Dunn*, 317 F.R.D. 634, 651 (M.D. Ala. 2016) ("Braggs I")*.* Neither is helpful in this instance, and they had nothing to do with the scope of inspection under Rule 34, or indeed any discovery-related issues. Rather, both cases took up *Daubert* challenges to expert opinions based on the adequacy of sample sizes in statistical analysis. *Jama*, to the extent that it has any application at all, allowed an expert opinion that was based on 79 medical request forms, *all submitted by the nine plaintiffs in that action.* In rejecting a challenge that the 79 was too small a size given the roughly 1600 inmates, that Court indicated that was a "weight" issue, and not a bar to admissibility.

Nor does *Braggs I* help here, as it too was a decision made after the close of discovery. The portion that the Plaintiffs cite is a partial sentence reflecting the fact that a challenged expert had based her opinion in part on "chart reviews and interviews with and observations of prisoners." *Braggs I* at 651. Defendants and the Court are left to guess under what circumstances and what limitations these interviews and observations took place.

Plaintiffs incorrectly read *Amos v. Taylor*, 2020 WL 618824 (N.D. Miss. Feb. 10, 2020), as one of the few cases where a plaintiff's expert was precluded from interviewing incarcerated people, shrugging it off as an "outlier" and "poorly reasoned." *Plaintiffs' Memorandum,* p. 28. To the contrary, *Amos* weighed the arguments of both sides and reached a workable balance. There, as here, the parties (inmates versus the Mississippi State Penitentiary at Parchman) disagreed on

the scope of an inspection during the height of the Covid-19 pandemic. The Plaintiffs demanded multiple days for their seven experts to view a wide range of facilities, to videotape their tours, and to interrogate, examine, diagnose and provide medical treatment to inmates. Recognizing the security concerns and declining to allow "roving depositions," *Amos* allowed pared down tours at the pre-class certification stage, with no interviews, videography or medical evaluations of non-party inmates. That is not "poorly reasoned," as Plaintiffs argue. That is a balancing of the needs and interests of the parties and the litigation.

The court in *EEOC v. Vicksburg,* 3:13-cv-895-KS-MTP, 2015 U.S. Dist. LEXIS 52812 (D. Miss. Sept. 22, 2015), denied a request for a walk-through inspection of a medical center in an employee discrimination case, recognizing that "the right to inspect under Rule 34 'has ultimate and necessary boundaries. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed. 2d 253 (1978).'" In rejecting the Plaintiff's request to inspect, the court noted that where "burdens and dangers" that would accompany the inspection outweigh the degree to which it will aid in the search for the truth, the inspection would not be permitted." *Id.* at *9. That court was "convinced that the possible disruption of patient care and the risk of compromising patients' rights to confidentiality are significant concerns" and therefore did not allow "roving depositions" of staff, or of any observation of the facility that might implicate patients' confidential information. *Id.* at *12

Finally, as highlighted in the Declaration of Dr. Joseph Penn, Exh. 7, the Request for Inspection is short on particulars, and neither the Defendants nor the Court are obliged to provide limits to an otherwise unreasonable request. Plaintiffs' request "is so broad and all-encompassing that its utility is outweighed the dangers posed by the breadth of the questioning and the abandonment of the Rule 30 procedural safeguards." *Virgin Islands*, 280 F.R.D. at 237.

**PAIMI DOES NOT CONFER "SUPER-PLAINTIFF" STATUS ON DRRI**

Contrary to Plaintiffs' assertions, DRRI's PAIMI status simply does allow DRRI unfettered access to RIDOC's records, facilities, and inmate population.

The statute authorizing access to records "grants [DRRI] authority to investigate incidents of abuse of 'individuals,' not general operations." *Disability Law Ctr. v. Discovery Acad.*, No. 2:07-cv-755 CW, 2010 U.S. Dist. LEXIS 410, at *8 (quoting 42 U.S.C. § 10805(a)(4)(B)). Section 10805(a)(4)(B) provides that a PAIMI Protection and Advocacy System ("P&A") shall have access to all records of–

> (B) any **individual** (including an individual who has died or whose whereabouts are unknown)–
>
> (i) who by reason of the mental or physical condition of **such individual** is unable to authorize the system to have such access;
>
> (ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
>
> (iii) **with respect to whom a complaint has been received** by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is **probable cause to believe that such individual** has been subject to abuse or neglect[.]

§ 10805(a)(4)(B) (emphasis supplied). The language of the statute is clearly focused on "the protection of individuals for whom there is either a complaint or a finding of probable cause to believe 'such individual' has been subjected to abuse." *Discovery Academy*, 2010 U.S. Dist. LEXIS 410 at *10 (quoting § 10805(a)(4)(B)). There is "[n]othing in the statute to suggest a general investigative power absent reference to an identified individual." *Id.* The scope of a P&A's access under PAIMI is constrained for a very important reason—"to avoid warrantless searches that are otherwise prohibited by the Fourth Amendment." *Id.* This is precisely why PAIMI access

to conditioned on either a complaint or a finding of probable cause with respect to a specified individual. *See id.* In this context, probable cause is defined as

> reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect. The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.

42 C.F.R. § 51.2 (2009). The P&A's probable cause finding must be supported by facts pointing to the abuse of a specific individual. *See Charlotte-Mecklenburg Bd. of Educ. v. Disability Rights of N.C.*, 430 F. Supp. 3d 74, 83 (W.D.N.C. 2019) (granting summary judgment for school district on declaratory judgment claim that school district not required to provide requested records because P&A failed to provide sufficient factual basis to support probable cause determination).

Here, Plaintiffs' argument that DRRI's PAMI status essentially gives it authority to inspect any and all of RIDOC's records (about present and former non-SPMI, non-Plaintiff inmates) that it sees fit on the spot while touring RIDOC's facilities is belied by the plain language of Section 10805(a)(4)(B). To begin, Plaintiffs fail to identify a single inmate who has lodged a complaint against RIDOC thus necessitating a review of that inmate's records with the exception, of course, of the named Plaintiffs. Plaintiffs, however, already possess all records relevant to the named Plaintiffs—including, but not limited to, custodial records, medical records, grievance files, disciplinary files, and use of force reports—which were turned over in discovery pursuant to Rule 34(a)(1)(A). Further Plaintiffs do not even attempt to establish probable cause to believe that a particular inmate or inmates are being subjected to abuse or neglect. Absent such a showing, DRRI cannot invoke PAMI to gain access to RIDOC records. *See* §10805(a)(4)(B); *see also Charlotte-Mecklenburg Bd. of Educ.,* 430 F. Supp. at 83; *Discovery Academy*, 2010 U.S. Dist. LEXIS 410 at *13 (dismissing P&A's complaint seeking full and immediate access to residents of residential

facility and their records because P&A failed to provide factual or evidentiary support for probable cause determination); *Ohio Legal Rights Servs. v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 887 (S.D. Ohio 2005) (denying P&A's request for records where no evidence that P&A had determined there was probable cause to believe abuse or neglect had occurred at time requests were made). Consequently, Plaintiffs clearly have not met the requirements of PAIMI and, as such, Plaintiffs cannot gain access to records or inmates solely on the basis of DRRI's PAIMI status.

**CONCLUSION**

Defendants respectfully request that the Court deny the Plaintiffs' Request for Inspection as framed by the Plaintiffs, and instead order the tours to go forward under the parameters suggested by the Defendants.

Respectfully submitted,

STATE DEFENDANTS
RHODE ISLAND DEPARTMENT OF
CORRECTIONS, PATRICIA COYNE-
FAGUE, in her official capacity of the
Director of the Rhode Island Department
of Corrections; MATTHEW KETTLE, in
his official capacity as Assistant Director
of Institutions and Operations; and
BARRY WEINER, in his official
capacity as Assistant Director of
Rehabilitation Services,
By:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Brenda D. Baum*
Brenda D. Baum #5184
Assistant Attorney General
R.I. Department of Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 ext. 2294

Fax: (401) 222-2995
bbaum@riag.ri.gov

*/s/ Rebecca Tedford Partington*
Rebecca Tedford Partington, Esq. (#3890)
DESISTO LAW LLC
60 Ship Street
Providence, RI 02903
(401) 272-4442
(401) 533-9848 – fax
rebecca@desistolaw.com

## **CERTIFICATION**

I hereby certify that on this 8th day of April, 2022, the within document was electronically filed and served on all counsel of record via the ECF system and it is available for viewing and downloading to:

| | |
|---|---|
| Maria V. Morris, Esq.<br>Tammi Gregg, Esq.<br>ACLU NATIONAL PRISON PROJECT<br>915 15th Street, N.W., 7th Floor Washington, D.C. 20005-2302 | |
| Anne M. Mulready, Esq.<br>Brian Adae, Esq.<br>DISABILITY RIGHTS RHODE ISLAND<br>33 Broad St., Suite 401<br>Providence, RI 02903 | |
| Patrick T. Uiterwyk, Esq.<br>James S. Rollins, Esq.<br>Nelson, Mullins, Riley & Scarborough LLP<br>One Financial Center Suite 3500<br>Boston, MA 02111 | |

*/s/Rebecca Tedford Partington*